**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | **No. CR 18-01695-TUC-JAS (EJM)** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| David Kapone Williams – 001, Marcell Demetrius Gray – 002, Shawmaine Eustace Ardell Moore – 003, Samuel Lee Berrelle Rakestraw, III – 004, Michael Anthony Williams -005, Keana Nicole Iwankia – 007, Jermaine Lamar Maxwell – 009 Dezirae Alexandria Monteen – 018 | |
| Defendants. | |

Pending before the Court is a motion that defense counsel clearly took no pleasure in having to file; that has annoyed and angered the government; and that this Court loathes having to resolve.  The subject of the Court's musings and distress is a Motion to Disqualify Assistant U.S. Attorney ("AUSA") Adam Rossi from further representation of the government in this case based on prosecutorial misconduct.  (Doc. 2895.)  The motion was filed by counsel for defendant Shawmaine Moore and joined by counsel for defendants David Kapone Williams, Marcell Demetrius Gray, Samuel Lee Berrelle Rakestraw, Michael Anthony Williams, Keana Nicole Iwankia, Jermaine Lamar Maxwell, and Dezirae Alexandria Monteen.

The defendants seek the disqualification of AUSA Rossi based on his: (1) "complicity in the misconduct" committed by defense counsel Jesse Smith; specifically,

Smith's concurrent conflict of interest in representing defendant Monteen and a government cooperator named BR; (2) lack of candor to the Court; and (3) "interference with the Sixth Amendment right to counsel for defendant Monteen and other defendants." In addition to the disqualification of AUSA Rossi, the defendants request the disclosure of all documentation and communications between AUSA Rossi and any AUSA who was made aware of or provided advice on "the conflict issue."  Once this disclosure is made, the defendants believe that an evidentiary hearing will be necessary to determine if any other AUSA should also be disqualified.

The three categories of alleged misconduct committed by AUSA Rossi have substantial overlap.  AUSA Rossi's "complicity" in Smith's misconduct includes: (1) failing to advise Smith at the outset that he had an actual conflict in concurrently representing defendant Monteen and BR; (2) failing to report the actual conflict to the Court at any point and instead allowing Smith to delay reporting the conflict; (3) participating in free talks with Smith and BR while Smith had an actual conflict; and (4) engaging in litigation against Smith in Monteen's case while Smith had an actual conflict. The defense argues that the government's failure to take any action, and instead, assisting Smith in his unethical concurrent representation resulted in Smith favoring BR's rights over Monteen's rights.  AUSA Rossi's alleged lack of candor to the Court is also based on his failure to notify the Court of Smith's actual conflict at any point, including during hearings when AUSA Rossi was litigating pre-trial motions against Smith in Monteen's case after he had an actual conflict.  Relatedly, the defense argues that AUSA Rossi interfered with Monteen's Sixth Amendment right to counsel when he litigated these motions even though he knew that Monteen had a conflicted lawyer who had to withdraw from representing Monteen and BR.

The government first argues that the defendants have not established that they suffered a Sixth Amendment violation or were otherwise prejudiced by the delayed disclosure of Smith's conflict of interest.  (Doc. 2952 at 6-9.)  As a result, the Court should not take the "drastic measure" of disqualifying "one of the original prosecutors who has

been intimately involved in this case since 2017 and who is expected to play" a lead and integral role in four upcoming trials. (Doc. 2952 at 2, 7.) The government also takes the position that it "did not commit misconduct related to Smith's conflict of interest." (Doc. 2952 at 9.) The government maintains that Smith only had a potential conflict of interest for many months, and the government does not have a duty to report potential conflicts to the court. The government appears to acknowledge that it is obligated to report actual conflicts to the court and does not dispute that Smith and AUSA Rossi delayed reporting the actual conflict to the court. However, the government argues that its delay in reporting the conflict is not misconduct because there is no evidence "that the government delayed notifying the Court for its own benefit. Rather, the record establishes that the government acceded to Smith's request to delay notice because Smith had *bona fide* concerns that his prompt withdrawal would lead to BR suffering physical harm." (Doc. 2952 at 11.) The government alternatively argues that "any violation of the professional rules of conduct regarding reporting Smith's conflict of interest was de minimis and does not warrant sanction by the Court." (Doc. 2952 at 12.) The government contends that the allegations of AUSA Rossi's lack of candor are meritless because he delayed reporting the conflict because of a concern for BR's safety. Finally, the government argues that neither an evidentiary hearing nor discovery is warranted based on the record before this Court.

After hearing argument from the attorneys on the Motion to Disqualify, the Court granted the defense request for an evidentiary hearing and later ordered the production of a small amount of the disclosure requested by the defense. At the evidentiary hearing, the defense called two ethics expert witnesses and several current and former AUSAs. The defense did not call AUSA Rossi as a witness because he provided extensive testimony at a prior evidentiary hearing on a related motion pertaining to Smith's conflict. The government did not call any witnesses.

The Court concludes that AUSA Rossi exercised poor judgment on multiple occasions and made a series of uninformed and reckless decisions resulting in constitutional and ethical violations which, in combination, amount to clear and convincing

1    evidence of prosecutorial misconduct.  Specifically, AUSA Rossi violated his duty as a
2    minister of justice by: failing to recognize Smith's obvious and clear conflict of interest
3    when it arose; failing to notify the Court of the conflict at any point; acquiescing in and
4    assisting Smith in his substantial delay in withdrawing from representing Monteen and BR;
5    concealing the conflict from the Court; exploiting the conflict by both conducting free talks
6    of BR and litigating motions in Monteen's case with a conflicted attorney; and his lack of
7    candor to the Court.[1]  Although prejudice or harm need not result from the misconduct for
8    the Court exercise its supervisory powers and disqualify a prosecutor, prejudice to the
9    defendants and the administration of justice been shown.

10        While the actions and inactions of AUSA Rossi are troubling, the Court is also
11   troubled by the lack of supervision and control exercised by those above him.  AUSA
12   Rossi's superiors seem to have been unaware that anything at all was amiss; and his
13   experienced co-counsel (who formally served as a mentor to less experienced AUSAs) left
14   him to deal with this conflict issue (and did not follow-up to make sure that he did so)
15   because she was shortly leaving the employment of the U.S. Attorney's Office.  Frankly,
16   what may be most troubling is that the government has continued to show no appreciation
17   of the seriousness of AUSA Rossi's conduct or display a hint of contrition, other than to
18   begrudgingly acknowledge that AUSA Rossi did not follow "best practices."   The
19   government's three-part strategy has been to minimize and attempt to justify AUSA
20   Rossi's ethical lapses; place the blame solely on Smith; and express outrage at defense
21   counsel for both unfairly impugning AUSA Rossi's reputation and "making a mountain
22   out of a molehill."[2]  This strategy culminates in the government's argument that the Court

23
24   _____
25   [1] To be clear, the Court is not finding or suggesting that AUSA Rossi acted maliciously.
     It seems that he had blinders on and did not have the training, experience, and/or supervision to
     handle the conflict situation appropriately.  For example, AUSA Rossi testified several times that
26   he is not an expert in legal ethics and would rely on people who were smarter than him in that area.
     However, he neither sought advice from those people (whoever they may be) nor looked at the
27   ethical rules that govern conflicts of interest until after he believed the conflict arose, even though
     he was concerned about a potential conflict for six months.

28   [2] The government has also argued that this Court has not afforded AUSA Rossi with any
     due process, let alone the due process that he would receive during a disciplinary proceeding before

- 4 -

need not address or even concern itself with the alleged ethical violations because the defense cannot show prejudice. "Acceptance of responsibility this is not." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). The government's position does not inspire "confidence that this kind of thing won't happen again." *Kojayan*, 8 F.3d at 1324.

The proportionate sanction for AUSA Rossi's failings and the government's cavalier response to those failings is the disqualification of AUSA Rossi from further participation in the prosecution of these defendants. Accordingly, it is recommended that the District Court grant the Motion to Disqualify.

## FACTUAL BACKGROUND

The story that led to the Motion to Disqualify is long, tortured, and frankly, unbelievable. The Court first sets forth the story chronologically using documentary evidence (*e.g.*, emails, pleadings, court records, and transcripts of free talks and court hearings) which were either exhibits to various pleadings or admitted at evidentiary hearings that pertained to the conflict issue raised in the instant motion. The Court then supplements the story with the testimony of the pertinent witnesses.[3]

A. The Charges against Monteen and her co-defendants:

Jesse Smith was appointed to represent defendant Dezirae Alexandria Monteen on October 28, 2020. (Doc. 546.) At that time, Ms. Monteen was charged in a Superseding

---

the Arizona State Bar. The irony of that argument is that the government did not call a single lay or expert witness to defend against the allegations against AUSA Rossi. If the government had looked for and found an ethics expert who believed that AUSA Rossi did nothing wrong, the government surely would have called that expert witness to testify. Moreover, although Firewall Counsel were not representing AUSA Rossi, they acted like they were in terms of making objections and trying to limit the scope of his testimony and the testimony of other witnesses.

[3] The documentary evidence consists primarily of exhibits admitted at the evidentiary hearing on the instant motion, as well as the exhibits admitted at the evidentiary hearing in October 2023 on a Motion for Sealed Hearing Regarding Potential Professional Misconduct Implicating Defendants' Fifth and Sixth Amendment Rights dated April 20, 2022 ("the Potential Misconduct Motion") (Doc. 1518). There are a few exhibits that were attached to a Joint Motion of Certain Defendants for an Order Excluding [BR] as a Witness at the Trials in this Matter ("the Motion to Exclude") (Doc. 2622). The Motion to Exclude did not result in an evidentiary hearing because the motion was denied as moot when the government represented that it would not call BR as a witness at any trial.

Indictment dated October 21, 2020, with the following offenses: (1) a RICO conspiracy, the objects of which include murder, drug trafficking, and obstruction of justice (Count 1); (2) two counts of Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Counts 14 and 17); (3) Conspiracy to Possess with the Intent to Distribute Cocaine (Count 24); (4) Conspiracy to Possess with the Intent to Distribute Marijuana (Count 33); (5) two counts of Possession with the Intent to Distribute Marijuana (Counts 34 and 37); and (6) Possession with the Intent to Distribute Cocaine (Count 38).  (Doc. 537.)[4]

The other defendants who have joined in the Motion to Disqualify are also charged with the RICO conspiracy offense (Count 1).  Defendants David Williams, Marcell Gray, Shawmaine Moore, Samuel Rakestraw, Michael Williams, and Jermaine Maxwell are charged with additional RICO offenses – Conspiracy to Commit Murder and/or Murder (Counts 2 and 3) – and at least one count of Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death (Counts 4 and 9).  (Doc. 1425.)[5]  With the exception of Rakestraw, the other defendants are also charged with drug and/or firearms offenses.[6]

The charges against the defendants are all tied to an alleged criminal street gang known as the Western Hills Bloods ("Western Hills" or "WHB").  The defendants are alleged to be either members or associates of the Western Hills.  The violent offenses stem from a longstanding feud between Western Hills and the Freestones, a rival gang in Tucson, Arizona, and the retaliatory violence committed by members of both gangs.

---

[4] On April 23, 2024, the government filed a Motion to Dismiss Counts 13, 14, 33, and 34 against Monteen and defendant Michael Williams, which was granted by the district court.  (Docs. 3123 and 3140.)  The dismissal of these counts is unrelated to the instant motion.

[5] Maxwell is not charged with the Conspiracy to Commit Murder.

[6] The original indictment is dated August 23, 2018; that indictment also did not allege the RICO conspiracy offense.  (Doc. 3.)  The RICO conspiracy was added to a Superseding Indictment dated October 21, 2020.  (Doc. 537.)  The Second Superseding Indictment dated October 20, 2021, added Bhishm Neal as a defendant, but it did not add charges against the defendants already under indictment.  (Doc. 811.)  The Third Superseding Indictment dated April 6, 2022, did not add defendants or charges; it corrected some "technical issues" and extended the end date of RICO conspiracy to date of the Third Superseding Indictment.  (Doc. 1425.)

On January 15, 2021, Smith and Monteen joined a pre-existing Joint Defense Agreement ("JDA") with counsel for defendants charged in the original Indictment dated August 23, 2018.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 1.)  Current or former counsel for all the defendants who joined the instant motion were JDA members at the time Smith and Monteen joined the JDA.  *Id.*

B. Smith's Communications with Prosecutors after he is Appointed to Represent BR:

On February 5, 2021, Smith was appointed to represent BR, who was charged with an alien smuggling offense.  (Doc. 2, U.S. v. BR, before the Hon. Rosemary Marquez).  On March 18, 2021, Smith sent the assigned prosecutor, AUSA Serra Tsethlikai, an email advising her that BR wanted to do a free talk "on a guy named Bryan who runs things out of Nogales port of entry; Fentanyl, guns and has a stash house in Tucson he claims can identify, set up etc."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 4.)  Smith sent AUSA Tsethlikai another email on April 26, 2021, that provided phone numbers and more detailed information "about the drug and alien smuggling . . . and gang activity that Mr. [BR] can provide[.]"  (*Id.* at 6)

On May 12, 2021, AUSA Tsethlikai and AUSA Rossi had a series of email exchanges.  AUSA Tsethlikai's first email to AUSA Rossi stated:  "I know that you have been working on gang cases.  I have a 1324 D – [BR].  His attorney, D. Jesse Smith, says his client is interested in providing information to federal law enforcement officers."  (*Id.* at 4–5.)  AUSA Tsethlikai's email included Smith's March 18, 2021 email.  Rossi responded that he was interested in talking with BR and asked whether he is released pending trial or in custody.  Tsethlikai sent a response advising Rossi that BR is in custody; fled from law enforcement; and has a criminal history.  She also told AUSA Rossi that she is "not a big fan of free talks but the defense attorney says he has a lot of information."  (*Id.* at 3.)  Rossi responded:  "we do know this guy has at least some access to our cast of characters, and if he's telling the truth it would be immensely helpful."  (*Id.*)

On June 3, 2021, AUSA Tsethlikai sent an email to Smith (copying AUSA Rossi) advising him that although she is not interested in speaking with BR, "AUSA Adam Rossi

and his agent FBI SA David Neill would like to speak with your client." (*Id.* at 7.)  AUSA

Tsethlikai also advised Smith that she is still opposing BR's release from custody and

would appeal a release order.  (*Id.*)

Smith sent AUSA Rossi an email dated June 6, 2021, advising Rossi that BR "is

still willing to do the free talk[.]" (*Id.* at 8.)  He also advised Rossi that BR was accepted

by Community Bridges, but because AUSA Tsethlikai is opposed to BR's release, he "was

going to continue the hearing set for the 15th of June for potential release until after the

free talk." (*Id.*)  AUSA Rossi responded in an email dated June 7, 2021, advising Smith

that BR's free talk was set for June 23, 2021.  (*Id.* at 8.)  Smith responded in an email the

same day and asked Rossi the following question:

> On an entirely different matter (the 18 defendant case) are the photos of the
> gang members from Facebook etc [sic] that were shown to the grand jurors
> exhibits mentioned in the transcript at TPD evidence or somewhere else?  I
> want to view those but did not want to take up space and time at the TPD
> evidence viewing if those photos are not in TPD possession.

(*Id.*)

On June 21, 2021, CAFCC (which is presumably a unit at Core Civic) sent an email

to Deputy U.S. Marshall Alexander, Deputy U.S. Marshall Felton, an unknown recipient

at the email address of TUS.COTRS@usdoj.gov, and many other Core Civic employees,

which stated that a homemade weapon was found in a coffee can that was in a cell that

housed detainees David Williams and BR.  (Evid. Hr'g on the Potential Misconduct

Motion, Def. Ex. 3, Ex. 5, Attach. 5 at 3–5.)  The email further advised that neither detainee

"admitted any knowledge of the weapon." (*Id.* at 5.)

C.  The June 23, 2021, Free Talk:

The free talk with BR was conducted on June 23, 2021.  (Evid. Hr'g on the Potential

Misconduct Motion, Def. Ex. 8.)  Those present were AUSA Rossi, Smith, FBI Special

Agent Neill, FBI Special Agent Wood, and FBI Task Force Officer Alzaga.  The transcript

of the free talk is 166 pages.  After introductions, the ground rules for the free talk were

explained to BR.  In response to Agent Neill's question of where BR would like to begin,

BR stated: "I mean I'm pretty sure y'all looked up when I went to prison and all that. So I mean I don't know where to start. . . . I know a lot of people, you know what I mean, whether it's Freestone, Western Hills. I know everybody. Everybody know me, so . . . whatever y'all wanna know, you know what I'm sayin', so." (*Id.* at 8.)  Agent Neill redirected BR to Bryan, which is the person that Smith referenced in his email to AUSA Tsethlikai. (*Id.*)

The discussion about Bryan and alien smuggling activity continued for 118 pages until Agent Neill asked BR if he wanted to discuss "anything else, like . . . more people with violence[.]" (*Id.* at 126.)  BR responded: "No. I thought y'all was gonna aks [sic] me about, uh, Freestone and all that, Western Hills and all that[.]" (*Id.*)  Rossi asked BR if he knows about "them;" BR asked Rossi if he knows "about that;" and Rossi confirmed that he does. (*Id.* at 126–27.)  BR then said: "Oh yeah. I thought they was gonna ask me about that." (*Id.* at 127.)  Smith chimed in and said: "I think he's prosecuting the – . . . there's about 18 defendants in that case." (*Id.*)  BR told Rossi that he knows "all them dudes." (*Id.*)  Rossi asked BR: "What do you know about that? How do you know about – how do you know them, just in general?"  BR said that he "used to kick it with them," and mentioned Freestone, Shimon, KK, and Big Rodney. (*Id.*)  In response to Rossi's question of whether BR is close with Western Hills, the transcript reflects a partially inaudible response: "(No @ 01:52:42), I'm not in between (that/them?), you know what I mean?" (*Id.*)  BR stated that he hung out with Freestone guys, "know[s] everything," and volunteered to speak with Freestone guys when he got out of custody. (*Id.* at 127–28.)  BR added: "I know Gil. I know all of them, man. Floyd, I know how – I know what's up with Floyd, all that, man." (*Id.* at 128.)  BR also said that he knew Floyd, and added that he also knew Marshall, Mar-K, and "all that shit." (*Id.*)

BR let AUSA Rossi know that the Western Hills guys are "locked up" with him and "they can't do nothin'." (*Id.* at 129.)  Rossi asked if BR has "anything on them that would be helpful for us?" (*Id.*)  BR told Rossi: " I don't wanna speak on the Western Hills, you know what I mean. I don't wanna get into that, that's oof." (*Id.*)  However, BR then asked

Rossi what he wanted to know and if Rossi is "runnin' that case?"  (*Id.*)  After Rossi confirmed that he is the prosecutor on the WHB case, BR said:  "Damn,  I don't really know about Western Hills.  Like, I know about Freestones more, you know?"  (*Id.* at 130.)  But then BR volunteered that he knows "people from Western Hills, Sly Bone, Sammy Mack, Lil Mike, I know all of them."  (*Id.*)

Rossi asked BR if he knows "anything about what the Freestones are doin' recently about anything illegal?"  (*Id.*)  BR responded:  "Little, petty shit, sellin' weed."  (*Id.*)  In response to Rossi's question of whether that's all he knows, BR said:  "I just know what's up, like, . . . it's crazy, . . . all the Hills locked up for . . . murders and all that, but none of them is in there for no murders, you know what I mean.  That's crazy.  It's fucked up."  (*Id.* at 131.)  Rossi asked BR if he knows "any information about their murders?"  (*Id.*)  BR responded:  "It's crazy.  I'm pretty sure you already know about it, you know what I mean?"  (*Id.*)  Smith interjected and told BR:  "Well . . . it's not gonna hurt you to let 'em know."  (*Id.*)

Rossi explained to BR that "just because we ask you questions doesn't mean we don't know the answers to them.  And sometimes we ask questions that we don't know the answer to.  'Cause I don't know what you know about the Freestones."  (*Id.*)  BR responded:  "Well, you'll probably know about Floyd and Marquay, right?"  (*Id.* at 132.)  After Rossi confirmed that he did, BR said that "Floyd killed Marquay, you know, at the park, Freedom Park, and all that."  (*Id.*)  Rossi then stated:  "And when they got Marshall, they thought they were getting' Floyd."  (*Id.*)  BR responded:  "You know they got Floyd at La Qunita Hotel, yeah.  I know all that."  (*Id.*)  BR added that he knew Tranel and Flame.  (*Id.*)  Rossi told BR that "there was nothin' the state could do about that one because Flame pulled first."  (*Id.*)

BR told Rossi that "Shimon getting' out soon."  (*Id.* at 132–33.)  Rossi asked BR if he knows about "any of the other stuff that they did?"  (*Id.* at 133.)  Rossi told BR that he is going to "run upstairs and pull out my big binder.  I got hundreds of pages."  (*Id.*)  BR asked Rossi if he knows Chanky.  (*Id.*)  Rossi confirmed that he does and asked BR if he

knows "somethin' about that?" (*Id.*)  BR's inaudible response causes Rossi to say:  "We've been talkin' free and open for the last couple hours and now you're getting' nervous." (*Id.*)  BR told Rossi that he knows that Chanky "got killed in a garage." (*Id.* at 134.)  After Rossi told BR that "everybody knows that," BR said: "I can't really say who did it."  (*Id.*)  However, BR confirmed that someone told him directly that "they were involved in that[.]"  (*Id.*)  Rossi concluded the discussion about Chanky by telling BR:  "that's a whole 'nother subject that we probably weren't gonna talk about today," but "[w]e could talk about it another time when you feel more comfortable with us[.]"  (*Id.* at 135.)  The remainder of the free talk appears to be about Bryan and alien smuggling.

D. <u>Communications between Smith and Rossi after the first free talk:</u>

Smith sent AUSA Rossi an email dated June 30, 2021, advising Rossi that BR had a twenty- minute phone call with Bryan yesterday, which Smith assumed was recorded, and that Bryan still wants to work with BR.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 11.)  In an email sent the same day, Rossi told Smith that "this is a little concerning as we instructed him to do nothing during our meeting.  Can you please let him know that he is not to reach out to Bryan or do anything as he has not been approved to do so." (*Id.*)  AUSA Rossi also advised Smith that agents were following up on the information provided by BR at the free talk.  (*Id.*)

AUSA Tsethlikai sent an email dated July 7, 2021, to AUSA Rossi and AUSA Curran asking that the BR alien smuggling case be transferred to Rossi, who was willing to take the case.  (*Id.* at 12–13.)  She further advised that the "defendant is cooperating in one of Adam's cases so it is prudent to have Adam handle this underlying case while the investigation is pending." (*Id.*)

On July 23, 2021, AUSA Rossi sent Smith an email advising him that a free talk was scheduled for August 11, 2021, at 8:30 a.m. (*Id.* at 16.)  Rossi also asked Smith if he needed another Kastigar letter or if the original letter was sufficient.  (*Id.*)  Smith responded the same day advising Rossi that he never got the first Kastigar letter, but Rossi could bring the one from the first free talk.  (*Id.*)  Smith also mentioned that he had a sentencing set in

1    the morning on August 11, 2021, so they may need to take a fifteen-minute break.  (*Id.*)

2        E.   The August 11, 2021, Free Talk:

3        The second free talk with BR was conducted on August 11, 2021.  (Evid. Hr'g on

4    the Potential Misconduct Motion, Def. Ex. 9.)  Those present were:  AUSA Rossi, Smith,

5    FBI Special Agent Neill, and FBI Special Agent Douglas.  The transcript of this free talk

6    is 106 pages.  On page 24 of the transcript, Smith told BR that he has to go to a sentencing

7    and asked BR if he is "comfortable continuing to talk to these guys" or "[i]f you wanna

8    wait . . . it should be about 25 minutes."  (*Id.* at 24.)  BR responded:  "Naw, it's all right[.]"

9    (*Id.*)  Smith told BR:  "Yeah, it's fine 'cause . . . I'll get a copy of the tape[.]"  (*Id.*)

10        Up until Smith left the free talk, the subject matter was Bryan and his criminal

11   activity.  That discussion continued until page 63 when Agent Douglas asked BR:  "Outside

12   of the stuff we've talked about, do you have any other information on like violent crimes

13   or things that you think would help us out?"  (*Id.* at 63.)  BR first said that "it already

14   look[s] weird" that he is coming to court a lot and people in his pod are asking why he is

15   going to court.  (*Id.* at 64.)  BR also said that that he is willing to help but he feels like he

16   should get something in return.  (*Id.*)  BR then stated:  "like I told you before, like I know

17   all the – the dudes, you – you know that case."  However, he added that it would be different

18   if he were on the streets rather than in jail, "especially with a case like that, you know what

19   I'm sayin'."  (*Id.* at 65.)  Rossi told BR that "we can talk about that . . . another time . . .

20   '[c]ause that case isn't goin' anywhere."  (*Id.*)

21        The discussion turned back to Bryan as well as BR's concern about getting a benefit

22   for cooperating.  After that discussion concluded, Rossi asked BR if he is still "cellmates

23   with Mike Williams?"  (*Id.* at 90.)  BR told Rossi:  "No, I'm actually cell mates with

24   Sammy Mack."  (*Id.*)  Rossi responded:  "they're moving them around."  (*Id.*)  BR

25   explained that he got moved to a cell with Sammy because Williams got caught with a

26   knife in their cell.  (*Id.* at 91.)  BR added that he is "at rec with Saint" and Little Mike.  (*Id.*

27   at 91.)  Rossi told BR that "[w]e're not gonna talk about them today."  (*Id.*)

28        Rossi goes on to answer BR's questions about the sentencing guidelines and the

sentencing process if he pleads guilty.  On page 99 of the transcript, Rossi stated:  "I gotta run and go grab his attorney real quick."  (*Id.* at 99–100.)  After Smith returned to the free talk, Rossi told BR that "he got a good judge" on his alien smuggling case.  (*Id.* at 101.)  Smith also told BR that he is fortunate because he got "the softest of the sentencing judges[.]"  (*Id.* at 103.)  Smith told Rossi that he may "wanna eventually work out a cash arrangement after [BR's] done with this case[.]"  (*Id.* at 102.)

Smith then changed the subject and told BR:  "Oh, and if you wanna talk about that other thing where, you know, I represent somebody in that case, . . . I'll leave the room if you – I just don't wanna be present[.]"  (*Id.* at 104.)  Smith added that "we can deal with that later on . . . '[c]ause I don't wanna mess up that other case and create a conflict."  (*Id.*)  Rossi responded:  "Right. . . . No, I gotcha."  (*Id.*)  Smith volunteered that "as far as I know, she had nothin' to do with the homicides in that – with that other indictment, but [I'd] . . . rather not be around when you discuss[.]"  (*Id.*)

F.  Communications after the second free talk:

There are a series of emails between Smith and Rossi that range from August 16, 2021 to September 12, 2021.  The emails pertain to AUSA Rossi's agreement to allow BR to attend his father's funeral; BR's commission of a state crime while released; BR posting bond in the state case; BR self-surrendering to the U.S. Marshall's Service; and whether Rossi wants to talk to BR before he self-surrenders.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 18–23.)  In an email dated September 14, 2021, AUSA Rossi advised Smith that:  "I think at this point, we're not going to be able to talk to him anymore."  (*Id.* at 24.)

In an email dated September 15, 2021, Smith advised AUSA Rossi that BR "has expressed his desire to plead and get to sentencing as soon as possible."  (*Id.* at 25.)  Smith also stated that he assumed that Rossi will not obtain authorization to have BR released pending sentencing.  (*Id.*)  Rossi replied that Smith is correct in his assumption, but that he will tell the judge at sentencing what BR "at least tried to do for us, and what information he did provide[.]"  (*Id.*)

- 13 -

BR sent AUSA Rossi a letter postmarked November 30, 2021, with a return address of "CAFCC, [BR.]"  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 9.)  The last two pages of the letter have a date stamp of December 2, 2021, which presumably reflects when the letter was received by the U.S. Attorney's Office. (*See id.* at 4–5.)  After advising Rossi that he is innocent of the new charges, BR wrote: "The last time we spoke I told you I knew about Western Hills and Freestones but at the time I wasn't ready[.]  I feel like my life is on the line." (*Id.* at 2.)  BR asked Rossi for help because he needs more time with his family, wants to go to school and be a better person, and will abide by rules of probation.  (*Id.*)

BR highlighted the following sentence in his letter: "I know about Marshal too.  I'm willing to cooperate 100%." (*Id.* at 3.)  He goes on to state that:  (1) he "know[s] everything about Western Hills;" (2) Floyd Davis was his best friend's uncle; (3) "I not only was told what happened to Floyd but I know who was there, I know where it was done;" (4) David Williams was my celly[,] he told me everything" and "Sly Bone too;" (5) "I am willing to tell you everything you need to know" and "have enough info to solitify [sic] your case; (6) "I know the incident with Kenyatta too;" and (7) "I know why hills and Freestone BeeF [sic]."  (*Id.*)  BR concluded by telling Rossi that:

> I can be a very good asset on that case.  Besides who would ever think that a person like me would ever snitch[.]  [A]lot has been told to me[.]  Whatever you need to know[.]  I'm willing to help but like I said it has to go both ways[.]  I help you and I tell you about all the murders and all about Western Hills then you gotta get me time with my family[.]  I get sentenced soon.  I know a lot more than you do so I know the info I give you will be very good. . . . You get me to my family and I get you a conviction.

(*Id.* at 4–5.)

In an email dated December 6, 2021, AUSA Rossi forwarded BR's letter to AUSA Seger, Special Agent Parkinson, TPD Detective Frieberg, Special Agent Neill, Special Agent Lomas, and Special Agent Wells.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 27.)  In his email, Rossi stated that he received the letter Friday and will sending it to BR's attorney.  (*Id.*)  Rossi further stated:

> I wanted to bring it to your attention asap. I plan on trying to set up another free talk with him, and setting off sentencing so we can hash this out. One reason being is that his attorney is Jesse Smith, who represents Monteen, who is charged with a RICO offense with the other WHB members. Please let me know if you have any questions about this.

(*Id.*)

Rossi also forwarded BR's letter to Smith in an email dated December 6, 2021. (*Id.* at 28.) Rossi advised Smith he received the attached letter on Friday and "did not contact Mr. BR at all." (*Id.*) Rossi told Smith that:

> I would like to set up another free talk with him based on the contents of the letter, and set off sentencing so we can hash this out. One big reason being that you represent Dezirae Alexandria Monteen, who is charged with a RICO offense with other WHB members, and you may now have a conflict based on what he may be talking about. Please let me know what you think. Thanks!

(*Id.*)

Smith responded in an email dated December 9, 2021. (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 29.) Smith told Rossi:

> I will be seeing [BR] Saturday morning to go over things for sentencing and need to discuss with you prior to talking to him what if any subjects I should avoid talking about, i.e., should I be asking him about any information on Monteen to see if there is a conflict or do you think I have to conflict out of her case? [D]o not want to do anything to create issues. Please call me to discuss.

(*Id.*)

In an email dated December 13, 2021, Smith told Rossi that he met with BR and "explained that he would most likely have to be officially disclosed as a witness if he went forward with the additional free talk to be any value to the government in the murder of FD case; he said he understood" and was willing to do the free talk. (*Id.* at 30.) Smith noted that "apparently he has been in the same unit as some of your defendants in that case and has heard a lot about it from them, in addition to what he knew about it prior to being

1    arrested and placed at CCA; see you next Tuesday." (*Id.*)

2        G. <u>The December 28, 2021, Free Talk:</u>

3        The third free talk with BR took place on December 28, 2021. (Evid. Hr'g on the

4    Potential Misconduct Motion, Def. Ex. 10.) Those present with BR were Smith and Special

5    Agent Parkinson. The transcript of the free talk is 138 pages. The subject matter is almost

6    exclusively Western Hills and statements made by certain defendants to BR while in

7    pretrial detention together.

8        After Agent Parkinson confirmed that BR did not have any questions before they

9    got started, BR stated: "just so there is a clear understanding of what I'm gonna say is like,

10   . . . I didn't read nobody's paperwork or anything like that." (*Id.* at 2.) Smith interjected

11   and told Agent Parkinson that "there's an understanding that nothing's gonna be disclosed

12   to . . . . anybody in the, uh, conspiracy case unless and until he's out" because "[h]e's in

13   custody with the same people." (*Id.* at 3.)

14       For the next 67 pages, BR provided information on Western Hills and certain

15   defendants. On page 70, BR again stated: "And like I said, I want to make it very clear

16   that I didn't see no paperwork or nothin'[.]" (*Id.* at 70.) BR continued to provide

17   inculpatory information about certain defendants. However, during that discussion, BR

18   volunteered the following information about defendant Monteen: "I know Dezirae too, but

19   she wasn't involved in nothin'." (*Id.* at 75.) He added that she was Little Mike's girlfriend

20   but "[s]he didn't do nothin'. All that was on him." BR told Agent Parkinson that he knows

21   Dezirae from "Facebook, the streets[.]" (*Id.*) In response to Agent Parkinson's question

22   of how BR knew that Monteen was not involved in anything, BR explained that Mike

23   Williams is "aggressive with females . . . so of course a female would be scared of him[.]"

24   (*Id.* at 76.) The free talk returned to a discussion of the other defendants.

25       H. <u>Smith's concurrent representation of Monteen and BR after the third free talk:</u>

26       On January 3, 2022, Smith emailed Rossi and asked if he had a chance to listen to

27   the recording of BR's third free talk and whether he "may be using him as a witness."

28   (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 33.) Rossi

responded in an email the same day, advising Smith that "[b]ased on my initial conversation with the agent, we would like to use Mr. [BR] as a witness.  I'll know more later in the week, but I anticipate seeking a cooperation agreement authorization for him." (*Id*.)

On January 11, 2022, AUSA Rossi sent an email to AUSA Vercauteren and AUSA Seger.  (*Id.* at 35–36.)  Rossi stated: "Attached is another plea agreement and cooperation addendum, this time for [BR]."  (*Id.*)  Rossi noted that "[BR] participated in a free talk and provided helpful information regarding SMGK," and committed a new crime while released.  (*Id.*)  Rossi advised that [BR] sent him:

> a letter (which I forwarded to his counsel) asserting that he had information related to murders charged in OGL (2017R14459).   A free talk was conducted, and he spoke to several members of WHB in CCA, and they admitted several key facts related to the murder of FD, including members of WHB going to trial in May.

(*Id.*)

On January 18, 2022, AUSA Rossi sent AUSA Vercauteren an email advising that "ATF was able to complete a ROI on the proffer with Mr. [BR], and it's a good summary of the evidence he provided."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 32.)  Rossi noted that he is providing the ROI to Vercauteren "in case [he] wanted to see what he provided."  (*Id.*)  Rossi added: "I can help attribute any significance too, if that helps." (*Id.*)

On January 20, 2022, this Court held oral argument on a Motion to Sever Monteen's trial filed by Smith on November 23, 2021.  (Doc. 1022.)  The Court was not advised at oral argument or in the parties' pleadings that Smith had an actual or potential conflict or that Smith was concurrently representing Monteen and a cooperator.

In an email dated January 21, 2022, Smith let AUSA Rossi know that he is "fine with continuing sentencing until after [BR] testifies in your conspiracy case; but if you don't get approval to do it he wants to get sentenced based on what he already helped with[.]"  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at

37.)  Smith explained that BR's girlfriend just had a child and he needs to get out and get a job.  (*Id.*)

On January 25, 2022, Rossi sent an email to AUSA Vercauteren (copying AUSA Seger) advising that Smith told him that BR is not willing to sit in protective custody for six months waiting to testify.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 13.)  As a result, Smith asked Rossi if he would agree to release on an ankle monitor because otherwise [BR] would not likely testify.  (*Id.*)  Rossi advised Vercauteren that "while I do not like any of this, I think he has a point.  Whether we agree with said point is another story."  (*Id.*)  Rossi asked Varcauteren if he had any thoughts because "I'm of two minds on this honestly."  (*Id.*)

Rossi sent another email dated January 25, 2022, to AUSA Vercauteren (copying AUSA Seger) which stated as follows:  "Erica and talked, and while he's going to have a target on his back no matter what, we don't think there won't [sic] be any harm in him being released with an ankle monitor if it secures his testimony.  Plus, as Erica noted, if he messes up, he will be back in custody anyway.  In this case, we need all the corroboration we can secure, so it's worth it.  Please let us know if that's ok with you."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 13.)

AUSA Rossi advised Smith in an email dated January 25, 2022, that he "just received approval to seek [BR's] release, with ankle monitoring, prior to sentencing."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 16.)  Rossi explained that "[a]pproval for this is contingent on his execution of the cooperation agreement" and that BR will have to testify to get a benefit his sentencing, which "will have to be set off for a long time."  (*Id.*)

On February 1, 2022, Smith filed a Motion to Dismiss Counts 1, 24, and 33 charged against Monteen on based on multiplicity/duplicity.  (Doc. 1048.)  The government filed its response on February 15, 2022.  (Doc. 1109.)  Neither pleading advised the Court that that Smith had an actual or potential conflict if he continued to represent Monteen.

On February 22, 2022, Smith filed an Objection to this Court's Report and Recommendation dated February 4, 2022, which recommended that the District Court deny

the motion for a severance of Monteen's trial.  (Doc. 1137.)  The government filed a response to Smith's Objection on February 23, 2022.  (Doc. 1159.)  Neither the Objection nor the government's response advised the District Court that Smith had an actual or potential conflict.

On March 4, 2022, Judge Ferraro heard oral argument on Smith's motion to release BR pending his sentencing.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 33.)  The government also sought BR's release because of a concern for his safety while in pre-trial detention.  Specifically, BR was housed with defendants in the Western Hills case and is going to be a cooperating witness at their trials.  Judge Ferraro found that the U.S. Marshals Service could keep BR safe while in pre-trial detention, and therefore, declined to release him.  Later that same day, Smith sent AUSA Rossi an email advising that BR "is okay with going ahead with the [cooperation] agreement even [if] Judge Marquez keeps him in custody."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 9.)

On March 10, 2022, Smith filed a Joinder in a Motion for a Franks Hearing filed on February 22, 2022, by counsel for defendant Michael Williams.  (Doc. 1218.)  The Joinder did not advise the Court that Smith had an actual or potential conflict of interest.  Additionally, neither Smith nor the government advised the Court of a conflict or potential conflict during the evidentiary hearing on the motion.

I.  <u>The delay in Smith withdrawing from representing Monteen and BR:</u>

In an email dated February 12, 2022, Smith advised Rossi that:  "I believe I will be required to withdraw from continued representation from Monteen even if she and [BR] both have no objection to me representing both; discussed the theoretical (no names) situation with a state court judge who thought for sure I had to withdraw from Monteen's case because of co-defendant's [sic] in her case would object etc."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 40.)  Smith goes on to tell Rossi that he will need to file an "appeal from magistrate['s] order denying severance because any new attorney would not be able to file appeal within the 14 day time limit."  (*Id.*)  Smith also told Rossi that:  "I will not move to withdraw until you let me know that

- 19 -

you are going to disclose [BR] as witness (which I trust will not occur until he is released for his safety) but if you have some thoughts on this, let me know, I do not want to complicate your ability to proceed to trial as scheduled." (*Id.*)

Smith advised Rossi in an email dated March 1, 2022, that he "need[s] to file a motion to have new counsel appointed for Monteen as soon as possible; if his cooperation agreement is not okayed I can remain in to represent her, but if this is going forward I feel I should get [relieved] ASAP." (*Id.* at 43.) In an email dated March 4, 2022, Rossi advised Smith: "We will be willing to have him sentenced after he testifies in the grand jury (in April), should he testify truthfully, if the trial in May gets moved." (*Id.* at 44.)

On March 23, 2022, Judge Marquez imposed a time served sentence for BR. (Doc. 99, U.S. v. BR.) On March 25, 2022, Smith filed a motion to withdraw as counsel for Monteen. (Doc. 1341.) Judge Soto granted that motion and appointed Michael Brown to represent Monteen.

Between March 28, 2022, and March 30, 2022, there are email communications between AUSA Rossi and Smith about getting BR to Phoenix to testify before the grand jury. As discussed below, BR never ended up testifying before the grand jury. (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 48–49.)

On April 1, 2022, AUSA Fellrath sent Rossi an email wherein he asked for "a quick status update" on the Western Hills case and noted that he "heard Jesse Smith withdrew due to some conflict of interest." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 8.) In an email dated the same day, Rossi advised Fellrath that Smith "represents [BR], our new cooperator, so he withdrew as to Monteen." (*Id.*)

There are a series of emails dated April 4, 2022, between AUSA Clemens and AUSA Rossi. The email exchanges have a subject line of: "Jesse Smith Conflict of Interest." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 5–6.) Clemens' first email to Rossi purports to be a summary of the Smith conflict. (*Id.* at 6.) AUSA Clemens asked Rossi to:

1
2
3
4

> make any corrections or provide additional information as needed.  Please add the name of the cooperating defendant and the status of his case/cooperation, as well as the initial information as to how the government was made aware that defendant X wished to give a free talk and when we knew his information would involve Western Hills.

5
6

(*Id.*)  Clemens also asked Rossi if Smith had "moved to withdraw in the cooperating defendant's case[.]"  (*Id.*)

7
8
9
10
11
12
13
14

In a response dated the same day, Rossi provided Clemens with an "updated version" of the summary of the Smith conflict.  (*Id.* at 5–6.)  In a responsive email, Clemens asked Rossi the following questions:  "Did you ask Jesse Smith to withdraw from [BR]'s case after he pleaded guilty?  Also, where did the information come from that the bar was upset that Jesse had waited so long to withdraw and might be filing something laying blame on our office?  How realistic/credible is that information?"  (*Id.* at 5.)  Clemens sent another email asking Rossi:  "Also did Jesse lodge the cooperation agreement or the government?"  (*Id.*)  Rossi response to Clemens' questions was:  "He did.  Without my input."  (*Id.*)

15
16
17
18
19
20
21
22

On April 5, 2022, AUSA Clemens sent an email to "PRAO DOJ" which was forwarded to Ben Grimes, an attorney in the Department of Justice Professional Responsibility Office.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 10–11.)  That email sets forth the summary of the Smith conflict that was the subject of the April 4, 2022, email communications between Clemens and Rossi.  (*Id.*)  Grimes responded to Clemens in an email the same day.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 9–10.)  Grimes asked Clemens if she had "time for a quick call this afternoon."  (*Id.* at 9.)  Grimes also wrote:

23
24
25
26

> My biggest question is what actions Smith took on behalf of Monteen during this time period when we knew there was a conflict?  Because it appears that [BR] knew information about Monteen (but not the other way around), the most significant risk of negative fallout will be with regard to choices Smith made in representing Monteen.  To the extent remediation will be necessary, this is the case most likely to need it.

27
28

(*Id.*)

Grimes goes on to note that it is unlikely that Smith obtained informed consent to the concurrent representation from BR and Monteen "given Smith's indications that he would withdraw, just not yet." (*Id.*) Grimes also noted that it seems clear to him that "Smith is still working under a conflict in his representation of [BR] that requires withdrawal (assuming Monteen does not consent to it)." (*Id.*)

In an email dated April 5, 2022, Clemens advised Rossi that she has "a phone call with PRAO in 20 minutes" and one question they asked is "what actions did Smith take on behalf of Monteen during this period when we knew there was a conflict?" (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 7.) Rossi responded as follows: "He litigated a motion to suppress on her behalf." (*Id.*)

On April 12, 2022, AUSA Rossi sent an email to Smith, and copied AUSA Hopkins and AUSA Sottosanti on the email. Rossi advised Smith as follows:

> After speaking to our PRAO officer last week, and her discussing this issue with PRAO, and per our previous conversations, we still have a concern that you have a conflict in representing Mr. [BR]. While Mr. [BR] did not have any inculpatory information regarding Ms. Monteen, the fact that he provided information, and has now agreed to testify about that information, as to events alleged in the RICO count, she is still in the RICO count, and we believe that is a conflict. We understand your position on this, but we believe you need to either withdraw, or we need to present this to the Court to make a determination as to this issue. If you intend to continue representing Mr. [BR], please let us know by Thursday at 5pm, or earlier, so we can file a motion under seal with the Judge to have this worked out. We will be filing the motion Friday if we do not hear from you. Thank you.

(Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 4 at 50.)

Smith responded to AUSA Rossi in an email dated April 13, 2022. (*Id.*) Smith told Rossi that he had "no problem withdrawing from further representation of [BR] so long as he will have someone else appointed to be able to remind him of duties of witness to listen to the question, think about the correct answer, don't speculate etc." (*Id.*) Smith represented to Rossi that he "may file a motion under seal stating I have no objection to being removed from further representation of [BR] as long as someone will be appointed to represent his interests." (*Id.*)

On April 21, 2022, the government filed a "Motion to Appoint New Counsel for Potential Defense Counsel Conflict of Interest" with Judge Marquez in BR's case.  (Doc. 112, U.S. v. BR.)   The government represented that the "U.S. Attorney's Office has maintained a conflict of interest may exist for Mr. Smith with regards to Mr. [BR]" because "Mr. [BR]'s testimony may implicate Mr. Smith's responsibilities to a former client, Ms. Monteen, as to the RICO offense[.]"  *Id.*  Judge Marquez denied the government's motion but granted Smith leave to file a motion to withdraw.  (Doc. 114, U.S. v. BR.)

On April 21, 2022, counsel for David Williams filed a Motion for Sealed Hearing Regarding Potential Professional Misconduct Implicating Defendants' Fifth and Sixth Amendment Rights, which was joined by counsel for defendants involved in the instant motion.  (Doc. 1518.)  Rossi sent Smith an email dated April 22, 2022, advising Smith that defense attorneys in the WHB case have filed a sealed motion "alleging conflict of interest etc, in representation of Monteen and [BR]."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 29.)  Rossi's email goes on to state that:

> In order to respond why nothing improper occurred I would need to reference and ultimately attach emails to you that contain some things that would need to be redacted and contents of a letter from [BR] setting out what he could do at the initial free talk which had nothing to do with the west hills case but may endanger ongoing investigations plus subject [BR] to retaliation from what he disclosed at the free talk, plus attorney client privilege issues.  Has a new attorney been appointed to represent him yet?  I cannot disclose emails between us without your permission so I think we need some type of status conference to sort out procedures and limitations on who can see these materials etc.  Please let me know how you wish to proceed with this.

(*Id.*)

In an email dated April 22, 2022, Grimes asked AUSA Clemens if "there was any sort of joint defense agreement . . . between Monteen and the others?"  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 12.)  AUSA Clemens responded: "Not that I'm aware of."  (*Id.*)

On April 26, 2022, AUSA Rossi sent an email to Smith advising that Judge Marquez denied the government's motion but granted Smith leave to file a motion to withdraw.

Rossi asked Smith if he would be filing that motion.  Smith responded to Rossi's email the same day.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 30.)  Smith stated as follows:

> I do not see a conflict in terms of continuing to represent [BR] as to his interests; I can see that some of the 18 other defendants may think there is an appearance of potential conflict with it.  Can you email me whatever you received explaining why they perceive a conflict so I can cite whatever rule or case they cited to you in my motion?  I had told [BR] that someone new was going to be appointed and he was accepting of it but not thrilled about it so I would feel better if either you filed something with Judge Soto explaining why he needed new counsel or send the memo to me so I can cite it to Marquez.

(*Id.*)

Rossi responded in an email dated April 27, 2022.  (*Id.*)  Rossi advised Smith that: "[w]e cannot . . . send that memo to you as it is under seal.  This is partially why we wanted a status conference before Judge Markovich as we don't know what they said in yours, and you cannot tell us, and we can't tell you what's in ours.  This is wholly unfair, inefficient, and frankly contrary to law, so we will be bringing that up.  Any word on the request for a status conference?"  (*Id.*)

On April 27, 2022, Smith filed a motion to withdraw as counsel for BR.  (Doc. 115, U.S. v. BR).  Smith represented to Judge Marquez that: "[t]here is a potential for conflict of interest to arise[.]"  (*Id.*)  Judge Marquez granted the motion on May 2, 2022.   (Doc. 119, U.S. v. BR).

J.  Ross's May 10, 2022, Memorandum to File:

AUSA Rossi wrote a Memorandum to File dated May 10, 2022, whose subject line states: "D. Jesse Smith Potential Conflict of Interest."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12.)  In the first paragraph, Rossi noted that his memorandum details "the steps taken by AUSA Rossi and this office to ameliorate the potential for a full-on conflict of interest and prevent this from being an issue for the rights of" Monteen and BR.  (*Id.* at 1.)  Rossi goes on to discuss the charges against the defendants

and the facts that support the charges, the charges against BR, and the email communications discussed earlier that led to the first BR free talk.  (*Id.* at 1–4.)

Rossi then recounted what occurred at the June 23, 2021 free talk.  Rossi wrote that BR was "asked extensive questions regarding Bryan Moreno-Aguilar and SMGK for two hours."  (*Id.* at 4.)  Rossi then detailed a conversation after BR is asked if there is anything else he wants to discuss.  (*Id.*)  BR said:  "No.  I thought y'all was gonna aks me about, uh, Freestone and all that, Western Hills and all that[.]"  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at 4.)  Rossi asked BR:  "Oh, do you know about them?"  (*Id.*)  BR responded:  "Oh, do you know about – you know about that and all that?"  (*Id.*)  Rossi stated:  "Unfortunately, I do."  (*Id.*)

Rossi goes on to write:  "The parties then briefly discussed Mr. [BR]'s knowledge of the Freestones and WHB[;] [m]ost of this brief conversation was about Mr. [BR]'s knowledge about the Freestones, as he was friends with them."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at 4.)  BR later asked Rossi, "'You runnin' that case?' referring to the WHB case."  (*Id.*)  BR initially said that he knew more about the Freestones than Western Hills, but then volunteered:  "I know people from Western Hills, Sly Bone and Sammy Mack, Lil' Mike, I know all of them."  (*Id.* at 4–5.)  Rossi wrote that they then "discussed murders that AUSA Rossi knew to be committed by Freestone members on WHB members, including the murder of WHB leader Mar-K," F.D., and "the self defense killing of WHB member 'Flame' by Freestone member Trennel Griffin[.]"  (*Id.* at 5.)  Rossi and BR also discussed the murder of Chandler Booker, who was "a WHB member shot and killed by suspected members of the Freestones."  (*Id.* at 5– 6.)

Rossi wrote that he believed that BR had information about the Chandler Booker murder; but based on BR's change in demeanor and his statements, Rossi believed that BR "was fearful of relating that information for fear of retribution by members of the Freestones."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at 7.)  Rossi told BR that they did not have to discuss the Booker murder today; they

1    could possibly discuss it in the future if BR felt comfortable doing so.  (*Id.*)

2          Rossi then detailed a conversation with BR that occurred after the free talk

3    concluded and the recording ended.  (*Id.* at 7–8.)  BR told Rossi that a WHB member was

4    his cellmate.  (*Id.* at 8.)  Rossi recalled BR saying it was Little Mike, which is a nickname

5    for defendant Michael Williams.  (*Id.*)  Rossi wrote that he did not ask any questions and

6    he "cautioned Mr. Smith that if Mr. [BR] decided to share information on WHB members,

7    especially those indicted under the RICO charge, Mr. Smith would have a conflict.  AUSA

8    Rossi recalls Mr. Smith stated that he didn't believe there was one because Mr. [BR] had

9    yet to share any such information."  (Evid. Hr'g on the Potential Misconduct Motion, Def.

10   Ex. 3, Ex. A, Attach. 12 at 8.)

11         Rossi goes on to describe what was discussed at the second free talk on August 11,

12   2021.  (*Id.*)  BR again proffered information about SMGK.  (*Id.*)  Rossi then wrote:  "Based

13   on Mr. [BR]'s previous assertion that he was cellmates with a member of WHB, AUSA

14   Rossi, after the questions about SMGK had concluded, asked, "Are you still . . . cellmates

15   with Mike Williams?'"  (*Id.*)  BR told Rossi that he was now cellmates with Sammy Mack

16   (which is defendant Rakestraw's nickname).  (*Id.*)  Rossi wrote that he "expressed

17   surprise," and BR explained that he and Williams were separated because "Williams had a

18   knife in the cell." (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A,

19   Attach. 12 at 8.)  BR also said that he been at "'rec with Saint [Mure]" and Little Mike.

20   (*Id.* at 8–9.)  Rossi noted that:  "Again, cognizant of a potential conflict, AUSA Rossi then

21   responded, 'We're not gonna talk about them today" and "[a]ll questioning on this topic

22   ceased."  (*Id.* at 9.)

23         Rossi then detailed a conversation involving Smith when he returned to the free talk

24   after his court hearing.  (*Id.*)  Specifically, Smith told BR:  "Oh, and if you wanna talk

25   about that other thing where, you know, I represent somebody in that case . . . I'll leave the

26   room" because "I just don't wanna be present[.]"  (*Id.*)  Smith added that "we can deal with

27   that later on . . . '[c]ause I don't wanna mess up that other case and create a conflict[.]"

28   (*Id.*)

- 26 -

Rossi went on to summarize his view of the information provided by BR at the first two free talks.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at 10.)  Specifically, BR shared information on SMGK, but also mentioned that he knew other gangs in Tucson, including the Freestones and Western Hills.  (*Id.*)  Rossi wrote that he "believed Mr. [BR] to potentially have information regarding crimes committed by Freestones on WHB members, and not necessarily crimes committed by WHB members." (*Id.*)

Rossi explained that he forwarded BR's letter to Smith in an email and advised him that the government would like to set up another free talk based on the contents of the letter; he also advised that Smith "may now have a conflict" because he represents Monteen who is charged with the RICO offense.  (*Id.* at 10–11.)  Rossi also noted that in a subsequent phone conversation with Smith he again "raised the concern of Mr. Smith's representation of Ms. Monteen, but Mr. Smith did not believe a conflict existed at that time, and a free talk was scheduled."  (*Id.* at 11.)

At the third free talk on December 28, 2021 (which Rossi did not attend because he was sick), BR "provided information relating to WHB members and associates regarding the murder of F.D. and other violent offenses."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at 11.)  Rossi wrote that after the free talk he had a phone conversation with Smith in which he "again relayed the government's concern over a possible conflict, and Mr. Smith asserted he would conflict himself off Ms. Monteen's case if and when Mr. [BR] accepted a cooperation agreement."  (*Id.*)  AUSA Rossi reminded counsel that the conflict would apply to both Ms. Monteen and Mr. BR.  (*Id.*) The government, based on Mr. Smith's word that he would withdraw, then sought and offered a cooperation addendum for Mr. [BR]."  (*Id.*)

Rossi goes on to write that even though Smith had lodged the cooperation agreement with the court on February 14, 2022, "Mr. Smith stated to AUSA Rossi that he wanted to wait for sentencing to confirm Mr. [BR] wished to cooperate."  (*Id.* at 11–12.)  Mr. Smith expressed concern over filing a notice of conflict at this time, as it would endanger Mr.

1    [BR]."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at

2    12.)

3           Rossi further noted that he had a phone and email conversation with U.S. Deputy

4    Marshals who expressed concern about being able to protect cooperating witnesses and

5    that BR "would not be able to be moved in the federal system, unless he chose protective

6    custody."  (*Id.*)  Rossi relayed those concerns to Judge Ferraro in connection with a motion

7    to release BR.  (*Id.*)  Judge Ferraro declined to release BR and Smith appealed that decision

8    to Judge Marquez.  (*Id.*)  Rather than rule on the appeal, Judge Marquez accelerated BR's

9    sentencing to March 23, 2022.  (*Id.*)

10          "On March 25, 2022, Mr. Smith moved to withdraw from representing Ms.

11   Monteen, advising the court of a conflict of interest."  (Evid. Hr'g on the Potential

12   Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at 12.)  On the same date, the government

13   disclosed BR's statements to defense counsel in the WHB case because "[BR] was out of

14   custody and the safety concerns [were] ameliorated."  (*Id.*)  In an April 15, 2022, email

15   exchange with Group 4 defense counsel, Rossi advised them "BR will be a witness at the

16   Group 4 trial[,]" but "in fairness to defendant Monteen . . . we would suggest she be severed

17   to prevent any prejudice from her previous representation."  (*Id.* at 12–13.)  At a hearing

18   on April 26, 2022, Judge Soto removed Monteen from Trial Group 4.  (*Id.* at 13.)  Rossi

19   noted that the government reiterated to Monteen's new counsel and the District Court that

20   the government "does not intend to use Mr. [BR] to testify against Ms. Monteen."  (*Id.*)

21          Rossi goes on to describe his efforts to get Mr. Smith to withdraw from representing

22   Mr. BR. (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at

23   13.)  Rossi first noted that his office "has maintained a conflict of interest may exist for

24   Mr. Smith with regards to Mr. [BR] as well, due to the information Mr. [BR] provided is

25   relevant to the RICO offense."  (*Id.*)  Rossi described a communication with Smith where

26   he represented that he has "no objection to his withdrawal from representing Mr. [BR],"

27   provided that he has new counsel appointed to represent his interests when testifying at the

28   trials.  (*Id.*)  Finally, Rossi noted that Judge Marquez denied the government's April 13,

1    2022, motion to have Smith removed as counsel for BR, but she granted Smith's motion to

2    withdraw filed on April 27, 2022.  (*Id.* at 14.)

3        K.   <u>The First Motion that resulted from Smith's conflict:</u>

4            Counsel for David Williams filed a Motion for Sealed Hearing Regarding Potential

5    Professional Misconduct Implicating Defendants' Fifth and Sixth Amendment Rights

6    ("Potential Misconduct Motion") dated April 20, 2022, and docketed April 21, 2022.  (Doc.

7    1518.)  The other defendants who have joined in the Motion to Disqualify also joined the

8    Potential Misconduct Motion.  At the time the Potential Misconduct Motion was filed,

9    Smith was still representing BR.  The primary concern raised in the Potential Misconduct

10   Motion was that Smith may have shared confidential and/or privileged information on the

11   WHB case with BR and/or the government given Smith's concurrent representation of

12   Monteen and BR and his access to Joint Defense information.

13           On May 25, 2022, this Court ordered that the Professional Misconduct Motion be

14   handled by one of the other ninety-three (93) U.S. Attorney's Offices or another

15   prosecutorial entity within the Department of Justice.  (Doc. 1699.)  The U.S. Attorney's

16   Office for the District of Arizona appealed that order to the District Court, who affirmed

17   the decision by order on July 1, 2022.  (Doc. 1902.)  The government filed an interlocutory

18   appeal to the Ninth Circuit.  (Doc. 1939.)  The District Court denied the government's

19   motion for a stay pending appeal.  (Docs. 1937 and 1938.)  The Ninth Circuit subsequently

20   granted the government's motion for a stay pending appeal.  The stay was in effect for

21   almost a year until the Ninth Circuit reversed the order of the District Court in a decision

22   dated May 18, 2023, and held that attorneys within the U.S. Attorney's Office for the

23   District of Arizona could litigate the Potential Misconduct Motion.

24           An evidentiary hearing on the Potential Misconduct Motion was held the week of

25   October 16, 2023.  AUSA Rossi, Smith, BR, Monteen, and Connie Caspari testified.

26   Rossi's and Monteen's testimony is summarized below.[7]

27   _____

28       [7] The Court does not feel the need to summarize the testimony of Caspari, Smith, or BR
     for several reasons.  First, the testimony of Caspari and BR pertained only to the disclosure of

1    The defense was apparently satisfied that Smith did not disclose confidential

2    information (from Monteen or the JDA) to BR or the government because no substantive

3    motion based on any disclosure of confidential information has been filed.[8]

4    L.   The Motion to Disqualify:

5    On February 9, 2024, the defendants filed the Motion to Disqualify which is based,

6    in large part, on AUSA Rossi's October 2023 testimony.  As discussed earlier, the defense

7    argues AUSA Rossi committed misconduct by: failing to recognize Smith's conflict during

8    the first free talk in June 2021; failing to fulfill his obligation to notify the Court of the

9    conflict when Smith refused to do so; allowing Smith to continue his conflicted

10   representation of two clients for over nine months after the conflict arose; concealing and

11   exploiting the conflict to the government's benefit; and his lack of candor to the Court.

12   The government first argues that the disqualification is not warranted because the

13   defense cannot show prejudice.  The remainder of the government's argument is essentially

14   that AUSA Rossi did nothing wrong and Smith is to blame.  The government's position is

15   that Smith only had a potential conflict for many months, and the government does not

16   have a duty to report potential conflicts to the court.  Once the conflict arose, the

17   government delayed reporting the conflict because of a real concern for BR's safety, and

18   not for its own benefit.  For the same reason, the government argues that allegations of

19   AUSA Rossi's lack of candor to the court are meritless.  The government alternatively

---

confidential or privileged information, which is not the issue in the Motion to Disqualify.  Second, a large portion of Smith's testimony was also focused on the disclosure of confidential information. Finally, and most importantly, Rossi was questioned about Smith's testimony concerning his concurrent conflict of interest in representing Monteen and BR (*e.g.*, Smith's view of the conflict or potential conflict, when the actual conflict arose, communications with Rossi about the conflict, and actions that Smith took and failed to take to remedy the conflict), and that testimony is summarized within Rossi's testimony.

[8]  The defense did file the Motion to Exclude BR as a witness at trial referenced earlier. (Doc. 2822.)  That motion was not premised on the disclosure of confidential information, but rather on the government's contact with represented defendants and invasion of the defense camp as a result of BR's communications with defendants housed with him at CCA.  As noted earlier, the Motion to Exclude was denied as moot when the government represented that it would not call BR as a witness in any trial.

argues that "any violation of the professional rules of conduct regarding reporting Smith's conflict of interest was de minimis and does not warrant sanction by the Court." (Doc. 2952 at 12.)

On March 20, 2024, the Court granted the defense request for an evidentiary hearing on the Motion to Disqualify. (Doc. 3010.) That hearing was held the week of April 22, 2024. The following witnesses testified: Professor Bruce A. Green, Patricia A. Sallen, Esq., AUSA Seger, AUSA Clemens, AUSA Fellrath, AUSA Vercauteran, and AUSA Sampson. AUSA Rossi was not called as a witness, presumably because of his extensive testimony in October 2023. The Court turns first to that testimony.[9]

**1. <u>Testimony of AUSA Rossi in October 2023:</u>**

In early 2020, Rossi had a conversation with Laura Udall about a Joint Defense meeting that would be taking place at the courthouse. That conversation is when Rossi first learned that there was a Joint Defense Agreement; however, he did not know which defendants were in the JDA. (Hr'g Tr. 10/18/23 at 193, Doc. 2734.) Rossi never had a conversation with Smith about whether Monteen was part of the JDA, but he assumed she joined the JDA. (*Id.* at 194.)

---

[9] The Motion to Disqualify, co-counsel's pleadings joining in the motion, the government's response, and the defendant's reply briefs were all filed under seal. Those sealed pleadings stemmed from the fact that Potential Misconduct Motion and responsive pleadings were filed under seal and the evidentiary hearing on that motion was a sealed proceeding. The Potential Misconduct motion and the evidentiary hearing that resulted were sealed only because of a concern over the public disclosure of confidential or privileged information. That concern is not implicated in the Motion to Disqualify. As a result, the evidentiary hearing on that motion was not a sealed proceeding and the Court advised counsel that the pleadings related to that motion will be unsealed. However, because of the government's concern that BR's full name was used in pleadings and during court proceedings, the Court ordered that counsel file redacted versions of the pleadings which remove references to BR's name. For the same reason, the Court has requested the court reporter to prepare and file redacted transcripts of the proceedings related to the Motion to Disqualify, as well as the October 2023 testimony of AUSA Rossi. At the request of the defense, the Court will not yet unseal the October 2023 testimony of Smith, BR, Monteen, or Caspari because that testimony may contain confidential information that is not apparent to the Court. That said, the Court does discuss a portion of Monteen's sealed testimony. At oral argument at the conclusion of the evidentiary hearing, the Court alerted Monteen's counsel to the portion of Monteen's testimony that the Court planned to discuss. Counsel represented that he did not believe that testimony included confidential or privileged information. (Hr'g Tr. 4/25/24 at 57.)

1          *Events leading up to the June 23, 2021 Free Talk:*

2          The only information provided by Smith prior to first free talk on June 23, 2021,

3    was the email Smith sent to AUSA Tsethlikai.  (Hr'g Tr. 10/18/23 at 196, Doc. 2734.)

4    Prior to the free talk, Rossi was aware of the email and the charges against BR.  (Hr'g Tr.

5    10/19/23 at 32, Doc. 2735.)  Smith believed that BR had information on an individual

6    named Bryan Moreno Aguilar.  (Hr'g Tr. 10/18/23 at 193, Doc. 2734.)  Rossi did not have

7    any phone conversations with Smith prior to the free talk; the only contact was via email.

8    (Hr'g Tr. 10/19/23 at 38, Doc. 2735.)

9          Law enforcement gang databases did not reveal any gang affiliations for BR.  (*Id.*

10   at 34.)  BR was known to associate with SMGK members; he was not identified as someone

11   who associated with Freestones or WHB.  (*Id.* at 36.)

12         The agents involved in the first free talk did not work on the WHB case; their only

13   knowledge of that case would have come from "chit chat" with Rossi or potentially other

14   agents.  (*Id.* at 33–34.)  These agents were present for the free talk because they had an

15   open investigation on SMGK and Bryan Moreno Aguilar.  (*Id.* at 37.)

16         Prior to a free talk, Rossi would normally go over topics to be covered with the

17   defense attorney.  (Hr'g Tr. 10/18/23 at 197, Doc. 2734.)  He did not feel the need to do so

18   with Smith "because of the specificity of what we were talking about and [BR's]

19   relationship with SMGK gang members[.]"  (*Id.*)  As a result, Rossi testified that "everyone

20   on the law enforcement side assumed that we'd be talking about [Bryan] Moreno Aguilar

21   and his associates."  (*Id.*)

22         *June 23, 2021 Free Talk:*

23         At the start of the free talk, Rossi confirmed that Smith went over the Kastigar letter

24   with BR and asked if BR had questions.  (Hr'g Tr. 10/19/23 at 41, Doc. 2735.)  Rossi

25   agreed that BR began the free talk by saying:  "I'm not super famous but I'm in the middle

26   of this stuff, you know what I'm saying.  But I don't feel like I tell you all my stuff while

27   I'm still stuck sitting here."  (*Id.* at 42.)  When asked how he interpreted that comment,

28   Rossi explained that it is not unusual for defendants who do free talks to want assurances

from the government that the information would benefit them.  (*Id.* at 42–43.)

Rossi agreed that when Agent Neill asked BR where he wanted to begin, BR stated: "So, I mean, I don't know where to start.  I know a lot of people, you know what I mean?  It's whether Freestones or Western Hills.  I know everybody, everybody knows me.  So what do you guys all want to talk about?"  (*Id.* at 44.)  Rossi testified that he was "surprised" that BR "knew people from Freestones and Western Hills 'cause that was not in Mr. Smith's email."  (*Id.* at 44–45.)  When asked if BR bringing up Freestones and Western Hills early on in the free talk caused him concern, Rossi testified:  "I wouldn't say concern.  As you know, Tucson's a small town and the fact that people know other people in different gangs is not surprising.  It surprised me because he mentioned those two specifically[.]" .  (Hr'g Tr. 10/19/23 at 45, Doc. 2735.)

Rossi did not feel that he needed to "have a chat with Mr. Smith" at that point.  (*Id.* at 46.)  Rossi again explained that it is not uncommon for individuals to know people in other gangs, especially since SMGK is a Blood gang.  (*Id.*)  He further explained that "since the subject matter of the free talk, I believed, was not related to Freestones or Western Hills, I didn't have a concern at that point."  (*Id.*)  Rossi does not believe that he made "eye contact with Mr. Smith . . . to acknowledge that this is a surprise" that BR brought up Freestones and WHB.  (*Id.*)  Rossi "may have made a face" but he "didn't interact with Mr. Smith regarding that 'cause that happened really quickly . . . and Special Agent Neill directed him back to the subject matter rather quickly."  (Hr'g Tr. 10/19/23 at 47, Doc. 2735.)

Rossi acknowledged that he has "special prosecutorial duties and obligations" that are different than defense attorneys.  (*Id.*)  Specifically, he must be "on the lookout for where there may be some ethical or professional conduct issue[s]."  (*Id.* at 48.)  AUSAs get training on these issues "[a]ll the time."  (*Id.*)  Rossi testified that he is mindful of his ethical duties regardless of the defense attorney that he is dealing with.  (*Id.*)

With respect to BR mentioning WHB at the start of the first free talk, Rossi testified that at that time he did not feel the need to have his "radar up" in case WHB came up again.

- 33 -

(*Id.* at 49.)  Rossi never asked Smith why BR thought the first free talk was about WHB. (Hr'g Tr. 10/18/23 at 214, Doc. 2734.)  Rossi agreed with counsel that a defendant and his/her counsel should get together to prepare for free talks.  (Hr'g Tr. 10/19/23 at 54, Doc. 2735.)  Rossi agreed that Smith did not take any action or try to avoid that topic; however, he added that Smith along with Agent Neill directed BR "back to Brian Moreno-Aguilar." (*Id.* at 50.)  But Rossi agreed that no one said:  "Hey, we're not talking about Western Hills[.]"  (*Id.*)

Rossi also agreed that the following conversation took place as the discussion about Moreno-Aguilar was wrapping up.  Agent Neill asked BR:  "Anything else you can think of that you want to talk on?"  BR responded, "No, I thought y'all was going to ask me about Freestones and all that and Western Hills and all that?"  (*Id.* at 51–52.)  Rossi responded:  "Oh, do you know about them."  (*Id.*)  BR asked Rossi if he knew about Freestones and WHB, and Rossi responded that he did.  (Hr'g Tr. 10/19/23 at 52–53, Doc. 2735.)  Smith chimed in and said:  "I think he's prosecuting.  There's 18 defendants in that case."  (*Id.* at 56.)

Rossi testified that he was surprised by BR's comment that he thought they were there to talk about the Freestones and WHB.  (*Id.* at 52.)  He further testified that he wanted "[t]o see exactly what he knew" because in free talks people often say they know about things, but it turns out to be second hand information or something they have read in the paper.  (*Id.*)  However, Rossi added that "that's not what we talked about."  (Hr'g Tr. 10/18/23 at 214, Doc. 2734.)

If BR had said that he knew about the murders and/or Monteen's involvement, Rossi would have stopped the free talk because then Mr. Smith would have a direct conflict. (Hr'g Tr. 10/19/23 at 55, Doc. 2735.)  Rossi explained that the names that BR brought up – Shamone, KK, and Big Rodney – are all Freestones.  (*Id.* at 58.)  As a result, Rossi sought clarification from BR about whether he knew WHB members as well.  (*Id.*)  Rossi agreed that a conversation with BR about the Freestones could potentially have a link to the RICO charges.  (*Id.* at 59.)  However, he added that the gangs in Tucson are "very closely

connected" and it is his job to "help prosecute all gang offenses, including those committed by Freestones, who just happen to be mostly the victims in the RICO case[.]" (*Id.*)

Rossi agreed that the theory of the RICO charges is that WHB members murdered Freestones in retaliation for murders of WHB members committed by the Freestones. (Hr'g Tr. 10/19/23 at 61, Doc. 2735.)  Nevertheless, Rossi was not concerned "that [BR] was getting into Western Hills matters" because BR was bringing up names of Freestone members (*e.g*., Floyd Davis, Marshall Davis, and Gil).  (*Id.* at 61–62.)  Rossi explained that if someone hung out with the Freestones "they would certainly know about the murder of Floyd and Marshall Davis since Floyd and Marshall Davis were the leaders of the Freestone gang at that time."  (*Id.* at 62–63.)  However, Rossi acknowledged that BR mentioned the name "Mar-K," who was a WHB member.  (*Id.*)

Rossi still did not have a concern that Smith had a conflict at this time.  (*Id.* at 62.)  He testified that he did not mention a potential conflict to Mr. Smith "because we hadn't talked about anything related to Western Hills at that point."  (Hr'g Tr. 10/19/23 at 63, Doc. 2735.)  Rossi explained that "this happens in many cases" where a defense attorney represents a gang member who claims to know members of another gang.  (*Id.*)

Rossi disagreed that the "back and forth" conversation about what BR knew about Freestones and WHB was an attempt to assess BR's "value."  (*Id.* at 65.)  Rather, he was "assessing whether or not he actually knows what he's talking about."  (*Id.*)  Rossi agreed that he asked BR a general question to see "if he had any information on Western Hills," because all he had done was "list some fancy names[.]"  (*Id.* at 69.)  Counsel pointed out that BR told Rossi that he was "locked up" with WHB defendants. (Hr'g Tr. 10/19/23 at 69, Doc. 2735.)  Rossi denied that he was asking BR if he had any information on those specific defendants.  (*Id.*)  He added that "I am very confident that it didn't even register to me that Mr. [BR] knew them while he was in custody, just that they were locked up, too."  (*Id.* at 72.)

Rossi was not concerned about a conflict after BR said: "I know people from Western Hills.  I know Sly Bone, I know Sammy Mac, I know Lil' Mike, I know all of

1  them." (*Id.* at 83.) Rossi explained that "just knowing names" is "pretty common in free
2  talks involving gang members or associates." (*Id.*) As a result, Rossi was not "thinking
3  about shutting anything down yet[.]" (Hr'g Tr. 10/19/23 at 83–84, Doc. 2735.) Rossi
4  added that he did not "ask any follow-up questions on Western Hills;" he asked follow-up
5  questions about Freestones. (*Id.* at 84.) Rossi was interested in unsolved murders
6  committed by Freestones; at this point, he was not interested in specific information about
7  WHB members. (*Id.*)

8      Rossi interpreted Smith's comment to BR that "it's not going to hurt you to let them
9  know what you know" to mean that BR should talk about "what he knew about murders
10  committed by Freestones." (*Id.* at 88–89.) Rossi was not concerned about a conflict when
11  Smith chimed in because it sounded like he was encouraging BR "to talk about murders
12  committed by Freestones." (*Id.* at 89.)

13      With respect to BR's comment, "you probably know about Floyd and Mar-K" and
14  "Floyd killed Mar-K" at Freedom Park, Rossi testified that "it's fairly common knowledge"
15  and he believed that BR was checking to make sure "that I knew what I was talking about."
16  (Hr'g Tr. 10/19/23 at 90, Doc. 2735.) Rossi acknowledged that BR's comments related to
17  "[t]he motivations for the Western Hills case[.]" (*Id.*) But he "didn't put a pause on
18  anything" or have a conversation with Smith because the Mar-K information "was very
19  surface level." (*Id.*)

20      Counsel pointed out to Rossi that he continued the conversation by saying: "And,
21  well, they got Marshall, they thought they were getting Floyd," and that prompted BR to
22  say: "You know how they got Floyd at the La Quinta hotel?" (*Id.*) Rossi testified that this
23  information was common knowledge for "someone who hangs out with Freestones and is
24  associated with another Blood gang." (*Id.* at 91.) Rossi explained that he "was trying to
25  get him talking about [this] more . . . surface level information about these murders to see
26  if he actually knew anything about specifics about these murders. And in this case, with
27  regard to Floyd and Marshall, I wasn't trying to . . . elicit further information about it[.]"
28  (Hr'g Tr. 10/19/23 at 92, Doc. 2735.) Rossi added that " I was trying to get him to trust

me into relaying information about things I did not know about." (*Id.*)  Rossi explained
that he was "insinuating" to BR that he knew about Marshall already, and "was trying to
get information about other homicides."  (*Id.* at 93.)  He was trying to make BR feel
comfortable so that he would provide information that law enforcement did not already
have, "not necessarily about those murders specifically." (*Id.* at 93–94.)

Rossi again testified that he was attempting to get information on Freestones, not
Western Hills.  (*Id.* at 94.)  He added that "just because he names things about Western
Hills, those two gangs are inextricably intertwined so the fact that he mentioned Western
Hills members did not register to me as any concern."  (Hr'g Tr. 10/19/23 at 95, Doc.
2735.)  The "big binder" that Rossi said that he could get from his office related to the
Freestones.  (*Id.* at 97.)

Rossi anticipated having multiple free talks with BR, "but not about this subject."
(*Id.* at 102.)  Rossi was interested in developing information about Freestones, but "was
not hopeful."  (*Id.*)  He explained that BR's demeanor changed significantly "between
surface level conversations about Mar-K being killed, Floyd being killed," and the
conversation about Chandler Booker, which is when BR became nervous.  (*Id.* at 103.)

After the free talk ended and BR was being taken out of the room by law
enforcement, he mentioned that he was cellmates with Little Mike.  (Hr'g Tr. 10/19/23 at
104, Doc. 2735.)  Rossi responded:  "Oh, really."  (*Id.*)  When asked to interpret BR's
comment, Rossi testified as follows:

> [I]t was just a weird thing.  I was more concerned at that point because he
> had just told me that he hung out with Freestones and the fact that he was
> housed with a member of the Western Hills was very surprising to me.  I
> learned later that, actually, much [more] recently, that essentially there's not
> enough room at the inn and so if you wear red, you're all put together.  But
> apparently there was no follow-up by CCA or anything to figure out whether
> or not those two groups got along.

(*Id.* at 105–106.)

Rossi did not take BR's comment about his cell mate to mean that he had
information on Mike Williams or was afraid of him. (*Id.* at 106.)  Rather, it "[s]ounded

1   like an anecdote considering that we had discussed that I was the prosecutor in the case."
2   (*Id.*)

3        Smith was present when BR made the comment about Mike Williams, but Rossi is
4   not sure if Smith heard the comment.   (*Id.*)   Based on that comment and the general
5   conversation during the free talk, Rossi advised Smith that "if Mr. [BR] was to share
6   information about Western Hills, because Ms. Monteen is charged in the RICO count, then
7   he may have a conflict."  (Hr'g Tr. 10/19/23 at 107, Doc. 2735.)  The Court pointed out to
8   Rossi that his May 10, 2022, memo to file reflects that he told Smith that he "would" have
9   a conflict if BR decided to share information.  (*Id.* at 115.)  Rossi testified that "[i]f I said
10  in the memo that he would have a conflict, then that is what I said."  (*Id.* at 116.)

11       Rossi believes that Smith said: "well, he doesn't know them anyway or he doesn't
12  have information on them anyway.  And we're not going to talk about that."  (*Id.* at 107.)
13  However, Rossi later testified (after a review of his memo to file) that Smith more likely
14  said that he did not have a conflict because BR had not shared information about Western
15  Hills.  (*Id.* at 116.)  Rossi does not think that Smith "realized that he was potentially in the
16  middle of a conflict situation[.]"  (Hr'g Tr. 10/19/23 at 110, Doc. 2735.)  But Rossi did not
17  and does not think that Smith had a conflict based on the general conversation during the
18  first free talk and/or the fact that BR said that he was cell mates with Mike Williams.  (*Id.*
19  at 109.)

20       Rossi did not have a debrief with the agents about the Western Hills or Freestone
21  information shared by BR.  (*Id.* at 110.)   There was no desire to follow up on this
22  information; any follow-up was specific to SMGK and Moreno-Aguilar.  (*Id.* at 111.)  In
23  response to counsel's question of whether Rossi did not want to get into Western Hills or
24  Freestones with BR because of Smith representation of Monteen, Rossi responded:
25  "Partially, yes."  (*Id.*)

26       Shortly after the first free talk, Rossi had discussions with Erica Seger, who was his
27  co-counsel and a Senior Litigation Counsel, about what was discussed at the first free talk.
28  (Hr'g Tr. 10/19/23 at 113, Doc. 2735.)  Some of those discussions related to the Western

Hills investigation and Smith potential conflict.  (*Id.*)  Rossi did not discuss the potential conflict issue with a direct supervisor.  (*Id.*)  Ms. Seger provided Rossi with advice and she warned Mr. Smith "about the potential conflict should Mr. [BR] in the future discuss specifics about Western Hills." (*Id.* at 114.)  Rossi testified that Ms. Seger "affirmed and agreed that I'd taken the proper steps." (*Id.* at 115.)

*Events leading up to the August 11, 2021 Free Talk:*

Prior to the August 11, 2021 free talk, Smith emailed Rossi "with information regarding Brian Moreno-Aguilar that he said that Mr. [BR] had received."  (Hr'g Tr. 10/19/23 at 118, Doc. 2735.)  Rossi was concerned because BR either reached out to Moreno Aguilar or arranged to have contact with him, despite Rossi's warnings to BR in the first free talk "not to reach out to Brian Moreno Aguilar[.]"  (Hr'g Tr. 10/18/23 at 193, Doc. 2734; Hr'g Tr. 10/19/23 at 118, Doc. 2735.)

Rossi did not discuss with Smith whether BR would be sharing information on WHB or Freestones at the August 2021 free talk; their discussions were only about Moreno Aguilar.  (Hr'g Tr. 10/19/23 at 118–19, Doc. 2735.)  Rossi did not have concerns about WHB or Freestones coming up again because it appeared that BR "wasn't interested in sharing information about the Freestones" so there was no plan to have an "in-depth conversation with him about any Freestone murders."  (*Id.* at 119.)

Agents did some follow-up on the information that BR provided at the first free talk about SMGK and Moreno-Aguilar.  (*Id.*)  Rossi does not believe that he had any discussions with agents on the WHB case (Detective Frieberg or Agent Parkinson) about anything that BR discussed at the first free talk.  (*Id.*)  Prior to the second free talk, Rossi told AUSA Seger about the Chandler Booker information provided by BR.  (*Id.* at 121.)  Rossi again testified that AUSA Seger "agreed that the surface level conversation about those other murders was not relevant[.]"  (Hr'g Tr. 10/19/23 at 121, Doc. 2735.)  There was not a "plan of action to follow up with Mr. [BR] at some point with respect to any of that information about either Freestones or Western Hills[.]"  (*Id.*)

Going into the second free talk, Rossi did not have any concerns about a potential conflict resulting from Smith's representation of BR and Monteen. (*Id.* at 122.) Rossi testified that if he thought that BR was going to continue to talk about WHB at the second free talk, he would have "consulted with people smarter than me" on the conflict issue. (*Id.*) If he "had known that Mr. [BR] was just going to talk about Freestones," he does not believe that he would "have had to revisit the conflict issue with Mr. Smith[.]" (*Id.*) Rossi does not believe that he had any discussions with Smith about Monteen's case between June 2021 and August 2021. (Hr'g Tr. 10/19/23 at 123, Doc. 2735.)

*August 11, 2021 Free Talk:*

Prior to the August 11, 2021 free talk, Rossi and Smith did not have a discussion about "ground rules," such as, "not talking about Freestones and Western Hills." (*Id.*) Smith did tell Rossi that he would have to leave the free talk to attend a sentencing. (*Id.*) Smith was comfortable with the free talk continuing when he was not present. (*Id.*) BR told Smith that he was comfortable with the free talk proceeding in Smith's absence. (*Id.* at 124.) Smith told BR: "I'll get a copy of the tape." (Hr'g Tr. 10/19/23 at 124, Doc. 2735.) Rossi does not recall if Smith requested a copy of the tape; he added that we should have sent Smith a copy, but "if we didn't, that was my fault." (*Id.* at 125.)

Counsel asked Rossi if he thought that he could talk with BR about any subject while Smith was not present. (*Id.* at 123.) Rossi testified: "I wouldn't say any subject," but "[t]o my knowledge . . . we were going to be talking about the SMGK and [Bryan] Moreno-Aguilar." (*Id.* at 124.) When asked how Smith could effectively represent BR if he was not in the room, Rossi testified: "I don't know. I'm not a defense attorney. That's why I asked him if he felt comfortable or if he wanted us to stop." (*Id.*)

Rossi agreed that after the discussion about SMGK and Moreno-Aguilar, Agent Douglas asked BR if he had any other information "on violent crimes or things you think would help us out[.]" (Hr'g Tr. 10/19/23 at 126, Doc. 2735.) Rossi described that question as standard practice in all free talks. (*Id.*) Rossi did not "have any preparations with Special Agent Douglas about asking Mr. [BR] about information about other crimes[.]"

(*Id.*)  Rossi also did not give Agent Douglas any warning to stay away from WHB or Freestone information which might create a conflict.  (*Id.* at 127.)

Rossi agreed that he asked BR if he wanted to talk about Chanky (which is Chandler Booker's nickname) and BR responded that he was not sure if he wanted to do so.  (*Id.*) Rossi agreed that BR later made the following statement:  "[L]ike I told you before, like I know all the dudes, you know.  You know that case, you know, all of them."  (Hr'g Tr. 10/19/23 at 129, Doc. 2735.)  When asked if the reference to "the dudes" and "that case" meant the WHB case, Rossi testified that he thought BR was referring to the murder of Chandler Booker.  (*Id.*)  When confronted with the fact that there is not a Chander Booker case because it's an unsolved homicide, Rossi explained "[t]his whole conversation started with me asking him if he changed his mind about discussing Chanky, that case, as in the murder of Chandler Booker.  That's how I took it."  (*Id.*)  Rossi conceded that he did "not know what [BR] specifically in his mind was referring to as 'that case.'"  (*Id.* at 130.)  Rossi agreed that at the third free talk BR did not provide any information on Chandler Booker, only WHB, which is what BR's letter addressed.  (*Id.*)

Rossi agreed that Smith was not in the room when the discussion above occurred. (Hr'g Tr. 10/19/23 at 130, Doc. 2735.)  In response to counsel's question of whether Rossi had a concern about the free talk proceeding without counsel present, Rossi testified that it is not uncommon for defense attorneys to leave the room during a free talk, which he described as "a conversation between the defendant and the law enforcement agents that are present."  (*Id.* at 131.)  He added that "there's really nothing for the defense attorney to do.  I also know some defense attorneys sit in there and have a hard time staying awake, sometimes I do, because we're not involved most of the time."  (*Id.* at 132.)  Rossi further explained that:

> [W]e were talking about Freestone crimes, specifically the murder of Chandler Booker.  And then also if Mr. [BR] had information with regard to a murder or any information really that would be a conflict, we would then deal with the conflict.  I'm not going to not get information about a murder because of a potential conflict when the – if a conflict happens, and say Mr. [BR] said this, well, I know somebody in this case committed a murder.

* * *

Okay.  We're going to pause here.  I'm going to talk to somebody smarter than me on this issue, and right now, Jesse, you need to get off the case.

(*Id.* at 132–33.)

Counsel asked if Rossi if he was being "vigilant or really paying attention" during the free talk when Smith was not present because BR had given "an indication that he's going to talk on an area that is probably off limits[.]" (*Id.* at 133.)  Rossi testified:  "I didn't believe that he was going to talk about an area that was off limits."  (Hr'g Tr. 10/19/23 at 133, Doc. 2735.)  However, he agreed with counsel that he had an obligation "to pay a little extra attention" when Smith was not present.  (*Id.*)

Rossi agreed that, without any prompting by BR, he asked BR "if he was still cellmates with Mike Williams[.]"  (*Id.* at 136).  BR responded that he was housed with Sammy Mack.  (*Id.* at 137.)  BR also said that a knife that belonged to Mike Williams was found in his cell when he was cellmates with David Williams and both he and David Williams were sent to "the hole."  (*Id.* at 138.)  BR also referred to "Lil' Mike" and that he's "also at rec with Saint."  (Hr'g Tr. 10/19/23 at 138, Doc. 2735.)

In response to counsel's question of why he asked BR about his cellmate which led to the discussion of other WHB members, Rossi testified that he was "curious."  (*Id.* at 136.)  He explained that he "found it astonishing that they would place somebody who's friends with Freestones[,]" who are the sworn enemies of the WHB, "who have literally and repeatedly called for their murder on sight."  (*Id.*)  Notwithstanding his curiosity and astonishment, Rossi testified that he did not ask the U.S. Marshals Service about the housing situation at that time.  (*Id.*)[10]

Rossi does not believe that he "opened the door" to BR providing information about

---

[10]  Rossi explained that he was recently told that there is no room at CCA, so they presume inmates are "on the same team" unless there's an incident at CCA.  (Hr'g Tr. 10/19/23 at 136, Doc. 2735.)  Rossi testified that AUSA Hopkins and AUSAA Sottosanti later asked about housing decisions "in relation to the other matter on this issue;" there was no time frame provided for when that inquiry was made or whom it was made.  (*Id.* at 137.)

WHB members by asking about Mike Williams.  (*Id.* at 140.)  He also does not believe that BR's comments about Little Mike, Sammy Mac or Saint created a potential conflict.  (Hr'g Tr. 10/20/23 at 13, Doc. 2736.)  Rossi felt that BR "was just trying to build a rapport" because he did not give any specifics about what these defendants said.  (Hr'g Tr. 10/19/23 at 140, Doc. 2735.)  Rossi agreed that after BR talked "about Saint and hanging out with Saint and Little Mike," he told BR:  "Hey, we're not going to talk about them today.  I was just curious." (*Id.* at 157.)

Rossi also agreed that when Smith returned to the free talk, he told BR that if he wants to talk about "the other thing where I represent someone, I will leave the room because I don't want to create a conflict."  (*Id.* at 144.)  Rossi testified that he was "confused" by Smith's statement.  (*Id.*)  He explained that "[u]p to this point, I had been under the impression that Mr. [BR] didn't have any information on the Western Hills guys so I wasn't sure what he was talking about and . . . it kind of came out of nowhere[.]"  (*Id.*)[11]

Rossi agreed that Smith's reference to "that other thing" where he represents someone is the Western Hills case. (Doc. 2735, 10/19/23 Tr. at 144.)  He also agreed that Smith had just shared with BR that he represents someone in the Western Hills case.  (*Id.* at 145.)  And Smith had told BR in the first free talk that Rossi was the lead prosecutor on the WHB case.  (*Id.*)

With respect to Smith's comment that he does not "want to be present" if WHB information is discussed, Rossi testified:  "I have no idea of what that means."  (*Id.*)  Rossi interpreted that comment to mean that Smith would leave the room if WHB matters were going to be discussed, which is one of the reasons that he was confused.  (*Id.*)  Rossi didn't ask for clarification because he did not think they would be talking about WHB.  (Hr'g Tr. 10/19/23 at 146, Doc. 2735.)  He thought that Smith "just misspoke," "was confused," or "was referencing something specific like he'd just remove himself from the situation and

---

[11] BR testified that at the time of the second free talk he knew that Smith represented someone in the Western Hills case but was not sure who he represented.  (Hr'g Tr. 10/16/23 at 111–12, Doc. 2732.)

still report that he had a conflict." (*Id.*)  When asked if he had "any concern that Mr. Smith had no idea what the ethical rules were about a conflict," Rossi testified:  "I was just confused in general about that but I also knew that we weren't going to be talking about it, the Western Hills case, with Mr. [BR], at least not in the foreseeable future.  So his – I just left it at that."  (*Id.* at 145–46.)  Mr. Smith's comments did not give Rossi "any concern to even think about conflict issues with Mr. Smith[.]"  (*Id.* at 146–47.)

Rossi disagreed with counsel that Smith's comment to BR that "[i]f you want to talk about the other thing" is the first time that Smith informed Rossi that BR "was available to provide information on the Western Hills case[.]"  (*Id.* at 147.)  Rossi explained that "I thought [Smith] was conflating Western Hills and Freestones, that's why I was confused about why he would have to leave the room, one of the reasons I was confused about that statement."  (Hr'g Tr. 10/19/23 at 148, Doc. 2735.)

Rossi initially agreed with counsel that Smith was referring to Monteen when he made the comment:  "As far as I know, she had nothing to do with the homicides with that other indictment."  (*Id.* at 148–49.)  However, Rossi later testified that:

> I was confused and thought that maybe [Smith] was conflating the fact that Freestones were intertwined with Western Hills and so I thought he was thinking that he possibly could have a conflict if we talked about, say, for example, the Chandler Booker murder.  So that's why I was confused as to why he would have to leave for that and so, in my mind at that time, I thought that that's what he was referring to and he was just confused.

(*Id.* at 149.)

Rossi acknowledged that maybe he misinterpreted what Smith said, but that was his impression at the time.  (*Id.*)  Rossi did not believe that Smith would have a conflict if BR talked about the Chandler Booker murder.  (*Id.* at 158–59.)  Rossi did not ask Smith any questions about why he would have a conflict if BR talked about the Chandler Booker murder.  (Hr'g Tr. 10/19/23 at 158, Doc. 2735.)  Rossi explained that he "didn't want to clarify that at the time in front of Mr. [BR] because it had nothing to do with Mr. [BR]."  (*Id.* at 153.)

Rossi was not concerned when Smith referenced Monteen with BR in the room.  (*Id.* at 150.)  He explained that Smith "was just saying that he represented her in that other case."  (*Id.* at 151.)  However, he acknowledged that Smith was also representing that Monteen had nothing to do with the homicides charged in the WHB case.  (*Id.*)  Rossi added that Monteen is "not indicted for those homicides."  (*Id.*)

After the free talk concluded and the recorder was turned off, Rossi may have had a conversation with Smith about "logistics" and the next steps for BR "to become involved in the SMGK case with contacting Brian Moreno-Aguilar."  (Hr'g Tr. 10/19/23 at 154, Doc. 2735.)  There was no discussion about BR bringing up Mike Williams, Sammy Mack, Saint, or whether BR had Western Hills information.  (*Id.*)  Rossi did not tell Smith that he may have a conflict if BR was going to talk about Western Hills.  (*Id.*)

Based on what was discussed at the second free talk, Rossi testified that if he knew that BR wanted to talk about Western Hills, he "would defer to people who are much more ingrained in this but I would definitely bring it up to [Smith] and to my supervisors."  (*Id.* at 160.)  Rossi agreed with counsel that he needed to be "alert about conflict issues;" but he added:  "I'm by no means an expert."  (*Id.* at 161.)

Rossi's opinion is that BR would not have to be a government "witness against Monteen for a conflict to have existed[.]"  (Hr'g Tr. 10/19/23 at 161, Doc. 2735.)  Counsel asked if Rossi believed Smith would have a conflict "if Mr. [BR] just sat for a cooperation free talk and the subject was Western Hills[.]"  (*Id.* at 163.)  Rossi testified as follows:  "Again, I'm not an expert in this but I've been trained . . . to be on the lookout for potential conflicts and . . . if I see a potential conflict, I do bring it up to either our SLC or my direct supervisor or both and discuss it with our ethics persons, all of which I did do after the third interview."  (*Id.*)  He added that he "expressed his concern to Mr. Smith" after the third interview.  (*Id.*)  Rossi clarified that he did not believe that a conflict would arise merely if Smith said that BR "was willing to sit down for a free talk about Western Hills."  (*Id.* at 164.)  Rather, the conflict would arise if BR "does sit down for an interview[.]"  (Hr'g Tr. 10/19/23 at 164, Doc. 2735.)

- 45 -

*BR's letter to Rossi*:

BR sent Rossi a letter postmarked November 30, 2021.  (Hr'g Tr. 10/18/23 at 198, Doc. 2734.)  Rossi believes he received the letter the first week of December 2021.  (Hr'g Tr. 10/20/23 at 16, Doc. 2736.)  Rossi sent an email dated December 6, 2021, to the members of the trial team (AUSA Seger and law enforcement officers) involved in the Western Hills case.  Rossi advised these individuals that: (1) he got a letter from BR; (2) they should free talk him and push out his sentencing; and (3) they need "to hash some things out because of Ms. Monteen's involvement in the case."  (Hr'g Tr. 10/20/23 at 18, Doc. 2736.)  Rossi sent this email "[b]ecause it was pertinent information for the trial team."  (*Id.* at 35.)

Rossi does not recall if anyone responded to his email, but he is sure that he had a meeting with the trial team (AUSA Seger, Agent Parkinson, and Detective Frieberg) to discuss the letter.  (*Id.*)  That meeting likely occurred shortly after he received the letter.  (*Id.* at 36.)  The meeting was not limited to discussing the Western Hills information; the conflict issue was discussed as well.  (*Id.*)  Rossi testified that he does not think he "said that there was a conflict but I did discuss the fact that should Mr. [BR] disclose information about RICO charges . . . then I would believe that Mr. Smith would have to get off the case."  (Hr'g Tr. 10/20/23 at 35, Doc. 2736.)

Rossi agreed with counsel that he had an obligation "to protect not only Ms. Monteen but to protect Mr. [BR] from a conflicted attorney[.]"  (*Id.* at 37.)  Rossi did not look at the ethical rules that address conflicts of interests prior to sending the email to the trial team.  (*Id.* at 37–38.)  He believes he first looked at those rules after the third free talk.  (*Id.* at 38.)

Rossi acknowledged that BR's letter was from a represented party.  (*Id.* at 17, 21.)  Rossi does not believe that he had an obligation to send the letter to Smith without reading it.  (Hr'g Tr. 10/20/23 at 21, Doc. 2736.)  When asked to explain why he believed he could read the letter, Rossi testified: "Because it was addressed to me."  (*Id.*)  He further explained that "I'm not an expert in ethics and . . . in cases such as this, I usually refer to

people much smarter than me on this subject. And in the case of Mr. [BR]'s communication, whether it be to me or to anyone else that is not his attorney, those communications, I believe, are not privileged." (*Id.*) Rossi believes that he communicated with other people in his office when he received the letter. (*Id.*) Rossi added that he "equated it to him writing a letter to someone out of custody other than his attorney." (*Id.*)

Rossi agreed that BR's letter generally says the following: (1) BR knows about Western Hills and Freestones; (2) he knows "about Marshall too;" is "willing to cooperate 100 percent; and he "know[s] everything about Western Hills;" (3) "I help you and tell you about all the murders and all about the Western Hills;" and (4) "you get me to my family and I get you a conviction." (Hr'g Tr. 10/18/23 at 199–200, Doc. 2734.) BR's letter also states: "The last time we spoke I told you I knew a lot about Western Hills and Freestones." (Hr'g Tr. 10/20/23 at 22, Doc. 2736.) Rossi does not recall BR "ever saying he knew a lot about Western Hills." (*Id.*)

Rossi testified that the following subject areas mentioned in BR's letter led to the decision to conduct a third free talk: (1) the Marshall David murder; (2) that BR "knew everything about Western Hills, Floyd Davis  and then he also goes on to mention Rodney Wilson, Shamone Davis, and says he knows everything;" (3) David Williams "was his celly" and he knew "Sly Bone;" (4) the incident with Kenyatta, who is a listed victim in the RICO charge; and (5) "he knows why the Hills and Freestones are beefing," although that was less important to Rossi. (*Id.* at 25.) BR also wrote: "I know a lot more than you do about this situation." (*Id.* at 27.) What specifically "stood out" to Rossi "was Marshall Davis and [the] reference to Freestones and also including that he talked to David Williams and Sly Bone, too, or at least were cellies with them." (*Id.* at 25.)

Rossi agreed with counsel that in prior free talks BR had mentioned Marshall Davis, Floyd Davis, Rodney, Shamone, David Willliams, Sly Bone, Western Hills, and the beef between Western Hills and Freestones. (*Id.* at 26.) Rossi further agreed that there was no information in the letter that BR had not mentioned in prior free talks. (*Id.* at 27.)

Rossi disagreed with counsel that he knew the letter "created a conflict for Smith

1   for his continued representation of Ms. Monteen," but he did have a concern.  (*Id.* at 29.)

2   When asked to explain why the letter did not create a conflict, Rossi testified that BR was

3   "saying he knows about these things" but "I don't know what that means."  (*Id.*)  He added

4   that BR was not providing information "about Western Hills that went to the RICO charges,

5   that would create a conflict for Mr. Smith[.]"  (*Id.*)

6        Rossi's view is that after the third free talk Smith had a conflict in continuing to

7   represent Monteen and BR.  (*Id.* at 34.)  Rossi explained:

> It's my belief, rightly or wrongly, that until Mr. [BR] shared actual information in relation to those RICO charges, then there was no conflict. And the reason for that is because, you've seen from Mr. [BR], he's mentioned names . . . but no information was shared.  And, further, in my experience, people have claimed to have information about certain things and it turns out that they do not.  So it was imperative to find out if actually Mr. BR did have information and then, if he did have information, . . . and shared that with agents and myself, then there would be a conflict for Mr. Smith.

14   (*Id.* at 40–41.)

15        Rossi is "familiar with the concept of the ethical rule that [an] attorney cannot have

16   divided loyalties[.]"  (*Id.* at 41.)  At the time he received the BR letter, Rossi thought about

17   and looked at whether Smith had divided loyalties.  (*Id.*)  However, Rossi's view was that

18   Smith did not yet know if he had a conflict because BR had not yet shared any information.

19   (*Id.* at 42.)

20        Given Rossi's position that Smith would only have a conflict only if BR provided

21   information on Western Hills, the Court asked why he decided to take the chance of

22   creating a conflict.  (Hr'g Tr. 10/20/23 at 43, Doc. 2736.)  Rossi testified that he "did

23   caution Mr. Smith that if [BR] actually did provide information, then Mr. Smith would

24   have a conflict."  (*Id.*)  Rossi agreed with the Court that "by going forward, [he] clearly ran

25   the risk of [Smith] having to withdraw from a case that he had been on . . . about a year

26   and a half" and the result would be that it would take a new attorney "years to come up to

27   speed" on the case.  (*Id.* at 44.)  Rossi testified that he "didn't know what other steps [he]

28   could have taken at that time."  (*Id.* at 45.)  He explained:

[T]here was a risk, and I had discussed that with Mr. Smith and he was aware of that. And so I had asked him during that conversation if he wanted to go forward with the free talk and I believe his response was something to the effect of, well, we'll see what he says. And so, at that point, I'd notified him of the potential conflict and I told him specifically that if Mr. [BR] did share such information that he would have a conflict in both cases. So, at that point, I didn't know if there was anything further that I could do without actually hearing the information that Mr. [BR] provided. Because if Mr. [BR] just went in there and just said names and said the gang gossip, as we've discussed, then there's no conflict.

(*Id.* at 44–45.)

### The Rossi Memo to File:

Rossi wrote a memorandum to file dated May 10, 2022, after consulting with AUSA Robert Fellrath, who was the Acting Criminal Chief for the Western Hills case. (Hr'g Tr. 10/20/23 at 30, 33, Doc. 2736.) Rossi believes that his conversation with AUSA Fellrath occurred in March or April 2022, before Rossi "filed a motion with Judge Marquez to have Mr. Smith removed from Mr. [BR]'s case." (*Id.* at 30.) Rossi did not consult with anyone else before writing the memo. (*Id.* at 33.)

### Communications with Smith prior to the December 2021 Free Talk:

After receiving BR's letter, Rossi forwarded it to Smith in an email dated December 6, 2021. (*Id.* at 47.) In the email, Rossi stated: "I'd like to set up another free talk with him based on the contents of his letter and set off sentencing so we can hash this out[.]" (*Id.*) In response to counsel's question of what "hash this out" means, Rossi testified: "number one, whether or not we should go forward with the free talk based on [the] potential conflict; number two, Mr. [BR] was going to be sentenced relatively quickly and so if he did provide information, that would be beneficial to him at sentencing, that would be something that we'd need to set off for sentencing." (Hr'g Tr. 10/20/23 at 47, Doc. 2736.) When asked what he needed to hear from Mr. Smith in order to go forward with the free talk, Rossi responded: "if he felt that he, at this point, needed to withdraw and, if not, how we were going to handle moving forward if he did share information about Western Hills and the RICO charges." (*Id.* at 48.)

- 49 -

1          Shortly after the December 6, 2021 email, Rossi had phone conversations "with Mr.

2     Smith about the potential content'' of the third free talk.  (Hr'g Tr. 10/18/23 at 200, Doc.

3     2734.)  Rossi did not tell Smith about areas that would be the focus of the free talk because

4     the letter referred to areas of interest to the government – *i.e.,* Floyd Davis, Freestones, and

5     the Marshall Davis homicide.  (*Id.* at 201.)   The phone conversations consisted of making

6     sure Smith got the letter and raising the concern about a potential conflict (like he did after

7     the first free talk) because "it sounded like [BR] was going to talk about Western Hills and

8     their associates[.]"   (*Id.* at 200–201.)   Specifically, Rossi explained to Smith that the

9     conflict was that he's representing Ms. Monteen and she's charged in the RICO conspiracy.

10    (Hr'g Tr. 10/20/23 at 53, Doc. 2736.)  Rossi told Smith that if BR shared information about

11    Western Hills "he would have a conflict and would have to get off."  (*Id.* at 54.)   Smith

12    said something to the effect that he did not know what information BR had or what he was

13    going to say in the free talk, and that we would just have to wait and see if there was going

14    to be any potential conflict.  (Hr'g Tr. 10/18/23 at 201, Doc. 2734; Hr'g Tr. 10/20/23 at

15    53–54, Doc. 2736.)  Based on Smith's comments during their phone conversations, Rossi

16    got the sense that Smith was not "going to communicate with Mr. [BR] prior to the free

17    talk."  (Hr'g Tr. 10/18/23 at 202, Doc. 2734.)

18          However, Smith sent Rossi an email dated December 9, 2021, in which he stated:

19    "I'll be seeing [BR] Saturday morning to go over things for sentencing but need to discuss

20    with you prior to talking to him what, if any, subjects I should avoid talking about. . . . For

21    example, should I be asking him about any information on . . . Ms. Monteen to see if there

22    is a conflict or do you think I have to conflict out of her case?"  (Hr'g Tr. 10/20/23 at 49,

23    Doc. 2736.)  Smith also wrote:  "Do not want to create any issues."  (*Id.*)  Rossi's testified

24    that Smith was asking his "opinion about how he should talk to Mr. [BR] or if he thought

25    that . . . he had a conflict in Ms. Monteen's case."  (*Id.* at 47–48.)  Rossi did not understand

26    why Smith was asking him those questions.  (*Id.* at 48.)  Rossi agreed with counsel that

27    Smith did not tell him anything about the conflict issue or answer his question of whether

28    there is a conflict.  (*Id.* at 50.)

1    Rossi does not believe that Smith's question of whether he should avoid talking with

2    BR about Monteen is in line with the conflict rules.  (*Id.*)  Rossi testified that he had

3    explained to Smith on multiple occasions that "if Mr. [BR] shared information about not

4    just Ms. Monteen but about the RICO charges in general, then he would have a conflict."

5    (Hr'g Tr. 10/20/23 at 51, Doc. 2736.)  Rossi agreed that Smith's email reflects that he

6    "completely missed" the "major conflict about the RICO charge [and] Ms. Monteen[.]"

7    (*Id.*)  In fact, Smith's email did not clear up Rossi's question about the conflict issue; it

8    caused more concern about the conflict issue.  (*Id.* at 51–52.)

9    Rossi did not have a concern that a conflict already existed because of the BR letter;

10   as a result, he did not communicate any such concern to Smith.  (*Id.* at 53–54.)  Rossi did

11   not ask if Smith knew that BR had sent or was planning to send the letter.  (*Id.* at 55.)  He

12   also did not ask Smith if he and BR talked about the letter and has no idea if Smith and BR

13   talked about the letter prior to the third free talk.  (Hr'g Tr. 10/20/23 at 54, Doc. 2736.)

14   Rossi did not want to get into privileged communications.  (*Id.* at 55.)

15   Rossi was not concerned that Smith may be sharing Western Hills information while

16   preparing BR for the third free talk.  (*Id.*)  Rossi explained that "my understanding, based

17   on the conversations I had with [Smith] was that he was not going to prep Mr. [BR], that

18   we were just going to see what he said in the free talk.  And also it is not my practice to

19   assume that defense attorneys would do something like that.  That seems like a pretty

20   egregious violation of their responsibilities."  (*Id.* at 56.)  However, Rossi acknowledged

21   that Smith's December 9, 2021, email clearly says that he is going to the detention facility

22   "to prep him for the free talk."  (*Id.*)

23   Rossi agreed that Smith sent him an email dated December 13, 2021, which

24   confirmed that he met with BR and that he has Western Hills information.  (Hr'g Tr.

25   10/20/23 at 59–60, Doc. 2736.)  Rossi does not recall if he had any further discussion with

26   Smith after receiving this email.  (*Id.* at 60.)

27   Rossi had no indication that BR knew Monteen.  (Hr'g Tr. 10/18/23 at 202, Doc.

28   2734.)  Rossi did not have a conversation with Smith about avoiding discussing Monteen.

1   (Hr'g Tr. 10/20/23 at 56, Doc. 2736.)  He does not recall Smith saying that "we're going

2   to do this free talk but we're not going to talk about Ms. Monteen[.]"  (Hr'g Tr. 10/18/23

3   at 203, Doc. 2734.)

4          In response to counsel's question of whether it was "[f]air to say that you and Mr.

5   Smith embarked on a path to just take the risk to . . . see if a conflict matured at the free

6   talk," Rossi testified:  "I wouldn't put it in those terms but we did know that that was a

7   possibility, yes."  (Hr'g Tr. 10/20/23 at 60, Doc. 2736.)  Rossi first testified that he did not

8   have a concern prior to the third free talk that Smith did not "understand the nature of the

9   conflict" because he had "explained it to him."  (*Id.*)  However, he acknowledged that after

10  he received Smith's December 9, 2021, email he was concerned that Smith that did not

11  "understand the nature of the conflict."  (*Id.* at 61.)  Rossi explained that their subsequent

12  telephone conversations alleviated that concern.  (*Id.*)  Prior to the third free talk, Smith

13  never told Rossi that he planned to withdraw.  (*Id.*)

14          *December 28, 2021 Free Talk*:

15          Rossi did not attend the third free talk because he was sick.  (Hr'g Tr. 10/18/23 at

16  204, Doc. 2734.)  If Rossi had been able to attend the third free talk, he "possibly" would

17  have stopped the free talk if Monteen's name came up.  (Hr'g Tr. 10/20/23 at 56–57, Doc.

18  2736.)  Because he was not present, he had to rely on the agents, whose responsibilities are

19  "totally different" than his, to "stand in his shoes."  (*Id.* at 57.)  As a result, Rossi did not

20  expect the agents to have knowledge of "prosecutorial responsibilities."  (*Id.*)

21          At one point during his testimony, Rossi testified that he did not "have a prep with

22  Agent Parkinson" for the free talk.  (*Id.*)  He explained that he "had notified Mr. Smith

23  several times . . . what I felt was going to be a conflict, and if the information was going to

24  come out in that free talk, then he was going to have a conflict and we were going to move

25  on from there."  (*Id.*)  However, at another point, Rossi testified that he believes that he

26  had a conversation with the agents prior to the free talk about not discussing Monteen.

27  (Hr'g Tr. 10/18/23 at 202, Doc. 2734.)  Rossi explained that he had this conversation

28  "because of my concern that Mr. Smith was representing Mr. [BR] and Ms. Monteen," and

even if BR "had no knowledge of Monteen, she's still charged in the RICO count so any evidence that Mr. [BR] may proffer to us would necessarily implicate his client." (*Id.* at 203–04.)

Rossi would have preferred to attend the free talk, but he disagreed with counsel that it was critical for him to be present. (Hr'g Tr. 10/20/23 at 61, Doc. 2736.) When asked why he did not cancel or reschedule the free talk, Rossi testified as follows:

> A couple reasons. We'd already reset it once, I was concerned that Mr. [BR] may change his mind if he did have information, and also I'd explained to Mr. Smith at this point several times what my and my office's position would be should Mr. [BR] share information that relates to those RICO charges. And, frankly, I was a little resigned to the fact that it's going to come up.

(*Id.* at 61–62.)

Rossi disagreed that BR's comment made during the third free talk that Monteen was not involved in anything "sticks out like a sore thumb" in the transcript. (*Id.* at 100.) Rossi testified that "[i]t didn't sound like he knew her too well." (*Id.*) It also did not seem "out of the ordinary" that BR said that Monteen was "not involved in anything, this is all Mike Williams, she wasn't part of the conspiracy[.]" (*Id.*) Rossi presumed that BR knew than Smith represented Monteen by the time of the third free talk. (*Id.*)

*Discussions after the December 28, 2021 free talk*:

Rossi got a verbal report from the agents about what was discussed at the free talk and later got a transcript of the audio recording. (Hr'g Tr. 10/18/23 at 204, Doc. 2734.) He does not "recall much of the conversation other than the general sense that [BR] had, in fact, discussed information related to the RICO charges." (Hr'g Tr. 10/20/23 at 62, Doc. 2736.)

Rossi sent Smith an email dated January 3, 2022, that stated: "Based on my initial conversation with the agent, we'd like to use Mr. [BR] as a witness. I anticipate seeking a cooperation agreement for him." (*Id.*) Rossi agreed that his email does not mention the conflict or Smith having to withdraw from representing Monteen and/or BR. (*Id.*) Rossi is not of aware of another email in the January 2022 time frame in which he told Smith that

1    he needed to withdraw.  (*Id.*)

2          Rossi believes that he called Smith after he became aware that BR had talked about

3    Monteen and the RICO charges.  (Hr'g Tr. 10/18/23 at 205, Doc. 2734; Hr'g Tr. 10/20/23

4    at 63, Doc. 2736.)  He cannot recall if that conversation occurred before or after the January

5    3, 2022 email.  (Hr'g Tr. 10/20/23 at 63, Doc. 2736.)  In that phone conversation, Rossi

6    "relayed the government's concern over a possible conflict and Mr. Smith asserted that he

7    would conflict himself off Ms. Monteen's case if and when Mr. [BR] accepted a

8    cooperation agreement."  (*Id.* at 63–64.)  Rossi also reminded Smith that the conflict would

9    apply to both Monteen and BR.  (*Id.* at 64.)  The first time that Rossi asked Smith to

10   withdraw was during this phone conversation.  (*Id.* at 65.)  Rossi also told Smith during

11   this conversation that the BR free talks would have to be disclosed to the defense as *Brady*

12   material even if BR decided not to cooperate.  (*Id.* at 112.)  Rossi does not know if Smith

13   ever advised BR of the need to disclose his free talks even he decided not to cooperate.

14   (Hr'g Tr. 10/20/23 at 112, Doc. 2736.)

15          *Allowing Monteen's conflict to linger until March 25, 2022:*

16          Rossi confirmed that his position was that Smith's conflict arose on December 28,

17   2021, the date of the third free talk.  (*Id.* at 65.)  At that point, Mr. Smith had to be off

18   Monteen's case no matter what happened[.]"  (*Id.* at 66.)  In response to counsel's question

19   of what steps were taken "to get Mr. Smith off Ms. Monteen's case," Rossi testified:

20   "Resolve [BR]'s case."  (*Id.*)  Counsel followed up by asking how resolving BR's case has

21   anything to do with the fact that Ms. Monteen . . . has a conflicted lawyer?"  (*Id.* at 62.)

22   Rossi testified as follows:

23          Mr. Smith explained in this phone call and others that he was concerned for
            the safety of Mr. [BR], a concern that, frankly, we shared.  So when he said
24          that he wasn't going to withdraw if he had a cooperation addendum – if he
            actually went through with a cooperation addendum, it was one of those
25          things where, okay, whatever you say.  However, you still have a conflict,
            you still need to get off.  So the fact that he put conditions on it doesn't
26          necessarily mean that we agreed with it and the fact that we wanted him off
            both cases . . . meant we had to keep moving forward, unfortunately, at that
27          time because we couldn't do anything about getting him off both cases at that

28

time.

(Hr'g Tr. 10/20/23 at 66, Doc. 2736.)

Rossi agreed with counsel that in his emails with Smith between January 2022 and March 2022, Smith "keeps putting conditions on Mr. [BR]'s cooperation." (*Id.* at 66–7.) For example, at one point Smith says that BR would only cooperate if he was released; at another point Smith says that BR would only cooperate if he was disclosed to the defense as a cooperating witness after he was released; and then he changed his mind and said he would cooperate even if he was not released. (*Id.* at 67.) Rossi agreed with counsel that Smith's "negotiations" to get BR what he wanted "had nothing to do with the fact that he needed to withdraw from [representing] Ms. Monteen." (*Id.* at 67–8.) Rossi reiterated that "our belief" was that "no matter what, he still had the conflict." (*Id.* at 68.) Rossi agreed with counsel that between January 2022 and March 2022, Smith had "not lived up to his end of the bargain [be]cause he [had] not gotten off Ms. Monteen's case[.]" (Hr'g Tr. 10/20/23 at 69, Doc. 2736.)

Rossi also agreed that Smith "conditioned his withdrawal [from] Ms. Monteen's case on something happening with Mr. BR's case." (*Id.* at 65.) Rossi did not agree with the condition that Smith put on his withdrawal. (*Id.* at 62.) In response to counsel's question of whether Rossi's position was "that if he said he wasn't going to withdraw, that you were not going to offer a cooperation addendum," Rossi testified: "I believe at that point we would have raised the issue with a judge." (*Id.* at 64.) Mr. Rossi interpreted Mr. Smith's comments during the course of their discussions to mean that "Mr. Smith was not going to seek to withdraw until [BR] signed on the dotted line on a cooperation agreement[.]" (*Id.* at 108.) If BR had not entered into the cooperation agreement, Mr. Rossi would have brought the conflict to the attention of the court. (Hr'g Tr. 10/20/23 at 108, Doc. 2736.)

Counsel asked Rossi if he agreed that Ms. Monteen was essentially without an attorney for months because she could not "be represented by a conflicted attorney." (*Id.* at 69.) Rossi testified: "Again, I'm not a defense attorney. I don't know the rules of ethics

but she did have a conflicted attorney at that time, yes." (*Id.*)  When asked why he did not bring the conflict to the attention of the Court in January 2022, Rossi testified: "There are a couple reasons.  The concerns about Mr. [BR] were very real, of his safety.  And at that time, those were our priority and it was my desire to get him out of custody before we brought anything up to the court." (*Id.* at 70.)

Rossi disagreed with counsel's characterization that he was "making a decision to advance one defendant's rights over another defendant's rights." (*Id.*)  However, Rossi agreed that Smith should not have been handling case negotiations, case strategy, motions, or attending JDA meetings on Monteen's case because he had a conflict.  (Hr'g Tr. 10/20/23 at 70, Doc. 2736.)  He also agreed that "the legitimacy of those are questioned if it's a conflicted attorney." (*Id.*)  Rossi explained that:

> I understand what you're saying because this was stuff that I thought about but all of that compared to Mr. [BR] being dead, that was, unfortunately, the only – the way that things were working out and the way that things were being described to me by Mr. Smith . . . .  "[T]he way that I had understood [how] safety works in CCA, all of those things at that time led me to believe that two or three months of Ms. Monteen not having someone who isn't conflicted would pale in comparison to the end result of Mr. [BR] being killed in prison.

(*Id.* at 71.)[12]  Rossi disagreed with counsel that he "favored Mr. [BR]'s rights over Ms. Monteen's Sixth Amendment right . . . to have unconflicted counsel." (*Id.* at 72.)  Rossi's explained:  "That wasn't our choice, though, that was Mr. Smith's choice." (*Id.*)

Counsel pointed out to Rossi that he "had an absolutely clear-cut way to deal with this" problem – bring the conflict to the attention of the court in a sealed pleading.  (Hr'g Tr. 10/20/23 at 72, Doc. 2736.)  Rossi testified that he "did do that for Mr. [BR] and the end result was that Judge Marquez told me to politely sit down and shut up." (*Id.*)  Rossi

---

[12] Rossi does not recall if he contacted the U.S. Marshalls Service about BR's safety in January or February of 2022.  (Hr'g Tr. 10/20/23 at 75, Doc. 2736.)  He believes he sent an email to Deputy Marshal Felton at some point.  *Id.*  Rossi recalls an email exchange with Smith where Mr. Smith mentions safety issues, but says that BR will not go into protective custody. (*Id.*)

explained that "in my experience and the experience of other attorneys in our office is that – and rightly so, the judges defer to defense counsel as to whether or not their representation of their client is adequate." (*Id.* at 73.) He added that "if we bring up that particular issue with a judge, even if it's under seal, it does not necessarily mean that, A, it's going to remain secret, and, B, the end result may be a judge's ruling that we are wrong." (*Id.* at 73.)

Rossi agreed that he notified the Court of a potential conflict relating to Mr. Higgins representation of defendant Mure and two or three former clients. (*Id.* at 82–83.) The Court held several sealed hearings to address the potential conflict. (Hr'g Tr. 10/20/23 at 82–85, Doc. 2736.) Rossi agreed that at any time between January 2022 and March 2022 he had the ability to file a motion to bring the Smith conflict to the court's attention. (*Id.* at 86.) He cannot recall if he discussed the possibility of doing that with Smith. (*Id.*)

*Smith's litigating Motions on behalf of Monteen after the third free talk*:

Rossi recalls litigating a severance motion against Smith in late 2021 and early 2022. (*Id.* at 76.) Rossi agreed that he, AUSA Seger, and Smith appeared before this Court on January 20, 2022, for a hearing on the severance motion. (*Id.* at 77.) Rossi acknowledged that Smith had a conflict at that time and the Court had not yet been made aware of the conflict. (Hr'g Tr. 10/20/23 at 77–78, Doc. 2736.) The District Court was also unaware of the conflict when ruling on Smith's objection to the Report and Recommendation on the severance motion. (*Id.* at 78.) A motion to dismiss based on multiplicity was also filed by Smith in the time period between January 2022 and March 2022. (*Id.*) Again, the court was not made aware of the conflict during the time frame it was resolving that motion. (*Id.*)

On March 10, 2022, Smith joined in a *Franks* motion challenging a search and seizure filed by counsel for Michael Williams (Mr. Flores) and Mr. Rakestraw (Mr. Payson). (*Id.* at 79.) Rossi was involved in litigating that motion. (Hr'g Tr. 10/20/23 at 79, Doc. 2736.) Rossi was not concerned that Smith, who had to conflict off Monteen's case, "was not doing all the things he should be doing to represent Ms. Monteen." (*Id.* at

80.)  Rossi testified that "I'm not sure what else he could have done on a motion that was filed by Mr. Flores and Mr. Payson."  (*Id.*)  Counsel pointed out that at the evidentiary hearing on the motion, Smith only asked three questions of one witness.  With respect to a photograph of Michael Williams, Smith asked the Detective whether he could see a gun on Michael Williams or a "bulge indicating a gun under his shirt."  (*Id.* at 81.)  Smith also confirmed that the Detective never told the state court judge who issued the search warrant either of those things.  (*Id.*)

In response to counsel's question of why he was litigating motions with conflict counsel. Rossi testified:  'Cause at that time I didn't have a choice" and "I had informed him of the conflict."  (Hr'g Tr. 10/20/23 at 86–87, Doc. 2736.)  Rossi explained:

> He did nothing with it.  At that time, he asserted to me that he was going to get off and we were working towards that resolution.  So if I were to bring that to the court – I don't know.  Part of the problem and part of the reason that he wanted to wait until Mr. [BR] was out of custody was the fact that he believed . . . that if he were to withdraw from Ms. Monteen's case, it would be easily discernable the reasons why and the person responsible, frankly, based on his caseload and based on [BR's] interactions with the people in the prison, that was a real possibility.

(*Id.* at 87.)

### *The Concern for BR's Safety and the Impact on Smith's purported inability to withdraw from representing Monteen and/or BR:*

The Court asked Rossi a series of long and somewhat inarticulate questions.  The first question was:

> Did Mr. Smith ever articulate the link between Monteen and [BR], how him withdrawing from Monteen would have affected Mr. [BR]'s safety?  And I ask because like [BR]'s got this, you know, reactive run-of-the-mill alien smuggling case, nobody really knows anything about that.  Did he provide any kind of explanation of why him getting out of Monteen's case impacted or had the potential to impact [BR], whose cooperation was still secret?

(*Id.* at 87.)

Rossi explained that BR had a concern about coming to court for the free talks and "implied that they had asked questions about, like, let me see your paperwork . . . which

- 58 -

happens often in prison." (*Id.* at 88.)  He added that Smith relayed to him that the defendants knew "he was representing [BR] and so if all of a sudden he had to drop out of that case because of a conflict," that fact, coupled with BR coming to court multiple times, led Smith to believe "that they would put together very quickly that Mr. [BR] was cooperating." (*Id.*)

The Court noted that "that's a [BR] issue," it "has nothing to do with withdrawing from Monteen's case." (Hr'g Tr. 10/20/23 at 88, Doc. 2736.)  Rossi testified that Smith "withdrawing from Monteen's case would be a trigger for all of that." (*Id.*)  Rossi explained that Smith told him that:

> he was representing Monteen and all the defendants were cognizant of who their co-defendants were.  And if he had to withdraw because of a conflict, he believed that they would intuit that he was representing someone that was cooperating.  And because Mr. [BR] had interacted with the defendants in this case who are co-defendants with Monteen, he believed that they would be able to intuit that he was the one that was cooperating.

(*Id.* at 88–89.)

Rossi recalls Smith sending him an email on February 12, 2002, which said that he had consulted with a state court judge about the conflict issues[.]" (*Id.* at 89.)  Based on that email, Rossi had a concern that, as late as February 2022, "Mr. Smith was still trying to figure out a way to stay on Mr. BR's case and to stay on Ms. Monteen's case." (*Id.* at 90.)  Counsel asked what steps Rossi had  taken "as late as February to figure out how to protect both . . . the constitutional rights for Mr. [BR] and Ms. Monteen as far as having . . . unconflicted counsel." (Hr'g Tr. 10/20/23 at 91, Doc. 2736.)  Rossi testified as follows:

> Again, I know it sounds simple but we were trying to get Mr. [BR] out of custody because as soon as he was out of custody, we would have no further concerns about his safety  -- well, no immediate concerns about his safety.  And, in doing so, at least my plan was as soon as he was out of custody, if Mr. Smith did not immediately withdraw, then we would be filing a motion for him to withdraw.

(*Id.*)

1    Rossi added that Mr. Smith told him "several times that he wasn't sure if Mr. [BR]

2    was going to go through with it.  And so the first time that I learned specifically that Mr.

3    [BR] was going to actually cooperate was at his sentencing [on March 23, 2022].  And two

4    days later, Mr. Smith got off the case for Ms. Monteen." (*Id.* at 106.)

5    Rossi did not reach out to the U.S. Marshals Service or CCA when he first learned

6    at the June 2021 free talk that BR was housed at CCA with Western Hills defendants.  (*Id.*

7    at 93.)  Rossi agreed that between January 2022 and April 2022, he had the ability to contact

8    the U.S. Marshals Service to have BR put into protective custody.  (*Id.* at 91.)  However,

9    Rossi disagreed that putting BR into protective custody "would have resolved the issues of

10   danger at CCA." (Hr'g Tr. 10/20/23 at 92, Doc. 2736.)  He explained that he was told by

11   the U.S. Marshals Service that "even if he was in protective custody, they could not

12   guarantee his safety." (*Id.*)  However, Rossi does not believe that this conversation was

13   about BR specifically, but rather, cooperators generally.  (*Id.*)

14   Rossi never had any information that BR was "injured or attacked by anybody" at

15   CCA.  (*Id.*)  And Mr. Smith never told Rossi that BR had a physical altercation at CCA

16   interaction or was worried.  (*Id.* at 93.)  Rossi was aware that BR did not have a gang

17   affiliation to Western Hills or Freestones.  (Hr'g Tr. 10/20/23 at 93, Doc. 2736.)

18   *Rossi's consultations with co-counsel and supervisor attorneys:*

19   With respect to the Smith conflict issue, Rossi consulted with the following

20   attorneys in his office:  AUSA Seger, AUSA Clemens, AUSA Fellrath, AUSA Vercauteren

21   (his direct supervisor at the time), and possibly AUSA Sampson.  (*Id.* at 94–95.)  He

22   believes that he had in-person meetings with AUSA Seger and AUSA Clemens, and phone

23   calls with AUSA Vercauteren and possibly AUSA Sampson.  (*Id.*)

24   Rossi believes the third free talk was made available to these attorneys.  (*Id.* at 103.)

25   He does not believe that he provided the attorneys with his emails with Mr. Smith.  (*Id.* at

26   104.)  Rossi testified that even if the other attorneys did not review the free talk transcript,

27   he "gave them a pretty detailed breakdown about what the issues were . . . ." (Hr'g Tr.

28   10/20/23 at 103, Doc. 2736.)  Rossi did not specifically tell these attorneys that "Monteen

was stuck without counsel from January moving forward[.]" (*Id.* at 104.) In response to counsel's question of whether he expressed any concern to these attorneys "about the length of time it was going to be that Monteen was stuck with a conflicted attorney," Rossi testified: "We all did. Hence, unfortunately, we were in that same position with other attorneys." (*Id.*) When asked what "other attorneys" he was referring to, Rossi explained: "the potential conflicts that Mr. Higgins had" which "had been ongoing for two years or so at that point." (*Id.*)

Rossi received the same advice from these attorneys and followed their advice. (*Id.* at 97.) None of these attorneys advised Rossi to take the conflict issue to the court. (Hr'g Tr. 10/20/23 at 97, Doc. 2736.) When asked if he had any idea of why his office did not recommend taking the conflict issue to the court, Rossi explained that in his experience "the result is the same result that I got from Judge Marquez and to run the risk of calling attention to the reasons for Mr. Smith's conflict with Ms. Monteen could have been disastrous." (*Id.*)

Rossi is not aware that the "current law in Arizona on conflicts" provides that the only thing that defense counsel is supposed to tell the judge is that s/he is seeking to withdraw due to "professional considerations." (*Id.* at 98.) Rossi's concern was not filing the motion, it was "an under seal hearing regarding the motion." (*Id.*) Rossi explained that "[t]here are a number of people in this courthouse who are present even during under seal[] hearings and, in my experience" information discussed at the sealed hearing has leaked. (*Id.* at 94–95.)

*The plan to have BR testify at the grand Jury:*

After BR was sentenced to time served on March 23, 2022, and after Smith had withdrawn from representing Monteen a few days later, Rossi had conversations with Smith about getting BR to Phoenix to testify before a grand jury. (Hr'g Tr. 10/18/23 at 206, Doc. 2734.) Rossi asked Smith to drive BR to Phoenix. (*Id.*) Even though Rossi's position was that Smith had to withdraw from representing BR, he asked Smith to drive BR to Phoenix because he was still a represented party. (*Id.* at 215.)

1    The intention was to have BR testify before the grand jury and then obtain a Third
2    Superseding Indictment.  (*Id.* at 206–07.)  BR never testified because it was brought to
3    Rossi's attention that Department of Justice policy is that it is inappropriate to present
4    witness testimony to "clean up" an indictment by correcting a string citation.  (*Id.* at 208–
5    09.)  Rossi acknowledged that the Third Superseding Indictment does change the end date
6    of the RICO conspiracy to the date of the return of that superseding indictment; but he
7    agreed that BR's testimony was not necessary for that change.  (Hr'g Tr. 10/18/23 at 208,
8    Doc. 2734.)  Rossi agreed that the purpose of BR's testimony at the grand jury was to have
9    BR provide sworn testimony.  (*Id.* at 209.)  Rossi did not anticipate that the Group 4
10   defendants would be going to trial in May 2022.  (Hr'g Tr. 10/20/23 at 105, Doc. 2736.)

11       **2.  Monteen's October 2023 testimony**:

12       Dezirae Monteen first spoke with her attorney Jesse Smith on October 28, 2022.
13   (Hr'g Tr. 10/18/23 at 7, Doc. 2734.)  They had a phone conversation while she was in pre-
14   trial detention.  (*Id.*)  Ms. Monteen had never been charged with a crime before or had an
15   attorney.  (*Id.* at 10.)

16       Monteen believes that she first met with Smith in person at her house two or three
17   months after their phone meeting.  (*Id.* at 7.)  However, she later testified that the meeting
18   was likely in November 2020.  (*Id.* at 9.)  She described it as brief meeting where "[w]e
19   just pretty much went over what my charges were, we didn't get into depth, just what I was
20   being charged with."  (Hr'g Tr. 10/18/23 at 8, Doc. 2734.)  Smith "just listed, of course,
21   the RICO charges, the possession, and all that.  We didn't go into why or what I was being
22   charged with, just what the charges actually were."  (*Id.*)  They did not go into the evidence.
23   (*Id.* at 9.)  The meeting lasted "[p]robably 30 to 45 minutes."  (*Id.*)  At the time the first
24   meeting ended, Monteen did not understand "what it meant to be charged with the RICO
25   count[.]"  (*Id.*)  Smith did not explain the concepts of "an enterprise" or "overt acts."  (Hr'g
26   Tr. 10/18/23 at 9, Doc. 2734.)

27       Monteen's next contact with Smith was "probably about three months" later in
28   January 2021.  (*Id.*)  There were no communications with Smith between those two

meetings.  (*Id.* at 9–10.)  As a result, she did not know what was going on with her case during that time frame.  (*Id.* at 10.)  She believes the second meeting at her house lasted about 45 minutes.  (*Id.* at 11.)  Smith did not give her any documents to review and she did not see the indictment during the meeting. (Hr'g Tr. 10/18/23 at 11, Doc. 2734.)  She believes that Smith told her that he did not yet have any disclosure.  (*Id.*)  Smith discussed the attorney-client privilege and advised her that what they "talked about would be between us."  (*Id.* at 10.)  They also discussed where she worked and lived, her age, and how long she "and Michael dated[.]"  (*Id.* at 10–11.)  They also discussed her relationship with Michael Williams, but did not "talk about things that Mr. Williams was involved with[.]"  (*Id.* at 12.)  Smith did not tell her the charges against Michael Williams.  (Hr'g Tr. 10/18/23 at 12, Doc. 2734.)  Smith did not ask if Williams had gang affiliations, but he did ask if she did.  (*Id.* at 13.)

Although she understood that she was charged with a conspiracy, Smith never went over the details of what that meant.  (*Id.* at 12.)  For instance, Smith did not explain she "can be held responsible for the acts of other people even though [she wasn't] present and/or [she] might not have known what they were doing[.]" (*Id.* at 12–13.)  Smith did not discuss the nature of the drug or firearms charges against her.  (*Id.* at 13.)  They "never really went into detail" except for what she was charged with.  (*Id.*)  Smith "never really went into what the defense would be." (Hr'g Tr. 10/18/23 at 14, Doc. 2734.)  He told her the trial would be much later than the currently scheduled date.  (*Id.*)

At one of the two in-person meetings, Smith told Monteen that "probation was eligible and that's what he was saying he was pushing for."  (*Id.* at 26.)  He did not go through each charge and advise her of the prison time that she faced either if she plead guilty or lost at trial.  (*Id.* at 26–27.)  Smith never told her that there was a chance that she could go to prison.  (*Id.* at 27.)  Again, he told her he was "pushing for probation" because she had never been in trouble before.  (Hr'g Tr. 10/18/23 at 27, Doc. 2734.)  If Smith told her that she was facing lengthy mandatory minimum prison sentences, Monteen testified that: "I wouldn't have liked it but I definitely would have probably felt like we did need to

1    meet more" and "be more on top of things and dealing with each other more often." (*Id.*)

2        Monteen recalls coming to one court hearing in October 2021 where trial groups

3    were set. (*Id.* at 14.) She believes that she met with Smith for about ten minutes. (*Id.* at

4    15.) She did not hear from Smith for a few months, until about the "beginning of April"

5    of 2022, when he told her that the court would be appointing her a new attorney. (*Id.*) Ms.

6    Monteen identified a text message sent to her from Mr. Smith dated April 7, 2022, in which

7    he stated: "Dear Dezirae, the court appointed a lawyer, he is very good, named Michael

8    Brown, to represent you. He is on vacation this week but I will meet with him next

9    Wednesday morning and go over your file, et cetera, with him." (Hr'g Tr. 10/18/23 at 18,

10   Doc. 2734.) This text is the first time she learned that Smith was no longer going to be her

11   attorney. (*Id.* at 18–19.) Smith called her a few days after the text message to tell her that

12   he spoke with her new lawyer and "went over whatever information he already had." (*Id.*

13   at 19.) Smith never told Monteen why he had to withdraw and did not mention the name

14   BR. (*Id.*)

15       Monteen was shown a Joint Defense Litigation and Confidentiality Agreement

16   ("JDA"). (*Id.*) Smith went over the document with her and told her "that everybody was

17   working in a group." (Hr'g Tr. 10/18/23 at 20, Doc. 2734.) Smith told her that he would

18   be emailing her the signature page and for her to sign and fax it back to him. (*Id.*) Monteen

19   does not recall being provided with the whole JDA. (*Id.*) Monteen did not know that the

20   attorneys who joined this agreement could share confidential information with each other.

21   (*Id.*) Again, she just knew the defense attorneys were working together "for strategy and

22   stuff like that." (*Id.*)

23       Monteen's new lawyer explained to her that Smith had to withdraw because Smith

24   "was representing another client who was cooperating with the government" against her

25   and her case. (Hr'g Tr. 10/18/23 at 21, Doc. 2734.) Smith never told Monteen that he had

26   a conflict. (*Id.*) Monteen never gave Smith permission to talk with anyone else about her

27   case except the attorneys in the JDA. (*Id.* at 22.) Monteen would not have given Smith

28   permission to talk to anyone else about her case. (*Id.*) If Monteen knew that Smith was

representing someone who was cooperating against her case, she would not have wanted him to continue as her attorney.  (*Id.*)  Smith never discussed the concept of a waiver of a conflict.  (Hr'g Tr. 10/18/23 at 22–23, Doc. 2734.)

Monteen is now aware that Smith helped BR provide the government with information to help prosecute the case against her.  (*Id.* at 23.)  In response to counsel's question of how that makes her feel, she testified: "Not good.  I mean, it makes it hard to trust anybody representing me after that."  (*Id.*)  And that is true even for her current attorney.  (*Id.*)  Monteen explained that:

> [t]his is my first time ever having a lawyer and, I mean, after that, it did start off kind of bad once I knew that so it makes it hard just to kind of trust anybody representing me.  The whole time I did think Jesse had the best interests, even without speaking for the [sic] months.  I never had a lawyer before so I didn't know it wasn't normal.

(*Id.* at 23–24.)

Monteen further explained that she has met with her current attorney more than she did with Smith, "[b]ut, after that, it's just, I don't really know who really has the best interests and if you're fighting for me, how you should be."  (Hr'g Tr. 10/18/23 at 24, Doc. 2734.)  She still has worries that she does not really know how the process works because of how she was treated by Smith, especially since her case is complicated and she put all her trust in Smith "and he breached that trust[.]"  (*Id.* at 24–25.)

Monteen is now aware that the government "is alleged to have been part of the conflict that Mr. Smith engaged in[.]"  (*Id.* at 26.)  Monteen was asked: "how does that affect you in terms of your feeling about the judicial process, that the government is alleged to have been involved in working with your attorney against you?"  Monteen responded: "Yeah, I definitely don't trust it, and they're still working on my case after dealing with Mr. Smith."  (*Id.*)

### 3. <u>Shelley Clemens</u>:

Ms. Clemens was an AUSA at U.S. Attorney's Office for the District of Arizona from January 21, 2006 until April 7, 2023. (Hr'g Tr. 4/22/24 at 14.)  From 2008 to 2010,

1    she was a Deputy Chief on a general crimes unit which morphed into a Violent Crime and

2    Indian Country Unit.  (*Id.*)  From 2010 to 2012, she was the Chief Attorney for the Tucson

3    Division.  (*Id.*)  In 2015, Ms. Clemens joined the Appellate Division and remained there

4    until she left the office in 2023.  (*Id.* at 15.)

5        Ms. Clemens also served as the Professional Responsibility Officer ("PRO") from

6    2008 or 2009 until she left the office.  (*Id.* at 16.)  In that role, AUSAs would come to her

7    both for advice and to deal with ethical issues which had arisen.  (Hr'g Tr. 4/22/24 at 16.)

8    She explained that "when a person had an issue or a potential issue that they were

9    concerned about, they would come to me and . . . I would give them advice on how to

10   handle the issue based on the rules of professional responsibility."  (*Id.* at 16–17.)  Her

11   advice was usually to "prevent future problems," but there were occasions were an issue

12   had already occurred and remedial measures, like getting the court involved, were

13   necessary.  (*Id.* at 17.)  If an AUSA had an ethical issue, s/he could come to her or a

14   supervisor, preferably "at the earliest possible opportunity[.]"  (*Id.*)  As the PRO, Ms.

15   Clemens routinely dealt with the rules of professional responsibly and had extensive

16   training on those rules.  (*Id.* at 18.)  As a result, she is aware that the Sixth Amendment

17   right to counsel includes the right to conflict free counsel.  (Hr'g Tr. 4/22/24 at 18.)

18       In preparation for her testimony, Ms. Clemens reviewed the government's brief to

19   the Ninth Circuit on the recusal issue and some redacted emails provided to her.  (*Id.*)  She

20   also reviewed the *Touhy* letter.  (*Id.*)  She did not review AUSA Rossi's October 2023

21   testimony or anyone else's testimony.  (*Id.* at 18–19.)  Ms. Clemens never supervised

22   AUSA Rossi, but she certainly knew him because his office was near her office.  (*Id.* at

23   19.)

24       Ms. Clemens was shown her email to AUSA Rossi dated April 4, 2022, which

25   reflects it was sent at 9:32 a.m.  (Hr'g Tr. 4/22/24 at 21.)  Ms. Clemens drafted this email

26   based off a "hallway conversation" with AUSA Rossi the prior week.  (*Id.* at 22.)  She

27   believes that conversation occurred on March 31, 2022.  (*Id.*)  She explained that AUSA

28   Rossi approached her in the hallway "and advised that he had an issue that he needed to

- 66 -

1    discuss." (*Id.* at 23.) Because the conversation occurred in the hallway, she did not have

2    a notepad to take notes. (*Id.*) After AUSA Rossi advised her of his concerns, she drafted

3    the email based on their conversation. (Hr'g Tr. 4/22/24 at 23.) In the email, she asked

4    "Mr. Rossi to fill in any blanks or to correct anything." (*Id.* at 22.)

5        The emails that Ms. Clemens has reviewed are probably not the only discussions

6    that she had with AUSA Rossi and others regarding the Smith conflict. (*Id.* at 23–24.) She

7    recalls a phone conversation with Mr. Grimes, who is a professional responsibility advisor

8    officer. (*Id.* at 24.) She also "probably ducked into Mr. Rossi's office a couple of times to

9    talk to him." (*Id.*) Ms. Clemens usually documented the consults that she had with AUSAs

10   on ethical issues. (Hr'g Tr. 4/22/24 at 24.) The email was the first documentation, again,

11   because she did not have a notepad during the hallway conversation. (*Id.*) She did not

12   write a memorandum to file, but "[t]here's probably some handwritten notes." (*Id.*)

13       AUSA Rossi responded to Ms. Clemens in an email also dated April 4, 2022, which

14   was sent at 5:12 p.m. (*Id.* at 25.) She did not have a meeting with AUSA Rossi to go

15   through his email "to make sure it was complete and accurate[.]" (*Id.* at 26.) She testified

16   that: "I sent it to him, I assumed because I asked him to review it and make sure everything

17   was correct, that when it came back to me, it was." (Hr'g Tr. 4/22/24 at 26.) In response

18   to Ms. Clemens' question of when AUSA Rossi knew that BR's information would involve

19   Western Hills, Ms. Clemens testified that AUSA Rossi wrote: "a few months prior to the

20   free talk." (*Id.* at 27.) However, Ms. Clemens agreed with counsel that AUSA Rossi's

21   email actually stated: "A few months ago, AUSA Rossi was advised BR wanted to provide

22   a free talk and had information relating to the Western Hills gang prosecution." (*Id.* at 28.)

23   As a result, she agreed with counsel that "a few months ago is dating from April 5th, a few

24   months before April 5th" [and] not "a few months before December 28th." (*Id.*)

25       Ms. Clemens "took this response from Mr. Rossi and . . . sent it on to Washington,

26   D.C." on April 5, 2022. (*Id.*) She agreed that her email to Mr. Grimes does not mention

27   the free talks in June 2021 or August 2021. (Hr'g Tr. 4/22/24 at 52.) At that time, Ms.

28   Clemens does not believe that she knew about those free talks. (*Id.* at 53.)

1

2      Ms. Clemens did not "did not do any other investigation to determine the accuracy

3  of Mr. Rossi's account" before sending her email to Washington, D.C. (*Id.* at 29.) She did

4  not review the court docket or the audio recording or transcript of the December 2021 free

5  talk. (*Id.* at 30.) Ms. Clemens testified that she did not speak with AUSA Seger because

6  "Mr. Rossi had brought this to me, Mr. Rossi had set up and participated in these free talks,

7  and I was never given information that Ms. Seger was involved in this part of it." (*Id.*)

8      Ms. Clemens is aware that there were other free talks with BR, but she does not

9  recall when they occurred and is "not 100 percent sure" if she knew about the prior free

10 talks when she sent her email to Mr. Grimes. (Hr'g Tr. 4/22/24 at 31.) She knows that "at

11 some point in the next couple of days" she became aware of the prior free talks. (*Id.* at 32.)

12 But "[t]he only free talk that [she] thought was at issue was at that point was the December

13 one." (*Id.* at 31.)

14      Ms. Clemens did not have conversations or email communications with AUSA

15 Rossi about any other free talks "during the process of going back and forth with

16 Washington, D.C." (*Id.* at 32.) Sometime after the email exchange with Mr. Grimes,

17 AUSA Rossi made her aware that there was a free talk with BR on June 23, 2021. (*Id.* at

18 32.) However, she is "not aware of whether or not Western Hills was talked about or not

19 in that particular free talk." (Hr'g Tr. 4/22/24 at 33.) Ms. Clemens explained that Rossi

20 told her about the June 2021 free talk "when we became aware that the defense bar was

21 saying that there was going to be a prosecutorial misconduct motion[.]" (*Id.* at 32–33.)

22 Ms. Clemens explained that her reference to "the defense bar" is not specific to the

23 attorneys in this case, but rather the defense bar in Tucson in general. (*Id.* at 42–43.)

24      Ms. Clemens had been provided with a copy of the defense motion alleging potential

25 professional misconduct dated April 20, 2022. (*Id.* at 36–37.) Ms. Clemens became aware

26 of BR's August 2021 free talk after the potential misconduct motion was filed. (*Id.* at 45.)

27 She does not recall being aware that Western Hills information came up during that free

28 talk. (Hr'g Tr. 4/22/24 at 45.)

Ms. Clemens agreed that in an email dated April 22, 2022, Mr. Grimes asked her if there was a joint defense agreement and she responded: "Not that I'm aware of." (*Id.* at 36.) Ms. Clemens subsequently learned that there is a joint defense agreement, but she cannot recall if "that information came from Mr. Rossi or if came from sitting through hearings on the potential misconduct motion. (*Id.* at 37.) She probably corrected the information about the joint defense agreement in a phone call with Mr. Grimes. (*Id.*)

Ms. Clemens agreed that she asked AUSA Rossi if Smith had "taken any actions on behalf of Ms. Monteen during the period when he knew there was a conflict[.]" (*Id.* at 38.) Rossi advised her that Smith "litigated a motion to suppress on her behalf[.]" (Hr'g Tr. 4/22/24 at 38.) Ms. Clemens did not look at the court docket to verify the accuracy of that information. (*Id.*) She does not recall if AUSA Rossi ever told her that Smith also litigated a motion to sever in Monteen's case. (*Id.* at 39–40.) Ms. Clemens was aware that Smith litigated a motion to dismiss based on multiplicity on Monteen's case. (*Id.* at 41–42.) She either saw it on the docket or Rossi told her about it. (*Id.*) Ms. Clemens was provided with BR's letter to Rossi sometime after the potential misconduct motion was filed on April 20, 2022. (Hr'g Tr. 4/22/24 at 42.)

Ms. Clemens gave AUSA Rossi advice about this conflict of interest and how he needed to address it. (*Id.* at 43.) Her advice was to "either provide the court notice of a potential of a conflict so that we could bring it to the court's attention regarding the issue with Mr. Smith remaining on Mr. [BR]'s case and how long he could remain on it or to convince Mr. Smith to file the motion himself." (*Id.* at 56.) With respect to any advice provided about how to deal with the fact that Monteen had conflicted counsel for months, Ms. Clemens testified: "It is my understanding that, given that he'd already withdrawn and that there had not been any actions taken, there was no information provided by [B.R.] that would have prejudiced Ms. Monteen . . . that at that point we had covered our bases and did not need to do anything further." (*Id.* at 56–57.)

Rossi told Ms. Clemens that he had not come to her earlier because he had spoken with his supervisors, AUSA Vercauteren and AUSA Sampson. (*Id.*) She did not ask Rossi

1    if his supervisors directed him to talk to her. (Hr'g Tr. 4/22/24 at 44.)

2        **4. <u>AUSA Sampson</u>:**

3        Ms. Sampson has been an AUSA in the U.S. Attorney's Office for the District of

4    Arizona since 2008.  (Hr'g Tr. 4/22/24 at 66.)  She has held several supervisory positions

5    during that time.  (*Id.* at 67.)  In August 2019, she became one of two Criminal Chiefs for

6    the district working in Phoenix but supervising AUSAs in Phoenix and Tucson.  (*Id.*)  She

7    had that position until May 2021, when she became the Executive Assistant U.S Attorney.

8    (*Id.*)  Ms. Sampson described the Executive Assistant position as more of an administrative

9    supervisory position; she "did not oversee the criminal division[.]"  (*Id.* at 67–68.)  She

10   was in that role until the end of 2021, and by January 2022 she was returned to being a line

11   AUSA.  (Hr'g Tr. 4/22/24 at 67–68.)

12       When Ms. Sampson became Criminal Chief in August 2019, she did not directly

13   supervise AUSA Rossi; she "directly supervised his supervisor," which was AUSA

14   Vercauteren "for the majority of that time frame."  (*Id.* at 69–70.)  Ms. Sampson had

15   supervisory authority over the Western Hills case while she was Criminal Chief and was

16   aware of AUSA Rossi's involvement in that case.  (*Id.* at 70.)

17       Ms. Sampson was never made aware of a conflict of interest involving Mr. Smith

18   and never had any discussions with anybody about this conflict "until now."  (*Id.* at 71.)

19   She does not recall a phone conversation with AUSA Rossi about the Smith conflict.  (*Id.*

20   at 74.)  She explained that from June 2021 to March 2022, the time frame pointed to be

21   defense counsel, she was not the Criminal Chief.  Again, she was the Executive Assistant

22   from May 2021 to the end of 2021, and in January 2022 she "went back to a line

23   prosecutor" and was no longer in a supervisory role.  (Hr'g Tr. 4/22/24 at 75.)  When she

24   was the Executive Assistant, if a line prosecutor had a conflict issue it would not come to

25   her attention; it would go to the direct supervisor and could be elevated to the Criminal

26   Chief.  (*Id.*)  Although Mr. Rossi may have called her for advice when she was Criminal

27   Chief, AUSA Sampson did not counsel AUSA Rossi on the conflict issue or give him any

28   advice.  (*Id.* at 76.)

1

2      **5.  AUSA Vercautern:**

3          Mr. Vercauteren has been an AUSA at the U.S. Attorney's Office for the District of

4   Arizona since April 2002.  (*Id.* at 79.)  He currently supervises a Violent Crime Unit in the

5   Phoenix office.  (*Id.* at 80.)  During the time period of June 2021 to the end of March 2022,

6   he was in his current position.  (Hr'g Tr. 4/22/24 at 80.)  However, during that time period

7   he supervised both Tucson and Phoenix AUSAs, including AUSA Rossi.  (*Id.* at 80–81.)

8          In  preparation  for  his  testimony,  AUSA  Vercauteren  spoke  with  the  Firewall

9   AUSAs and reviewed some emails to refresh his memory as to when he started supervising

10  only Phoenix AUSAs.  (*Id.* at 81.)  The Firewall AUSAs provided him with some basic

11  background about the issue that led to his testimony.  (*Id.*)

12         AUSA Vercauteren met AUSA Rossi shortly before he "took over supervision of

13  Phoenix and Tucson," which was in March 2020.  (*Id.*)  AUSA Vercauteren is familiar

14  with the Western Hills case and the charges generally because he was supervising AUSA

15  Rossi when the superseding indictment was returned.  (Hr'g Tr. 4/22/24 at 82.)  He was

16  aware that Rossi and AUSA Seger were working on the Western Hills case.  (*Id.*)

17         In response to counsel's question of if he became "aware of a conflict of interest

18  issue involving one of the defense attorneys named Jesse Smith, Vercauteren testified:  "It

19  only sounds vaguely familiar to me."  (*Id.* at 82–83.)  With respect discussions with AUSA

20  Rossi about a conflict of interest, Vercauteren testified:  "It sounds vaguely familiar to me

21  but I don't remember any specifics of any conversation with Mr. Rossi" or AUSA  Seger

22  "for that matter about any kind of conflict of interest case regarding Jesse Smith."  (*Id.* at

23  83.)  He later testified that:  "there's kind of a vague recollection but there was another

24  Tucson AUSA that I was supervising that also had a conflict issue and I don't remember

25  which one, if I'm conflating those two or not.  But it appeared from the prior testimony

26  you had me read from Mr. Rossi that he did discuss it with me."  (*Id.* at 87.)  When asked

27  yet again whether he recalls discussing a conflict issue with Rossi, AUSA Vercauteren

28  testified:  "I think what I said is it vaguely sounds familiar to me and I don't recall

- 71 -

1   specifically talking to him about the topic and I could have but I don't remember it and I
2   definitely don't remember any specifics about it." (*Id.* at 91–92.). He also does not recall
3   providing Rossi any advice. (Hr'g Tr. 4/22/24 at 92.)

4   **6. <u>AUSA Fellrath</u>:**

5           Mr. Fellrath has been an AUSA in the District of Arizona since 2008. (*Id.* at 110.)
6   He was a supervisor from 2012 to 2018. (*Id.*) He has been the supervisor of the OCTEF
7   unit since February 2022. (*Id.*). At the beginning of February 2022, he took on the role as
8   Acting Criminal Chief the Western Hills case because the Criminal Chief had a conflict.
9   (*Id.* at 111–12.). At that time, he believes that he talked with AUSA Rossi and AUSA
10  Seger about the status of the case. (Hr'g Tr. 4/22/24 at 112.). The first level supervisor
11  was Raquel Arrellano. (*Id.*). AUSA Fellrath knew that AUSA Seger was going to be
12  leaving the office. (*Id.* at 116.) AUSA Sottosanti and AUSA Hopkins later joined the trial
13  team. (*Id.*)

14          Based on an email that he reviewed to prepare for his testimony, AUSA Fellrath
15  believes he learned of the Smith conflict on April 1, 2022. (*Id.* at 119.). But he cannot
16  recall how he learned of the conflict. (Hr'g Tr. 4/22/24 at 120.). He believes he asked the
17  trial team to tell him "what was going on so that [they] could figure out what the issue was
18  and how to resolve it." (*Id.*). His recollection is that AUSA Rossi was the only one who
19  had the information. (*Id.* at 121.). AUSA Fellrath cannot recall specifically what Rossi
20  told him, but it was "something along the lines that he had a proffer or two" with BR on a
21  different gang case and then he later got a letter from BR saying he had information on the
22  Western Hills case and they did another proffer. (*Id.*). AUSA Fellrath cannot recall if
23  Rossi told him that BR talked about Western Hills and Freestones during the first two
24  proffers. (*Id.* at 121–22.) AUSA Rossi recalls hearing that Rossi and Smith litigated a
25  motion to suppress after the third free talk on December 28, 2021. (Hr'g Tr. 4/22/24 at
26  124.). He cannot recall if there were other motions. (*Id.*)

27  **7. <u>Erica Seger</u>:**

28          *Examination by defense counsel*:

Ms. Seger currently works in the office of counsel for the Department of Homeland Security, Office of the Inspector General. (Hr'g Tr. 4/25/24 at 6.) Ms. Seger was previously an AUSA for the District of Arizona. (*Id.*) She started in the U.S. Attorney's Office in August 2010, as a Special Assistant U.S. Attorney from the Department of Homeland Security Office of Principal Legal Advisor. (*Id.*) She joined the U.S. Attorney's office as an AUSA in 2012 and left the office in April 2022. (*Id.* at 7.)

Ms. Seger never had a supervisory position at the U.S. Attorney's Office. (*Id.* at 7.) She did serve as Senior Litigation Counsel. (*Id.*) That position involved training, working with the newer attorneys, serving as second chair on trials with a newer attorneys, and "mentoring younger attorneys in learning how the federal system works." (Hr'g Tr. 4/25/24 at 8.) She explained that she "rarely gave the training, [her] role was more to facilitate the training for the office." (*Id.*)

Ms. Seger believes that she was assigned to work on the Western Hills case in the summer of 2019 because she was not involved in the case when the initial indictment was obtained in 2018. (*Id.* at 10–11.) Although there were "a lot of other AUSAs involved throughout the history of the case, AUSA Rossi was the only other attorney on the case at that time. (*Id.* at 11.) There was not a specific division of labor between them. (*Id.* at 12.) She recalls that the allegations in the indictment "were gang-related murders." (Hr'g Tr. 4/25/24 at 12.)

Ms. Seger believes she first learned about a person named BR when AUSA Rossi forwarded her a letter from BR. (*Id.* at 14.) However, she only "remember[s] that because of the emails that were sent to her" prior to her testimony. (*Id.*) With respect to if (or when) she learned of BR's June 2021 interview, she testified that AUSA Rossi:

> was working on a different gang-related case and so it's very possible that he mentioned something in passing about having . . . a conversation with a defendant but it wasn't a case I was involved in so I wouldn't have like followed up or anything 'cause I didn't have the bandwidth to talk about something that I wasn't actively . . . assigned to at that point.

(*Id.* at 14.) To the best of her recollection, AUSA Rossi did not give her "any information

1    in June 2021 about that interview also involving Mr. [BR] about Western Hills and the

2    Freestones[.]"  (*Id.* at 14–15.)  She does not remember ever reading the transcript of the

3    June 2021 interview.  (Hr'g Tr. 4/25/24 at 15.)

4         Ms. Seger believes that she became aware that Smith was representing Monteen and

5    BR in December 2021.  (*Id.*)  But, again, her recollection is based on the email that was

6    forwarded to her; she does not have an independent recollection of the time frame.  (*Id.*)

7    She does not remember having conversations with AUSA Rossi during "the summer of

8    2021 about Mr. Smith having a conflict of interest[.]"  (*Id.* at 16.)  She also does not

9    remember if AUSA Rossi made her aware that BR had a second interview in August 2021

10   during which he talked about Western Hills.  (*Id.*)

11        AUSA Rossi did not ask her opinion during the summer of 2021 about whether

12   Smith had a conflict of interest because he was representing Monteen and BR.  (Hr'g Tr.

13   4/25/24 at 16.)  She does recall a conversation with AUSA Rossi about the Smith conflict

14   issue but she does not recall when it took place.  (*Id.* at 17.)  She testified that AUSA Rossi:

15   
16        was talking about Mr. [BR] and he said the name Jesse Smith.  And I
          remember immediately thinking, stopping the conversation and saying: Wait,
          doesn't he also represent Dezirae Monteen?  And Adam said:  Yes.  And I
17        said: Okay.  Is that a – I don't know if I said is that a conflict.  I said:  Have
          you talked to Jesse, Mr. Smith, about the potential that that's a conflict?  And
18        I don't remember what Adam said but I remember talking to Adam about –
          'cause I said:  And, if not, that needs to happen.  And if you have, somebody
19        needs to talk to our ethics, you know, professional responsibility folks to see
20        if we need to do anything about that.

21   (*Id.* at 17.)

22        Ms. Seger went on to testify about another case where she had a concern about a

23   defense attorney's conflict and how she dealt with that issue.  (*Id.* at 18.)  Ms. Seger brought

24   her concern about the to the defense attorney's attention who told her it wasn't a conflict.

25   (*Id.*)  She testified that she then talked to "our ethics folks and they said that essentially that

26   we don't have the ability to tell the court there's a conflict but what I needed to do was file

27   something with the court" laying out the facts and let the court decide if there was a conflict.

28   (Hr'g Tr. 4/25/24 at 18.)  She filed "something with the court, there was an *ex parte* hearing,

- 74 -

1    and ultimately that conflict was waivable and had been waived by the defendant."  (*Id.*)

2          Ms. Seger remembers telling AUSA Rossi about her conflict experience in that other

3    case and what she did when the defense attorney disagreed that there was a conflict.  (*Id.*)

4    In terms of the timing of this conversation with AUSA Rossi, Ms. Seger testified that she

5    did not "know anything about these two interviews with Mr. [BR] during the summertime

6    period[.]"  (*Id.* at 19.)  Again, based on the email sent to her prior to her testimony, she

7    believes she learned about BR in December 2021.  (*Id.*)  Ms. Seger would have "paid

8    attention" if AUSA Rossi had told her that there is a witness "who potentially is going to

9    be giving favorable information to the government about a prosecution" that she was

10   working on.  (Hr'g Tr. 4/25/24 at 21.)

11         Ms. Seger knows that she had the conversation with AUSA Rossi about how she

12   handled the conflict situation in that other case before he sent her the December 6, 2021,

13   email advising her that BR provided a free talk about Western Hills and Smith was his

14   lawyer.  (*Id.* at 22.)  AUSA Rossi did not provide her with the audio recording or transcript

15   of the December 2021 free talk.  (*Id.*)  Ms. Seger agreed with counsel that she did not have

16   "enough information to come to a conclusion or even an inclination:  Oh, Mr. Smith has a

17   conflict he has to get off."  (*Id.* at 23.)  She testified: "I know it was enough to raise like a

18   red flag, like we need to make sure that there's not an issue here but not enough information

19   to definitively" resolve the issue.  (*Id.*)  She added that AUSA Rossi "said he would talk to

20   Mr. Smith about it and so then I kind of, you know, just stepped back and assumed he was

21   handling it."  (Hr'g Tr. 4/25/24 at 23.)

22         Ms. Seger cannot remember if she ever saw the BR letter.  (*Id.* at 24.)  She also does

23   not remember having any conversation about the specifics of the BR proffer.  (*Id.* at 25.)

24   Other than her conversation with AUSA Rossi about her conflict experience in her other

25   case, Ms. Seger does not "remember having another conversation with Mr. Rossi about the

26   representation issue."  (*Id.*)  Although she likely had access to the first two BR interviews,

27   she did not review them and Mr. Rossi did not ask her to listen to them or review the

28   transcripts.  (*Id.*)  She added:  "That being said, I think by the beginning of December, I

1  knew I was leaving the office and . . . the office had started to kind of make a transition

2  plan for me to exit."  (Hr'g Tr. 4/25/24 at 25–26.)

3       Ms. Seger does not remember anything about AUSA Rossi scheduling grand jury

4  time for April 6, 2022.  (*Id.* at 27.)  She also cannot remember if she was "aware that Mr.

5  Rossi intended to have Mr. [BR] testify at a grand jury in the Western Hills case being

6  assisted by Mr. Smith[.]"  (*Id.*)  She is not sure if she was still on the Western Hills case at

7  that point, but she "was very much on [her] way out of the office at this point."  (*Id.* at 27–

8  28.)  If Ms. Seger knew that Smith was taking his client to the grand jury to testify against

9  Monteen, she "would definitely have raised that [ethical] issue."  (*Id.* at 28.)

10      As far as Ms. Seger can remember, she was not aware that a third interview with

11 BR was going to take place on December 28, 2021.  (Hr'g Tr. 4/25/24 at 29–30.)  She also

12 does not remember AUSA Rossi contacting her to ask if she could cover that interview.

13 (*Id.* at 30.)  In response to counsel's question of whether she would have let that interview

14 take place given that Smith represented BR and Monteen, Ms. Seger testified that: "I think

15 I probably would have asked questions" because of her previous experience where she

16 brought the conflict to the court's attention.  (*Id.* at 30–31.)  She cannot say whether or not

17 she would have let the interview go forward because she would have wanted to know more

18 information.  (*Id.* at 31.)  She agreed with counsel that she would not have said:  "Let's just

19 keep talking and sort it out later."  (*Id.*)

20      Counsel asked if Ms. Seger was aware of Smith's conflict at the time the severance

21 motion was being litigated.  (Hr'g Tr. 4/25/24 at 32.)  She testified:  "I had raised the

22 concern but I don't know that I was ever made aware that there was an actual conflict[.]"

23 (*Id.*)  She agreed with counsel that when the severance motion was argued on January 20,

24 2022, she "had no information about whether Mr. Rossi had resolved the conflict[.]"  (*Id.*

25 at 42–43.)  Again, AUSA Rossi told her after their conversation that "he would take care

26 of it."  (*Id.* at 43.)  Ms. Seger does not remember ever asking AUSA Rossi "if he had

27 resolved the conflict issue."  (*Id.*)

28      Ms. Seger also does not remember AUSA Rossi mentioning that BR was providing

- 76 -

information on the Freestones and crimes committed by the Freestones[.]"   (Hr'g Tr. 4/25/24 at 34.)  She does not have an independent recollection of AUSA Rossi telling her that he or Smith had a concern for BR's safety.  (*Id.* at 34–35.)

Ms. Seger has sought the advice of the Professional Responsibility Officer in the U.S. Attorney's Office on "a handful" of occasions.  (*Id.* at 39.)  Ms. Seger does not recall a case where there was a concurrent representation of clients with adverse interests other than the case she described earlier.  (*Id.*)  Based on her training and experience, if defense counsel has a conflict she would first talk to the defense attorney to get his or her position, and if she was not satisfied with the answer she would talk to someone more senior than her or the ethics advisor.  (*Id.* at 40.)  Based on that conversation, she may bring the conflict to the court's attention.  (Hr'g Tr. 4/25/24 at 41.)

*Examination by government counsel:*

AUSA Rossi was lead counsel on the Western Hills case.  (*Id.* at 45.)  The division of labor depended on their workload considerations.  (*Id.*)  Ms. Seger testified that she "was doing more stuff behind the scenes."  (*Id.*)  Because of her substantial caseload and SLC duties, Ms. Seger does not have perfect recollection" of every conversation she had with other attorneys during the relevant time frame.  (*Id.* at 46.)  As a result, it is possible she had conversations with AUSA Rossi that she cannot recall.  (Hr'g Tr. 4/25/24 at 46–47.)

### 8. **Professor Bruce A. Green**

*Green's Initial Declaration:*

Bruce Green provided a Declaration to defense counsel that was attached as an exhibit to the Motion to Disqualify.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4.)  It provides as follows.  Green has been a law professor at Fordham University since 1987.  (*Id.* at 1.)  After graduation from law school in 1981, Professor Green was a law clerk for a judge on the U.S. Court Appeals for the Second Circuit.  (*Id.*)  He then clerked for Supreme Court Justice Thurgood Marshall.  (*Id.*)  When that clerkship ended, Professor Green became an Assistant U.S. Attorney for the Southern District of New York, eventually serving as Deputy Chief and Chief of the Criminal Division Appeals unit.  (*Id.*)

Since 1987 at Fordham and elsewhere, Professor Green has regularly taught courses on lawyers' professional responsibility, as well as courses on criminal procedure, criminal law, and white-collar crime.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 1.)  He currently teaches a course on Professional Responsibility and a seminar on Ethics in Criminal Advocacy.  (*Id.*)  He is the co-author of a textbook that he uses for the Professionality Responsibility course.  (*Id.*)

Professor Green has organized or co-organized numerous conferences and programs on issues of professional responsibility and speaks frequently at Continuing Legal Education programs and academic programs on that subject.  (*Id.*)  He has written extensively on this subject, including law review articles addressing criminal defense attorney conflicts of interest.  (*Id.*)  He has also written extensively on the professional obligations of prosecutors, "including an early work on prosecutors' professional obligations upon learning of criminal defense lawyers' conflicts of interest."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 1–2.)

Professor Green has been involved in the drafting, interpreting, and enforcement of professional conduct rules.  (*Id.* at 2.)  He is currently the chair for both the ABA Standing Committee on Ethics and Professional Responsibility and the Multistate Professional Responsibility drafting committee.  (*Id.*)  He previously chaired the ethics committees of the ABA Litigation Section, the ABA Criminal Justice Section, and the Section on Professional Responsibility of the Association of American Law Schools.  (*Id.*)  He has also been a past chair of the New York City Bar's Committee on Professional ethics, and a member and past chair of the New York State Bar Association's Committee on Professional Ethics.  (*Id.*)  Professor Green occasionally testifies as an expert witness, gives advice, drafts amicus briefs, and renders other professional services on issues of lawyers' professional conduct.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 2.)

For purposes of Professor Green forming his opinions, he relied on the following material provided to him by defense counsel: (1) transcripts of the BR free talks conducted on June 23, 2021, and August 11, 2021; (2) a December 6, 2021, email from Rossi to Smith;

- 78 -

(3) a December 13, 2021, email from Smith to Rossi; (4) a November 29, 2021, letter from BR to Rossi; and (5) Rossi's May 10, 2022, Memorandum to File. (*Id.* at 2.)  In rendering his opinions, Professor Green drew, in part, on his experience as a federal criminal prosecutor.  (*Id.*)  In that role, he entered into proffer agreements with defendants or potential defendants, participated in proffer sessions, entered into cooperation agreements, and interviewed, prepared, and presented cooperating witnesses at trial. (*Id.*)  On occasion, he declined to enter into cooperation agreements with defendants who he believed were not fully forthcoming and truthful.  (*Id.*)  Professor Green also drew on his more recent experience in "assisting criminal defense lawyers regarding conflicts of interest including, on several occasions, representing them in hearings in federal court."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 4.)

> *Mr. Smith's ethical and constitutional violations:*

Professor Green first addressed a criminal defense attorney's "professional obligation to represent their clients competently, which includes providing competent advice." (*Id.*)  Professor Green's opinion is that "[g]iven the pitfalls of lying or deliberately withholding information in a proffer session, competent defense lawyers prepare their clients to answer questions fully and truthfully and discourage their clients from making a proffer unless they are prepared to be forthcoming."  (*Id.*)  With respect to Mr. Smith, Professor Green's opinion is that Mr. Smith "knew on June 23, 2021 (and would have known earlier if he had competently interviewed and prepared his client for the proffer session) that Mr. [BR] had information about the Western Hills gang that might be relevant to the prosecution of the RICO case against Ms. Monteen and others." (*Id.* at 4–5.)  As a result, "Mr. Smith knew sufficient facts to establish that he had a concurrent conflict of interest under Rule 1.7 of the Arizona Rules."  (*Id.* at 5.)

Professor Green's opinion is that Mr. Smith had a conflict of interest from the perspective of both BR and Ms. Monteen as of June 23, 2021.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 5.)  From BR's perspective, Smith had "a conflict of interest because of his loyalty obligation to Ms. Monteen," which included to avoid assisting

another client in prejudicing Ms. Monteen's defense." (*Id.*)  Professor Green explained that:

> [t]here was a significant risk that, out of loyalty to Ms. Monteen, Mr. Smith would fail to represent Mr. [BR] adequately with regard to his potential cooperation – for example, Mr. Smith might fail to give Mr. [BR] disinterested information about the benefit of cooperating, might not prepare Mr. [BR] adequately to testify completely and truthfully about Western Hills, or might not zealously pursue a cooperation agreement.

(*Id.*)

With respect to Ms. Monteen, Professor Green's opinion is that Smith had "a conflict of interest from [her] perspective for two reasons." (*Id.*)  "First, Mr. Smith representation of Mr. [BR] was 'directly adverse' to Ms. Monteen." (*Id.*)  Professor Green explained that in assisting BR to become "a cooperating witness in the case against Ms. Monteen, Mr. Smith prejudiced Ms. Monteen's defense," even if the possibility that BR would become a witness was "contingent and remote – e.g., dependent on whether Mr. [BR] entered into a cooperation agreement, Ms. Monteen went to trial, and the prosecution called Mr. [BR] as a witness." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 5.)  Simply stated, Smith owed Ms. Monteen "a duty of loyalty, and by assisting another client in potentially testifying against her, he was betraying her regardless of the outcome." (*Id.*)

The second reason that Smith had a conflict of interest from Monteen's perspective is because "there was a significant risk that Mr. Smith's representation of Ms. Monteen would be limited by his duties to Mr. [BR]." (*Id.* at 6.)  Professor Green pointed out that the Supreme Court has held that "a conflict of interest arising out of concurrent representation of two defendants can adversely affect the representation in multiple ways, even though its effects may be unprovable." (*Id.*)  There were multiple risks to Ms. Monteen "that may or may not have eventuated." (*Id.*)

"First, Mr. Smith could not reveal 'information relating to the representation' of Ms. Monteen or use that information to her disadvantage without her informed consent." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 6.)  There was a risk that Smith, even if

- 80 -

1    inadvertently or unconsciously, would disclose confidential information gained in

2    representing Monteen and/or information learned from co-counsel who were part of the

3    JDA when advising BR and/or preparing him for the proffer sessions.  (*Id.*)

4         There was a related risk that Smith "would exploit the representation of Ms.

5    Monteen to obtain information that could be used to benefit Mr. [BR] – e.g., to refresh Mr.

6    [BR]'s recollection about Western Hills or to ensure the accuracy of Mr. [BR]'s

7    information."  (*Id.*)  The conflict also provided Smith with motivation to neglect or abandon

8    Monteen's case "for a period of time to minimize the appearance that he was exploiting

9    the representation to benefit Mr. [BR]."  (*Id.*)

10        There was also "a risk that, because of his confidentiality duty to Mr. [BR], Mr.

11   Smith would withhold relevant information from Ms. Monteen."  (*Id.*)  The best example

12   is that Smith did not tell Ms. Monteen that BR was negotiating to potentially testify against

13   her and Smith was helping him do so.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at

14   6.)  BR's cooperation "may have been relevant to Ms. Monteen's decision whether to plead

15   guilty or herself seek to cooperate."  (*Id.*)  And that information "was unquestionably

16   relevant to whether Ms. Monteen could trust Mr. Smith as her lawyer or whether she should

17   ask the court to provide a substitute lawyer who was not in a position to betray her to

18   another client's advantage."  (*Id.*)

19        Professor Green's opinion is that "Mr. Smith could not avoid the conflict by not

20   learning what Mr. [BR] knew about Western Hills, by discouraging him from being

21   forthcoming with the prosecutor, or by arranging for the prosecutor to refrain from eliciting

22   information about Western Hills."  (*Id.* at 6–7.)  Any of those actions would not have

23   mitigated or minimized the conflict; they would have "prejudiced Mr. [BR] *as a result* of

24   the conflict" because BR had be fully forthcoming with the prosecutor to obtain the most

25   favorable cooperation agreement.  (*Id.* at 7.)  "Mr. Smith's responsibility was to learn what

26   Mr. [BR] knew about Western Hills and, if Mr. [BR] persisted in seeking to cooperate, to

27   encourage Mr. [BR] to offer that information to the prosecution."  (Evid. Hr'g on the Mot.

28   to Disqualify, Def. Ex. 4 at 7.)  But he could not do any of those things because of his duty

1   of loyalty to Monteen.  (*Id.*)

2       Professor Green's opinion is that "[o]nce Mr. Smith knew the information giving

3   rise to his conflict of interest – that is, on or before June 23, 2021 – he was professionally

4   obligated to seek to withdraw from representing Ms. Monteen, if not from both

5   representations."  (*Id.*)   Smith could not seek Ms. Monteen's "informed consent" to

6   concurrent representation because he could not give her adequate information (as required

7   by Rule 1.0(e) of the Arizona Rules) for her to make that decision because Smith had a

8   duty to keep confidential that another client might cooperate against Western Hills.  (*Id.*)

9   In fact, Smith and Rossi "calculated to keep Ms. Monteen in the dark by delaying Mr

10  Smith's withdrawal motion until after Mr. [BR]'s sentencing."  (*Id.*)

11      Professor Green's opinion is that Mr. Smith had a duty to move to withdraw

12  promptly pursuant to Rule 1.16(a)(1) of the Arizona Rules. (Evid. Hr'g on the Mot. to

13  Disqualify, Def. Ex. 4 at 7.)  He further opined that Smith's concurrent representation of

14  Ms. Monteen and BR "not only violated the professional conduct rules but deprived Ms.

15  Monteen conflict-free representation guaranteed by the Sixth Amendment."  (*Id.*)   Mr.

16  Smith represented Ms. Monteen "disloyally if not incompetently" during the nine-months

17  from when the conflict arose until he finally sought to end his representation of Ms.

18  Monteen.  (*Id.*)

19          *AUSA Rossi's ethical and constitutional violations:*

20      Professor Green's opinion is that AUSA Rossi "knew of the facts establishing the

21  conflict of interest by no later than June 23, 2021, when Mr. [BR] indicated that he had

22  information about Western Hills that he was reluctant to provide."  (*Id.*)  Moreover, Rossi

23  also knew that Smith had not withdrawn from representation as Rule 1.16(a)(1) and the

24  Sixth Amendment case law require, "and that Mr. Smith would delay doing so."  (*Id.*)  As

25  a result, "AUSA Rossi had an obligation under the professional conduct rules and case law

26  to alert the court in Ms. Monteen's case that her lawyer had an impermissible conflict of

27  interest."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 7.)

28      "One source of AUSA Rossi's disclosure obligation was Rule 8.3(a) of the Arizona

Rules," which requires an attorney to report another attorney's violation of a professional conduct rule if the violation raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. (*Id.* at 8.) Professor Green's opinion is that Smith's conflict of interest, and his failure to disclose it to either Ms. Monteen or the Court, was a violation that raised a substantial question about Smith's honesty, trustworthiness, and fitness. (*Id.*) Because Rossi knew the facts establishing Smith's violation, he was bound to report the violation. (*Id.*)

Professor Green is also of the opinion that AUSA Rossi "had an obligation to promptly disclose the conflict of interest to the court given AUSA Rossi's role as an officer of the court and as a prosecutor whose professional duty is to 'seek justice.'" (*Id.*) The prosecutorial duty includes, "in general, a duty to disclose procedural error and unfairness to the court, and in particular, a duty to alert the court to a possible ongoing violation of the Sixth Amendment right to counsel." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 8.) Because Smith's conflict could not be cured by Ms. Monteen's consent, Rossi "should not only have made the requisite disclosure but moved for Mr. Smith's disqualification." (*Id.*)

Professor Green's opinion is that "instead of insisting that Mr. Smith seek to withdraw or calling Mr. Smith's conflict to the court's attention, AUSA Rossi supported Mr. Smith's concealment of the conflict of interest from Ms. Monteen and the court." (*Id.*) Indeed, AUSA Rossi's December 6, 2021, email to Mr. Smith "encouraged the view that Mr. Smith had no need to immediately withdraw from the representation, and AUSA Rossi evidently never disabused Mr. Smith of the idea that he could delay until after Mr. [BR] was sentenced." (*Id.*) Professor Green's opinion is that AUSA Rossi violated Rule 8.4(a) of the Arizona Rules by knowingly assisting or inducing Mr. Smith to violate the professional conduct rules by arranging additional free talks and negotiating for BR's cooperation. (*Id.* at 8–9.) Finally, Professor Green noted that "ignorance of the applicable disciplinary rules would be no excuse given AUSA Rossi's knowledge of the relevant facts." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 9.)

*Professor Green's Supplemental Declaration:*

Professor Green submitted a supplemental declaration that addressed the government's objection raised at oral argument that he had not reviewed AUSA Rossi's prior testimony in forming his opinions. (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 29.) "[S]pecifically, that [Professor Green] had not discussed the significance of concerns that Mr. [BR]'s safety might have been jeopardized if Mr. Smith had terminated his representations sooner than he did." (*Id.* at 1.)

Professor Green noted that he had reviewed Rossi's May 10, 2022, memorandum to file and "assumed that, for the purpose of formulating [his] opinions on the two questions, the memorandum would provide an adequate account of Mr. Rossi's and the government's position." (*Id.*) In fact. Professor Green pointed out that the memorandum details "that on February 14, 2022, when Mr. [BR]'s cooperation agreement was lodged with the Court, 'Mr. Smith expressed concern over filing a notice of conflict at this time, as it would endanger Mr. [BR].'" (*Id.* (quoting Rossi Memo at 12).) Professor Green further noted that the memorandum also described that a concern about BR's safety which was raised at a hearing before Judge Ferraro, "who, evidently unimpressed, denied Mr. [BR]'s release." (*Id.*)

Professor Green's opinion is that based on the description of the concerns for BR's safety detailed in the memorandum:

> it is not evident that concerns over Mr. [BR]'s safety, expressed by Mr. Smith in February 2022, explained Mr. Rossi's and the Government's earlier failure to alert the Courts to Mr. Smith's conflicts of interest. Rather, the memorandum implies that the Government's inaction was explained by its belief that Mr. Smith had only a "possible" or "potential" conflict of interest and/or by its belief that the conflict of interest was avoided prior to the December 2021 free talk as long as the Government refrained from eliciting information about Western Hills and/or that the burden was entirely on Mr. Smith, not on the Government, to apprise the Court of his conflict of interest.

(Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 29 at 1–2.)

Professor Green further opined that even if the government and Smith believed at

all relevant times that Smith's withdrawal from representing Monteen and/or BR would put BR at risk until he was sentenced, "the lawyers were obligated to let the Courts decide whether Mr. Smith could continue representation." (*Id.* at 2.)  Professor Green explained that "there was no 'inmate safety' or other applicable exception to the lawyers' ethical duties in this case to disclose to the Courts, in candor, that Mr. Smith had a conflict of interest." (*Id.*)  The Court was both "best situated to make a disinterested decision of how to proceed" and had "an independent responsibility to ensure the lawyers' adherence to the professional conduct rules and to protect both defendants' right to conflict-free representation." (*Id.*)  The Court obviously "could not fulfill this responsibility without being adequately informed." (*Id.*)

Professor Green's opinion is that "if fully informed, it would not have been appropriate for the Court[]" to allow Smith "to continue representing Ms. Monteen and remain in a joint defense for months on end while concealing from his client and her co-defendants in the JDA that he was assisting a potential government cooperator who was offering to provide information and testimony against them." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 29 at 2.)  Professor Green's position is that the government "has a responsibility to protect its witnesses other than by having lawyers violate their professional obligations and by having defendants unwittingly relinquish their right to conflict-free representation." (*Id.*)

*Professor Green's Testimony:*

Because of Professor Green's extensive qualifications and the extensive information provided in his Declarations, defense counsel (at the Court's strong suggestion) did not conduct a direct examination except to admit the Declarations into evidence and confirm that Professor Green's opinions have not changed.

*Examination by government counsel:*

Government counsel asked Professor Green to identify the source of a prosecutor's duty to notify the court of a conflict of interest.  (Hr'g Tr. 4/24/24 at 22.)  Professor Green explained that there are a couple of sources.  The first is that:

- 85 -

courts have said that prosecutors have a duty to tell the court when defense counsel has a conflict of interest.  And the reason they've said that is because the courts have an obligation to deal with defense attorney's conflicts of interest and decide whether to replace the lawyer, secure a waiver of the conflict from the defendant, or deal with it in some other way.  And so, in part, the obligation grows out of obligations established by the courts pursuant to their supervisory authority.

(*Id.*)  Professor Green further explained the duty to disclose a conflict imposed by the courts also grows "out of the prosecutor's duty as an officer of the court who is required to do justice, which is what comment 1 to Rule 3.8" of the Rules of Professional Conduct provides to ensure "procedural fairness for the defendant."  (*Id.* at 22–23.)

A prosecutor's duty to disclose a conflict to the court is also "an obligation that grows out of the Rules of Professional Conduct.  There's a reporting obligation when a lawyer knows that another lawyer is engaged in serious disciplinary misconduct."  (*Id.* at 23.)  Professor Green's opinion is that "Mr. Smith was engaged in serious disciplinary misconduct by having a conflict of interest and not dealing with it appropriately" because he did not move to withdraw or bring the conflict to the court's attention.  (*Id.*)

With respect to AUSA Rossi, Professor Green's opinion is that "instead of alerting the court to the problem, [he] basically, in a sense, encouraged Mr. Smith to continue the representation without calling it to the court's attention," which Professor Green believes is a violation of Rule 8.4(a) of the Rules of Professional Conduct.  (Hr'g Tr. 4/24/24 at 23.)  Professor Green explained that AUSA Rossi seemed to make a distinction between potential and actual conflicts and suggested that Smith only had a potential conflict which did not need to be brought to the court's attention.  (*Id.* at 24.)  In Professor Green's opinion, "that is absolutely wrong."  (*Id.*)

Professor Green's opinion is that AUSA Rossi "was aware of the conflict in June and that was the time when Mr. Smith should have moved to withdraw and, failing to do that, Mr. Rossi should have alerted the courts to the conflict and that was an ongoing problem" from June 2021 "through until March and April."  (*Id.* at 31.)  Every day that AUSA Rossi (and Smith) waited to notify the Court of the conflict "deprive[d ]both clients

of conflict-free representation." (*Id.* at 31–32.)

With respect to the conflict arising at the June 2021 free talk, Professor Green testified that the free talk transcript reflects that BR expected to be asked about Western Hills and said that he had information about Western Hills. (Hr'g Tr. 4/24/24 at 38.) Professor Green acknowledged that even though BR does talk about the people he knows in Freestones and Western Hills, AUSA Rossi's perception was that BR was reluctant to talk, at least that day, about Western Hills. (*Id.* at 38–39.)

Professor Green was asked to address if there would have been a conflict if it turned out that BR did not actually have information about Western Hills except what he read in the paper or from third-hand accounts. (*Id.* at 39.) He testified that "the problem is that Mr. Smith had a conflict then because he perceived that because he represented Ms. Monteen, he couldn't inquire into what B.R. knew or prepare him to give a free talk if there was a later free talk, which I think there was an indication that the government was interested in continuing the conversations." (*Id.*) In fact, Mr. Smith's comments during the August 2021 free talk that he would leave the room if Western Hills information was going to be discussed, demonstrates his understanding that he "couldn't really discuss Western Hills at all" with BR. (*Id.*) That is the conflict. (Hr'g Tr. 4/24/24 at 39') Professor Green explained that "[a]n unconflicted lawyer could talk to the client . . . to find out what he knew" to assess whether "what he knew was going to be helpful to him and gain the benefit of cooperation," and "prepare the client to be truthful and forthcoming." (*Id.* at 39–40.) But, again, "Mr. Smith's perception was even then he couldn't even begin the conversation about Western Hills." (*Id.* at 40.) Moreover, in a later email to AUSA Rossi, Smith indicates "that he's uncertain about whether he can even talk to the client about that." (*Id.*) Thus, "the inability to have that conversation with the client that any other lawyer could have is a conflict of interest." (*Id.*) Stated another way, in June 2021, Smith had "an actual conflict because the duty to Ms. Monteen was limiting what he could do in communicating with B.R." (Hr'g Tr. 4/24/24 at 40.)

Government counsel asked: "if the client says he doesn't want to talk about it, why

1    would you inquire about something he doesn't want to talk about?"  (*Id.* at 40–41.)

2    Professor Green first noted that "that was not what B.R. said." (*Id.* at 41.)  Nevertheless,

3    he again explained that "a lawyer has a duty under [Rule 1.4 of the Rules of Professional

4    Conduct] to reasonably counsel the client," and an unconflicted lawyer "would talk to the

5    client about why the client didn't want to talk about Western Hills and give the client . . .

6    your best judgment about whether he should or shouldn't, given what he wanted to

7    accomplish here."  (*Id.* at 41.)  Because BR wanted to get a benefit, *i.e.*, to avoid or

8    minimize prison time, "a competent lawyer would explain to the client that the way to best

9    benefit [from] being a cooperator is to be a fully forthcoming cooperator."  (*Id.*)  And the

10   way to get that benefit is to be "fully forthcoming about an important gang case that's

11   pending," rather than trying "to avoid talking about it." (Hr'g Tr. 4/24/24 at 41–42.)  Thus,

12   a "lawyer couldn't entirely avoid talking about Western Hills without doing a disservice to

13   the client.  And an unconflicted lawyer would follow up and have conversations and maybe

14   change the client's mind."  (*Id.* at 42.)

15        Government counsel asked Professor Green if it was fair to say both that the conflict

16   is "not visible from the exterior," and a prosecutor is not going to know "the nature of the

17   prep or whether or not . . . .there's been any limitation below the surface?"  (*Id.*)  Professor

18   Green testified that: "to put it in the context of this case again, Mr. Rossi knew enough

19   information to know that there was a conflict, he even referred to it, as I understand it, after

20   the tape recorder was turned off in June."  (*Id.*)

21        Professor Green acknowledged that AUSA Rossi would not have known in June

22   2021 "all the ways the conflict impacts on the defense."  (*Id.*)  However, "even a court

23   looking back in retrospect wouldn't have known[.]"  (Hr'g Tr. 4/24/24 at 42.)  For that

24   reason, "the Supreme Court in Cuyler against Sullivan makes the point that . . . even when

25   you have an actual conflict, it's going to be hard to determine all the ways in which it

26   impacts the lawyer, some of which will not be memorialized.  And that's why the court

27   adopted a test that doesn't require the defense to show prejudice, it's enough to show an

28   actual conflict that adversely affected the lawyer's representation."  (*Id.* at 42–43.)

Government counsel asked Professor Green if it's his position that Smith had be removed from representing Monteen and BR if "June is the only free talk" and AUSA Rossi told the court that Smith has a conflict. (*Id.* at 43.)  Professor Green noted that he did not take a position on that point in his declaration. (*Id.*)  His position is that "there was a conflict in June and it should have been brought to the court's attention by Mr. Smith and, failing that, by Mr. Rossi." (*Id.*)  Professor Green explained that in the Southern District of New York, "the court would appoint another lawyer to talk to B.R.," which is called *Curcio* counsel (which stems from a Second Circuit case), "because the court is . . . limited in the amount of inquiry that it can do and so you would have a lawyer who didn't have a conflict talking to B.R." (Hr'g Tr. 4/24/24 at 43.)

Professor Green testified that "if I were the judge, I would have to disqualify because I don't know that you could ask Ms. Monteen to waive the conflict." (*Id.*)  He explained that "one of the manifestations of the conflict that made it an actual conflict is that Mr. Smith could not even tell Ms. Monteen that he was . . . representing a potential cooperator against her" because of his duty of confidentiality to BR. (*Id.* at 43–44.) Professor Green noted that he did not express an opinion on what the judge should do at that point; however, he testified that:  "I'm not sure if I were a judge what I could do other than disqualify Mr. Smith." (*Id.*)

That said, Professor Green explained that the Supreme Court in *Wheat* "said that courts have a lot of discretion.  They can replace lawyers, they can disqualify them." (*Id.* at 45.)  In some cases, the clients can waive the conflict. (Hr'g Tr. 4/24/24 at 45.)  However, Professor Green does not think this conflict situation "would have been a very good candidate" for waiver because he is "not sure how Ms. Monteen could have." (*Id.* at 45–46.)  The courts have a "supervisory responsibility that they can't undertake unless the prosecutor or defense lawyers tells them about the conflict.  But it doesn't always follow that there's disqualification." (*Id.* at 46.)

Government counsel asked if Professor Green believed that the June free talk met "the direct adversity prong of 1.7" of the Rules of Professional Conduct. (*Id.*)  Professor

Green explained that to the extent that BR "is going to potentially give testimony or give information that's going to be adverse to Western Hills defendants, including Ms. Monteen, that's disloyal, that's what creates in part the conflict.  It's not direct adversity in the sense of in testifying against another current client but it's certainly adversity, it's disloyal." (*Id.*)

Government counsel asked:  "Taking the June free talk on its own terms, it does not appear at that point that they are directly adverse.  Is that fair to say?"  (Hr'g Tr. 4/24/24 at 47.)  Professor Green disagreed.  (*Id.*)  He explained that even though at the end of the June 2021 free talk BR said he was reluctant to provide Western Hills information, he believed he had useful information and was open to cooperating if he could reach satisfactory terms with the government.  (*Id.*)  Professor Green observed:

> So that that point, if it wasn't clear to Mr. Smith and Mr. Rossi previously, it would have been clear that [BR] was a potential cooperator giving what he believed to be adverse information, potentially testimony, against Western Hills, and to the extent that Mr. Smith continued to represent him and promote his cooperation, which he obviously would have to do, that would be adverse to Ms. Monteen as . . . one of the co-defendants in the case against alleged members of the Western Hills gang.

(*Id.* at 47-48.)

Government counsel asked if Professor Green agreed that his opinion is "fairly speculative" if it based on the premise that "at some point there would be a development of the case on the Western Hills."  (*Id.* at 48.)  That was not his testimony.  (Hr'g Tr. 4/24/24 at 48.)  Professor Green explained that what he is saying that BR's cooperation did not end.  (*Id.*)  "It was clear that it was going to continue.  He had information about Western Hills that he expected to give if they could reach favorable terms, and Smith was going to continue to represent him in pursuing cooperation, which is what he wanted." (*Id.*)  Regardless of whether BR would end up testifying at trial, which would be "manifestly directly adverse" to Monteen, "even assisting him in making a cooperation agreement where he's providing information against Western Hills is directly adverse to Monteen[.]"  (*Id.*)  Professor Green noted that in *Wheat* the Supreme Court upheld the disqualification of a lawyer "based on things that might occur that were contingent and that

might not occur." (*Id.* at 48–49.) Professor Green further noted that whether BR would be a witness at trial "would be speculative as of June," but "[t]he idea that he wanted to cooperate and provide information about Western Hills if favorable terms could be reached wasn't speculative, that was clear by the end of the June free talk." (Hr'g Tr. 4/24/24 at 49.)

Government counsel asked a question that Professor Green had already addressed several times in response to other questions: "is there a conflict if Mr. Smith's advice to B.R. is, 'You probably shouldn't cooperate against Western Hills,' and that's also in line with Ms. Monteen, does Mr. Smith have a conflict?" (*Id.*) Professor Green again explained:

> So if Mr. Smith did not represent Ms. Monteen, he would be able to give disinterested advice to B.R. about whether to cooperate or not and whether to cooperate against Western Hills or not. Because he represented Ms. Monteen, he couldn't give disinterested advice. If he was going to be loyal to Ms. Monteen, he would say: Don't cooperate. And that would best protect her. If he says: You should cooperate because even though you only face a year or two in prison, you really don't seem to want to spend any time in prison. Your girlfriend is pregnant. You seem to want to be out as soon as possible. If you gave that advice, and therefore you should cooperate fully and forthcomingly, including against Western Hills, that would be disloyal to Ms. Monteen. So he's caught in a conflict at that point notwithstanding that B.R. might be only facing a year or two rather than longer imprisonment.

(*Id.* at 49–50.)

The Court interjected to try to get to the bottom line on the conflict that Professor Green believes arose at the June 2021 free talk. (*Id.* at 50.) Specifically, "once Western Hills gets brought up[,]" and that BR "knows information" and "the players," Smith "had to have a conversation with Mr. [BR] about that and he could not 'cause he had the conflict. That's – that's where the conflict stems from is that conversation had to be had to provide competent representation[.]" (*Id.* at 50–51.) Professor Green agreed and added that Smith "had to have a disinterested conversation which he could not have. Even if he had the conversation, it couldn't be disinterested and that's why he had to raise it with the court to give the court an opportunity to figure out what to do." (*Id.* at 51.)

Professor Green's opinion is that even if BR told Smith that "I was just making it up, I don't really have anything" on Western Hills, Smith "had to press him."  (Hr'g Tr. 4/24/24 at 51.)  Professor Green explained that "if you're a competent and disinterested lawyer, then, you know, it's not unusual for someone in B.R.'s position to have second thoughts because he's concerned about danger, because he doesn't want to look like more of a snitch than he is already, or for other reasons, but I think a competent lawyer would press him further and maybe then he concedes that he does have information."  (*Id.* at 51–52.)  In fact, BR told AUSA Rossi and Smith that he was housed with Western Hills members "so there's obviously a lot more conversation to be had[.]"  (*Id.* at 52.)

The Court asked why it should have been apparent to AUSA Rossi that Smith had a conflict at the conclusion of the June 2021 free talk.  (*Id.*)  Professor Green testified that "he did see it.  He alerted Mr. Smith to it.  Whether he knew how to deal with it, I guess, is a question of training."  (*Id.*)  Professor Green noted even if an experienced prosecutor (like AUSA Rossi) does not know how deal with the conflict situation, "every U.S. Attorney's Office has an ethics lawyer and . . . has access to a professional responsibility advisory office in the justice department."  (Hr'g Tr. 4/24/24 at 52–53.)  Because AUSA Rossi recognized the conflict problem in June 2021, "even if he didn't know personally how to deal with it, he could do research and he could seek advice from lawyers who were more experienced dealing with ethics issues."  (*Id.* at 53.)

Given that AUSA Rossi recognized the conflict issue in June 2021, the Court asked Professor Green if AUSA Rossi could have at protected himself (to an extent) by both telling Smith that he needs to sort out this conflict issue, and advising Smith that "[t]he one thing that's never happening is that you, me, and [BR] are never sitting down in the same room and talking about Western Hills?"  (*Id.*)  Professor Green testified that approach "doesn't solve the conflict from Mr. Smith's point of view[.]"  (*Id.*)  Rather, "that just sort of makes the problem kind of concrete."  (*Id.* at 53–54.)  Professor Green added that he does not know what the Court means by Smith "sorting out" the conflict "other than bringing it to the court's attention." (Hr'g Tr. 4/24/24 Tr. at 54.)  Professor Green

- 92 -

acknowledged that AUSA Rossi could have given Smith "a little bit of time" to research it and figure out what to do. (*Id.*)  However, "for every week that it goes on, Ms. Monteen is denied disinterested counsel and [BR] is denied disinterested counsel and you have a right to conflict-free representation." (*Id.*)  The longer the conflict goes on the more likely it is when Ms. Monteen gets a new lawyer she "might feel mistrustful because she had a lawyer who continued her representation with a conflict of interest and you don't know how that affects the representation of Ms. Monteen[.]" (*Id.*)  Professor Green is not suggesting that "Mr. Rossi has to run to court that day," but he could not wait very long, and certainly not months. (*Id.* at 55.)

Government counsel asked if Smith had a duty to explain to AUSA Rossi why he believes that he did not have a conflict. (Hr'g Tr. 4/24/24 at 56.)  Professor Green first noted that he assumes that Smith did not understand that he had a conflict, not that he was not being deliberately untruthful. (*Id.*)  Professor Green testified:  I don't know what source of obligation [Smith] would have to convince the prosecution of something that's not the case.  I think it's the prosecutor's job to make sure that he understands why he has a conflict or at least to raise it with the court so that the court could deal with it." (*Id.*)

Professor Green was asked to address AUSA Rossi's concern of a court leak if he notified the court of the conflict in a sealed proceeding. (*Id.* at 66.)  Professor Green explained that a fear of a leak would not excuse a prosecutor's duty to disclose a conflict to the court. (*Id.*)  Professor Green added that he found it "hard to imagine" that "a court is going to leak information to a gang." (Hr'g Tr. 4/24/24 at 67.)  Professor Green testified he would "raise it in a way that didn't get in the hands of the terminated clerk or employee." (*Id.* at 66.)  And hopefully the U.S. Attorney's Office and the Chief Judge would get together to handle the problem. (*Id.* at 67.)

*Examination by defense counsel*:

Professor Green's opinion is that Smith should not have been engaged in motion practice after the conflict arose, other than a motion to withdraw. (*Id.* at 77.)  A conflicted attorney should not "continue the representation for weeks or months on end without

1   raising it with the court." (*Id.*)

2          *The Court's additional questions:*

3          The Court asked Professor Green to address AUSA Rossi's testimony that he

4   believed that a conflict did not occur at the June 2021 free talk because he viewed the

5   conversation "as a Freestone issue which had nothing to do with Smith as opposed to a

6   Western Hills Bloods issue." (Hr'g Tr. 4/24/24 at 78.)  Professor Green testified that aside

7   from the fact that there was this rivalry between Freestones and Western Hills, "this is very

8   early in the cooperation stage" and BR said that he had information on Western Hills.  (*Id.*)

9   As a result, Smith "could not have formed a judgment at that point that he had no useful

10  information to give about the Western Hills prosecution." (*Id.*)  In fact, Smith did not form

11  that judgment; he was reserving judgment "because they hadn't really pursued it." (*Id.* at

12  78–79.)  As to AUSA Rossi's focus on the Freestones, Professor Green testified that

13  "regardless of whether Mr. Rossi . . . is predicting that the . . . information will be useful

14  or not, that's not the problem." (*Id.* at 79.)  Again, "the problem is that there's no

15  disinterested lawyer who could elicit whether [BR] has useful information and then bring

16  him back into the room for another free talk." (*Id.*)

17         The Court asked Professor Green to opine on the propriety of AUSA Rossi asking

18  BR questions about Western Hills during the August 2021 free talk while Smith was not

19  present.  (Hr'g Tr. 4/24/24 at 80.)  Professor Green first volunteered that he finds it "a little

20  hard to get my head around that the lawyer left his client alone with the prosecutor." (*Id.*)

21  From the conflict perspective, instead of insisting that Smith withdraw from representing

22  both clients and notifying the court if he did not do so, AUSA Rossi "took advantage of . .

23  . the conflict in a way." (*Id.* at 80–81.)

24         The Court also asked Professor Green to address the propriety of AUSA Rossi

25  reading BR's letter given that he was a represented party.  (*Id.* at 81.)  Professor Green

26  testified that "in fairness to Mr. Rossi, I think the question would be whether this was a

27  communication by him with the represented party or whether he was just a passive recipient

28  of [BR's] communication." (*Id.*)  While it may have been better for Rossi to send it to a

1    "taint team," he does not think that a prosecutor would be disciplined for reading the letter.

2    (Hr'g Tr. 4/24/24 at 84.)

3    The problem that Professor Green has with the letter is that "it's sort of the

4    manifestation of the conflict." (*Id.* at 82.)  One could infer that BR is writing the letter

5    "because he feels somewhat abandoned by the lawyer who has a conflict of interest with

6    respect to the Western Hills issue and, therefore, he feels that he has to communicate with

7    the prosecutor on his own." (*Id.*)  Professor Green added that "if I were the prosecutor

8    receiving this letter, it would confirm" to me that there was an actual, not a potential,

9    conflict. (*Id.*)  The letter would have made it "more crystal clear" that there was an actual

10   conflict. (*Id.* at 84.)

11   Professor Green's opinion is that Smith and Rossi were incorrect in concluding that

12   a conflict had not yet occurred because they did know what information BR had or would

13   provide. (Hr'g Tr. 4/24/24 at 84.)  Moreover, his opinion is that the information provided

14   by BR did not have to be inculpatory for there to be a conflict. (*Id.*)  He added that "it also

15   doesn't have to be new information" or that BR is telling the government what they already

16   know because "corroboration can be useful in a case.  Just because the prosecution knows

17   it doesn't mean it's irrefutable." (*Id.* at 85.)

18   *Further examination by Monteen's counsel:*

19   Counsel asked whether AUSA Rossi violated his duty of candor to the court by

20   litigating motions in Monteen's case and not telling the court about the conflict. (*Id.* at 87.)

21   Professor Green testified that notifying the court of a defense attorney's conflict is a part

22   of the candor obligation, even if "the defense attorney doesn't know of the conflict[.]" (*Id.*)

23   AUSA Rossi's silence on the conflict issue when litigating the motions "is the problem."

24   (Hr'g Tr. 4/24/24 at 88.)  Professor Green does not "know if there's a rule that says you

25   can't exacerbate the violation" by litigating motions; however, "pretending like there's not

26   a problem: . . . is part of the problem[.]" (*Id.*)  In a way, AUSA Rossi "is encouraging Mr.

27   Smith not to disclose this to the court by litigating against him," doing free talks, and

28   "basically continuing business as usual." (*Id.*)  With respect to the severance motion,

1   Professor Green testified that "making the court resolve an issue of severance  . . . hence

2   they know severance is inevitable because of a conflict that's undisclosed I think is a breach

3   of candor even if the judge had not explicitly asked." (*Id.* at 89.)

4   **9. <u>Patricia A. Sallen, Esq.</u>:**

5       Patricia Sallen provided defense counsel with a Declaration which was an exhibit

6   to defendant Maxwell's reply brief.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 28.)

7   Ms. Sallen has been practicing law for approximately 35 years. (*Id.* at 2.) Ms. Sallen's

8   "current practice is limited to lawyers' professional responsibility issues."   (*Id.*)

9   Specifically, "defending lawyers who have been accused of legal ethics violations;

10  advising lawyers who wish to avoid being accused of legal ethics violations or of being

11  sued for damages or for disgorgement of fees; advising lawyers and firms concerning their

12  practices and procedures; drafting and recommending amendments to the Ethical Rules;

13  and working as an expert witness."   (*Id.*)  She also works "with the American Bar

14  Association Model Rules of Professional Conduct and the study of lawyer standards of

15  practice and standards of care." (*Id.*)

16      Ms. Sallen has served as an expert advisor to or member of several Arizona Supreme

17  Court task forces and committees.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 28 at

18  2.)  She currently serves on the Supreme Court's Task Force on Ethics Rules Governing

19  the State Attorney General, County Attorneys, and Other Public Lawyers. (*Id.* at 3.)  She

20  also currently serves on the State Bar's Ethics Advisory Group. (*Id.*)

21      From February 2003 until October 2015, Ms. Sallen was employed at the State Bar

22  of Arizona.  (*Id.*)  She had the following positions and job duties:  (1) staff counsel to the

23  State Bar's then-existing Committee on the Rules of Professional Conduct, where she

24  assisted in writing ethics opinions; (2 ) State Bar ethics counsel, where she educated and

25  advised lawyers on ethical issues and dilemmas; and (3) senior bar counsel in the Lawyer

26  Regulation Office, where she evaluated charges against lawyers and prosecuted bar

27  complaints. (*Id.*)

28      Ms. Sallen has taught hundreds of continuing-legal-education seminars.  (Evid. Hr'g

on the Mot. to Disqualify, Def. Ex. 28 at 3.)  She also taught professional responsibility as an adjunct professor at Arizona State University Sandra Day O'Connor College of Law from 2008 to 2020.  (*Id.*)  Ms. Callen writes on professional responsibility and ethical issues, including the "Eye on Ethics" column in the Arizona Attorney magazine.  (*Id.* at 4.)  She has also testified as an expert witness at trial or by deposition in two cases over the past four years.  (*Id.*)

The extensive list of case-related documents that Ms. Sallen reviewed and considered in forming her opinions are listed in Exhibit B to her declaration.  (*Id.*)  Although the Court will not set forth each of those documents, it appears that Ms. Sallen has reviewed every document discussed above, including all pleadings (and their exhibits) and transcripts of hearings that are relevant to the instant motion.  As a result, Ms. Sallen began the substantive portion of her declaration with a lengthy discussion of the facts operative to her opinions.  That factual discussion is similar to the Court's discussion of the facts set forth earlier.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 28 at 5–17.)

*Smith's Clear Conflict of Interest:*

Ms. Sallen's opinion is that "Mr. Smith had an actual conflict of interest as soon as Mr. [BR] unilaterally raised the topic of the Freestones and the Western Hills Bloods at the first free talk on June 23, 2021."  (*Id.* at 18.)  Smith's concurrent representation did not create a "potential conflict," as AUSA Rossi stated in his May 10, 2022, Memorandum to File.  (*Id.*)  Because an actual conflict had already occurred, AUSA Rossi was incorrect when he cautioned Smith that he "would" have a conflict if BR decided to share information on WHB members.  (*Id.*)  Rather, "[t]he conflict began long before Mr. [BR] actually shared Western Hills information with the government or officially became a witness."  (*Id.* at 22.)

Ms. Sallen's conclusion is based on a straightforward application of Rule 1.7 of the Arizona Rules, which addresses conflicts of interests between current clients.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 28 at 18.)  Smith had a concurrent conflict of interest under Rule 1.7 because his representation of BR was "directly adverse" to Monteen.  (*Id.*)

The reason behind prohibiting a lawyer from representing clients with directly adverse interests is so clients will not feel betrayed.  (*Id.*)  In fact, Ms. Monteen's testimony – "it makes it hard to trust anybody representing me after that" – "epitomizes the betrayal" that Rule 1.7 is intended to address.  (*Id.* at 18–19.)

Smith's concurrent representation of Ms. Monteen and BR resulted in divided loyalties and constituted an actual conflict for the following reasons.  (*Id.* at 19.)  By cooperating with the government and providing information about the Freestones and WHB, "[BR] – via Smith – was acting directly adverse to Ms. Monteen's interests" in her case.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 28 at 19.)  Additionally, Smith's ability to consider, recommend, or carry out an appropriate course of action for Ms. Monteen was limited by his responsibility to Mr. [BR]."  (*Id.*)  Ms. Sallen's opinion is that "[i]t was incumbent on Smith to resolve the conflict as soon as it arose" and that "he had an ethical obligation to inform the court of the conflict."  (*Id.* at 20.)

Ms. Sallen's view is that Mr. Smith's explanation for why did not withdraw – that he would put one or both clients in danger – "proves why this conflict was seriously untenable from the moment Mr. [BR] raised the issue of having information about the Freestones and the Western Hills Bloods.  (*Id.* at 22.)  Mr. Smith had put himself in the position in which he could not fully and loyally represent either, because of his obligations to the other.  That is the essence of an impermissible conflict."  (*Id.*)

*AUSA Rossi's unethical conduct:*

Ms. Sallen's opinion is that AUSA Rossi acted unethically when he became aware of Smith's conflict and failed to deal with it, and instead "exploited, to the government's benefit, Mr. Smith's clear conflict of interest."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 28 at 22.).  In her opinion, AUSA Rossi's actions are "antithetical to the view of prosecutors' ethical obligations under the Arizona Ethical Rules," which impose high standards on prosecutors who must act as "ministers of justice[.]"  (*Id.* at 23.)  Ms. Sallen explained that Rule 5.2(a) makes clear that AUSA Rossi's "ethical lapses cannot be excused because of advice or direction that he was given by supervisors."  (*Id.* at 27.)

1    Ms. Sallen believes that Smith's "conflict arose at the earliest during the first free
2    talk in June 2021 and at the latest during the third free talk in December 2021." (*Id.* at 24.)
3    She further noted that even if AUSA Rossi:

> believed the conflict arose at that third free talk, he did nothing to see that
> Ms. Monteen was represented by unconflicted counsel between then and the
> end of March [2022], when Mr. Smith finally filed his motion to withdraw
> from representing her.  Instead, he let Mr. Smith's conflict of interest play
> out, to the government's benefit.  By not raising the issue, he obtained
> information from a confidential informant – also represented by Mr. Smith –
> that would not be in Ms. Monteen's interests.

9    (*Id.*)

10   Ms. Sallen's opinion is that AUSA Rossi's "failure to act caused actual damage not
11   only to Ms. Monteen, but also to the remaining defendants." (Evid. Hr'g on the Mot. to
12   Disqualify, Def. Ex. 28 at 24.)  Specifically, Smith continued to attend joint defense
13   meetings and had access to joint defense materials. (*Id.*)  Smith also never disclosed to the
14   joint defense group that he represented a client who was cooperating in the WHB case.
15   (*Id.*)  Ms. Sallen's opinion is that AUSA Rossi's testimony made clear that "he made a
16   calculated decision to allow the conflict to exist for months, either because he did not
17   believe one had matured or to protect Mr. [BR]." (*Id.*)  Either way, he was not ensuring
18   that Ms. Monteen would receive effective assistance of counsel and he kept significant
19   information from the court." (*Id.*)

20   Ms. Sallen's opinion is that that AUSA Rossi failed in his duty as a "minister of
21   justice" in several ways as a result of his interest in obtaining information from BR, despite
22   his concerns about Mr. Smith's conflict of interest. (Evid. Hr'g on the Mot. to Disqualify,
23   Def. Ex. 28 at 25.)  Specifically, "[b]y failing to disclose the conflict, [AUSA Rossi]
24   essentially aided and abetted Mr. Smith's ethical violation" in violation of Rule 8.4(a) of
25   the Arizona Rules. (*Id.*)  AUSA Rossi also violated Rule 8.4(d) which prohibits lawyers
26   from engaging in conduct that is "prejudicial to the administration of justice." (*Id.*)
27   Because Rule 8.4(d) does not require a mental state other than negligence, AUSA Rossi's
28   "motives for handling the conflict as he did thus would be irrelevant." (*Id.*)  Ms. Sallen is

of the opinion that that AUSA Rossi also violated Rule 8.4(c), which prohibits a lawyer engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation." (*Id.*) She bases her opinion, in part, on AUSA Rossi's testimony that as of December 28, 2021, Smith had an actual conflict, but he deliberately chose not to inform the court. (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 28 at 25.) In fact, AUSA Rossi litigated "Ms. Monteen's motion to sever (filed by her conflicted counsel) without disclosing to the court that he and her conflicted counsel had what appeared to be at least an implicit agreement or arrangement not to raise the conflict-of-interest issue." (*Id.* at 25–26.) Ms. Sallen's opinion is that keeping the conflict from the court was unethical. (*Id.*)

*Examination by defense counsel:*

Unlike with Professor Green, counsel questioned Ms. Sallen about her background and experience (which will not be repeated), as well as her opinions notwithstanding her thorough Declaration.

Ms. Sallen's opinion is that Smith had a clear conflict of interest on June 23, 2021, the date of the first free talk, "[t]he minute [BR] spoke about having information that was adverse to Mr. Smith's other client, Ms. Monteen[.]" (Hr'g Tr. 4/24/24 at 101.) Mr. Smith had a duty to recognize the conflict and "stop the interview and deal with it. He couldn't sit there and continue to make things worse by representing . . . one client who was clearly adverse or going to be adverse  or indicated an interest in being adverse to his other client." (*Id.* at 101–02.) Smith had "a duty to get out of representing both" clients and "the best way to notify the court is to withdraw from representation" of both clients. (*Id.* at 102.) Smith had "a current client conflict under Ethical Rule 1.7, "meaning that a lawyer has a conflict with two clients who are adverse to each other[.]" (*Id.* at 102–03.)

AUSA Rossi should have known about the conflict "the minute the words were out of [BR's] mouth, that should have been obvious to a prosecutor familiar with the case and who knew that Mr. Smith also represented Ms. Monteen." (*Id.* at 103.) In fact, "after the interview, Mr. Rossi actually told Mr. Smith:  'I think you've got a conflict.'" (Hr'g Tr. 4/24/24 at 103.) Ms. Sallen's testified that a prosecutor "is a minister of justice" who must

1    "make sure that the procedural and substantive rules are fair to defendants[.]"  (*Id.*)  As a
2    result, it was mandatory and critical for AUSA Rossi "to tell Mr. Smith: Hey, you've got
3    a conflict with both of these clients.  You need to get out.  And if you don't get out
4    voluntarily, I've got to bring it to the court's attention."  (*Id.* at 103–04.)

5         Because of Smith's duty of confidentiality to Ms. Monteen, he could not share
6    information with either client.  (Hr'g Tr. 4/24/24 at 107.)  For example, he could not tell
7    BR that he was in the JDA or share JDA information with BR, and he could not explain to
8    Ms. Monteen why he needed to withdraw from the JDA.  (*Id.*)  Ms. Sallen's understanding
9    is that Smith shared some documents or a page of the Western Hills indictment with BR.
10   (*Id.* at 108.)  She explained that even a disclosure of "something as basic as that was a
11   problem" because it was confidential information that he learned in the course of
12   representing Ms. Monteen.  (*Id.*)

13        Ms. Sallen was asked to discuss the propriety of AUSA Rossi litigating motions
14   against Smith in Monteen's case after the conflict arose.  (*Id.*)  She testified that "[b]y not
15   disclosing to the court that there was this conflict going on, both Mr. Smith and Mr. Rossi
16   essentially perpetuated . . . a falsehood with the court that Mr. Smith was able to continue
17   representing Ms. Monteen and that Mr. Rossi knew it and wasn't saying anything."  (Hr'g
18   Tr. 4/24/24 at 109.)  Ms. Sallen added: "the minute things happened in June 2021,
19   everything went downhill from there, everything got worse.  More steps, every step seemed
20   to get worse in the conflict."  (*Id.*)

21        Ms. Sallen's opinion is that if AUSA Rossi did not recognize the conflict at the June
22   2021 free talk, "[b]ells and sirens should have gone off" for him at the August 2021 free
23   talk when Smith said "'I don't want to be in the room when you talk about that.'"  (*Id.*)
24   And, of course, the BR letter should have also made clear to AUSA Rossi that Smith had
25   a conflict.  (*Id.*)

26        Ms. Sallen believes that AUSA Rossi violated Rule 4.2 of the Professional Rules of
27   Conduct, contact with a represented person, when he read BR's letter.  (*Id.* at 111.)  She
28   testified that the "represented person can't open the door."  (Hr'g Tr. 4/24/24 at 111.)  "The

gatekeeper and only person who can give permission is that person's lawyer." (*Id.*)  Ms. Sallen views the letter as no different than a phone call where "the only appropriate response from the other lawyer in the matter is:  I'm sorry.  I cannot speak, I cannot communicate with you period." (*Id.*)

*Examination by government counsel*:

Ms. Sallen has never practiced criminal law and has never worked on any gang cases or RICO cases.  (*Id.* at 114.)  She is not familiar with "gang politics" generally or in Tucson, other than this case.  (*Id.* at 115.)  Her understanding of the relationship between the Freestones and Western Hills "is you can't talk about one without talking about the other because they're so intertwined."  (Hr'g Tr. 4/24/24 at 115.)  In response to counsel's question of how they are related to one another, she testified:  "[c]riminal conduct perpetrated on the other." (*Id.*)  She is aware that these gangs are rivals and the indictment in this case "charges the Western Hills Bloods conducted various violent acts against Freestone[.]" (*Id.* at 116.)  When asked if there is any evidence that these gangs "conspired with one another," she testified that all she recalls is that AUSA Rossi said "that you can't talk about one without talking about the other and that they're very intertwined." (*Id.*)  Ms. Sallen agreed with counsel that "when you talk about two people being intertwined, they could be intertwined as co-conspirators or they could be intertwined as rivals[.]" (*Id.* at 116–17.)

Counsel asked Ms. Sallen "[w]hat were the words uttered by B.R. that triggered the conflict" at the June 2021 free talk?"  (Hr'g Tr. 4/24/24 at 117.)  She testified that the conflict arose when BR "broached the subject of:  I thought I was here to talk about the Freestones and the Western Hills Bloods." (*Id.*)  She agreed that there was discussion during the free talk "about the purported reason that B.R. was there but he also kept bringing up the information or . . . dancing around the fact that he had information [about Freestones and Western Hills] that he wanted to share and Mr. Rossi talked to him about that." (*Id.* at 118.)  In response to counsel's question of whether most of the information related to the Freestones, Ms. Sallen testified: "I just don't know to quantify 'most.'  I

1   mean, there was discussion about Freestones and Western Hills Bloods and specific

2   reference to specific people involved." (*Id.*)

3       Government counsel asked: "If the Freestones are the victims of the Western Hill

4   Bloods, what conflict is created by B.R. providing information about Freestone crimes?"

5   (*Id.* at 120.) Ms. Sallen testified that "[h]e didn't limit it to the Freestones." (Hr'g Tr.

6   4/24/24 at 120.) She added that if counsel is asking the question as a hypothetical, that BR

7   only talked about Freestones, then "I have to go back to my answer before that what I know

8   from this case from reading the documents is that everybody has said they are intertwined."

9   (*Id.*) Counsel again asked: "Did B.R.'s comments about Freestones – on their own – create

10  a conflict of interest?" (*Id.* at 122.) Ms. Sallen again testified that "he didn't talk just about

11  Freestones on their own." (*Id.*) Counsel asked if Ms. Sallen's answer is that "it's not the

12  Freestones on their own that's the problem, its only because he mentioned them together?"

13  (*Id.* at 123.) Ms. Sallen testified that she did not know enough about the underlying facts

14  of the case; all she knows comes from the documents she read and "the two have a lot of

15  crossover" and "B.R. was offering . . . information about Freestones and Western Hills."

16  (Hr'g Tr. 4/24/24 at 123.)

17      In response to the question of what information BR provided that is detrimental to

18  Ms. Monteen, Ms. Sallen testified that "[t]he conflict not only was what came out of his

19  mouth in saying, I thought we were going to talk about Freestones and Western Hills, but

20  the very fact that he was trying to leverage that information for his own benefit." (*Id.* at

21  124.) She added that Mr. Smith "was sitting there with a client who wanted to leverage

22  some information and the conflict began right when it became clear . . . that's what the

23  client wanted to happen. Mr. Smith couldn't even talk to him about whether it was a good

24  idea to try to leverage that information." (*Id.*) At that point, [BR] is going to be an adverse

25  witness. (*Id.*)

26      Government counsel returned to the subject of how BR providing information about

27  a victim's crime makes him adverse to Monteen. (*Id.* at 124–25.) Ms. Sallen again testified

28  that "the whole prosecution had to do with the crimes between Freestones and the Western

- 103 -

Hills Bloods." (Hr'g Tr. 4/24/24 at 125.) Counsel again asked "how does providing information about the victims of crimes charged [in the] indictment create a conflict?" (*Id.*) Ms. Sallen again testified "that's not what happened in this case." (*Id.*) She added that: "I don't know enough about the facts that led to the underlying charges to know – to be extricate something – Freestone conduct that was isolated from Western Hills Bloods conduct." (*Id.* at 126–27.) Ms. Sallen believes that her reliance on AUSA Rossi's description that the Freestones and Western Hills are intertwined "was entirely reasonable." (*Id.* at 128.) Even if AUSA Rossi was saying that these gangs were "inextricable intertwined because they were rivals," that "makes no difference in terms of a conflict analysis[.]" (Hr'g Tr. 4/24/24 at 128–29.)

Counsel again returned to the subject of how BR providing information about the victim is directly adverse to Monteen. (*Id.*) Ms. Sallen testified: "[c]onflcits are never in a vacuum, ever in a vacuum. And so that's why – that's in part why I'm having a hard time with your question because you have to take into account the context and circumstance and other facts." (*Id.* at 133.) Because counsel and Ms. Sallen had gone through this many times and had to agree to disagree, the Court tried to get some clarity on this subject. (*Id.* at 132.) The Court posed the following hypothetical: "let's say we're just talking about Freestones who are victims, and the free talk continues and Mr. [BR] talks about the Freestones. And Mr. Smith realized, 'Hey, there's helpful information for Ms. Monteen and other other members of the JDA,' can he share that information?" (*Id.*) Ms. Sallen responded: "No, because he's getting that information through representing B.R." (Hr'g Tr. 4/24/24 at 132.)

Counsel asked Ms. Sallen what information BR provided about Western Hills during the June 2021 free talk. (*Id.* at 133.) She testified that there "was a lot of coded dancing around language . . . in that free talk in which Mr. B.R. was trying to offer some information to show how much he knew and Mr. Rossi trying to get and trying to gauge what he knew." (*Id.* at 134.) She agreed that at one point BR said he did not want to talk about Western Hills guys, which she found "bizarre considering he raised it to begin

with." (*Id.*)   However, BR mentioned "Chanky" and that he knows a lot of people, including Freestones and Western Hills.  (*Id.* at 136.)  In response to counsel's question of when "Mr. Smith or Mr. Rossi should have stopped the free talk based on an obvious conflict of interest," Ms. Sallen again testified:  "the minute the words were out of his mouth that he had information about the Freestones and the Western Hills Bloods, that was the operative point."  (Hr'g Tr. 4/24/24 at 136.)

Government counsel advised Ms. Sallen that during the recess defense counsel informed him that "the government in this case has charged that the Western Hills Bloods retaliated for the murder of Chandler Booker."  (*Id.*)  Counsel asked if that fact changed her analysis or answers to any of his questions.  (*Id.* at 137.)  Ms. Sallen testified:  "No, it reinforces . . . what I testified to earlier, that they are intertwined;" when "you talk about one you necessarily implicate the other one."  (*Id.*)

Counsel turned to the August 2021 free talk and asked if BR provided any information that was adverse to Monteen.  (*Id.*)  Ms. Sallen testified that BR "talked about being cellmates with Mike Williams" and "about all the ways he could help in funneling information, I believe, but at the very least with Mr. Williams."  (Hr'g Tr. 4/24/24 at 137.)  In response to counsel's question of whether BR saying he was cellmate with Mike Williams was enough to create a conflict, Ms. Sallen testified:  "In this context and during that second free talk, knowing everything that I know about this case, absolutely."  (*Id.*)  When asked to identify when during the second free talk that BR said he wanted to talk about Western Hills, Ms. Sallen testified: "why else was he bringing it up . . . who he was cellmates with or who he knew?"  (*Id.* at 138.)  She added that, actually, "Mr. Rossi was the one who brought up the subject in the second free talk."  (*Id.*)

Ms. Sallen agreed that in early January 2022 Mr. Rossi asked Smith to withdraw, and that it is "appropriate for a prosecutor to first approach defense counsel and ask the defense counsel to withdraw[.]"  (*Id.* at 138–39.)  She also agreed that it can sometimes take defense counsel some time to do research and evaluate the circumstances before they can make a final decision about the need to withdraw.  (Hr'g Tr. 4/24/24 at 139.)

Ms. Sallen agreed with counsel that she is not "providing an opinion regarding the consideration of the threat to physical safety to B.R. by Mr. Smith withdrawing[.]" (*Id.* at 142.)  She did not provide any opinion regarding safety "because that's irrelevant." (*Id.*)  Her opinion is that Smith could have withdrawn "without drawing attention to the reason" he needed to withdraw, which goes to the issue of safety.  (*Id.*)  She explained that "the appropriate way to withdraw would have been to have a motion to withdraw that says virtually nothing and then if the court wanted more, the court could have asked for more." (*Id.* at 143.)

Government counsel advised Ms. Sallen that be believed that Smith testified that he "was not concerned about the fact that he needed to disclose the basis of his withdrawal in the motion," but rather if he withdrew individuals housed with BR would be able to infer that he was cooperating. (Hr'g Tr. 4/24/24 at 143.)  Ms. Sallen testified:  "frankly, that seems to be a stretch . . . to say that because there could be any number of reasons why a lawyer has to withdraw from representation.  So to presume that somebody is withdrawing for a reason that would harm Mr. B.R. seems to be a stretch but that's just me." (*Id.*)

Ms. Sallen's opinion is that by failing to disclose Smith's conflict to the court, AUSA Rossi aided and abetted a violation of Rule 8.4(a), which provides that a lawyer cannot help or assist another lawyer commit an ethical violation.  (*Id.* at 149–50.)  In her view, assisting a lawyer in committing an ethical violation can result from a failure to take action.  (*Id.* at 150.)

Ms. Sallen was asked if she has seen any information that suggests that AUSA Rossi and Smith were not in an adversarial relationship with respect to Monteen.  (*Id.* at 155.)  She testified: "Yes  Mr. Rossi made it clear that he wanted that December free talk to go ahead because if it didn't go ahead, he might not get the information that he wanted." (Hr'g Tr. 4/24/24 at 155.)  Ms. Sallen believes that AUSA Rossi was colluding with Smith when litigating the motion to sever because "they didn't explain to the court that there was this conflict." (*Id.*)  She added that "there was, at the very least, an implicit agreement that Mr. Rossi was kind of letting Mr. Smith go along and never . . .  brought it to the court's

1    attention.  So they were both kind of floating along letting the status quo be the status quo

2    and Mr. Rossi never brought anything to the court and Mr. Smith never withdrew."  (*Id.* at

3    156.)

4         Re-direct examination:

5         Ms. Sallen's view is that Mr. Smith and AUSA Rossi were colluding to injure Ms.

6    Monteen specifically and the JDA members "[o]n a broader scale."  (*Id.* at 163.)  Ms. Sallen

7    believes that Ms. Monteen "sits in a unique situation as opposed to the other defendants in

8    this case with respect to the conflict and potential harm" because "she had the counsel who

9    was also representing an adverse client."  (*Id.* at 174.)

10        Defense counsel turned to the government's hypothetical that it repeatedly raised.

11   Ms. Sallen testified that even if BR had only been talking about the Freestones (the alleged

12   victims named in the Western Hills indictment) during free talks, that information would

13   have been adverse to Monteen because it would have been helpful to the government in

14   proving motive for the murders alleged in the indictment.   (Hr'g Tr. 4/24/24 at 165.)

15   Additionally, if BR "knew a lot of bad information about the Freestones," Smith could not

16   share that information with JDA counsel because of his confidentiality obligation to BR.

17   (*Id.* at 166.)  Smith could not share any information that he obtained from BR.  (*Id.* at 169.)

18   "That's one of the problems with a conflict of interest and particularly this conflict of

19   interest[.]"  (*Id.* at 166.)   Similarly, Smith could not have looked at the disclosure in

20   Monteen's case "and checked out all the information that was being provided by Mr. [BR]

21   to see" if was consistent with that information.  (*Id.* at 166–67.)

22        Ms. Sallen's opinion is that the nature of conflict that arose on June 23, 2021 is not

23   "remotely complicated[.]"  (Hr'g Tr. 4/24/24 at 176.)  She believes it is "very clear-cut and

24   simple.  Mr. Smith was representing two clients who were adverse to each other[.]"  (*Id.*)

25   As soon as BR said that he had information about Western Hills that he "clearly wanted to

26   leverage, that was the conflict[.]"  (*Id.*)  As a minister of justice, AUSA Rossi's "obligation,

27   if Mr. Smith wasn't going to do it, was to push to get that resolved immediately.  They

28   should have stopped the free talk and walked out of the room and dealt with the situation."

- 107 -

1   (*Id.* at 175.)

2       When Smith told Rossi at the end of the first free talk that he did not believe that he

3   had a conflict, Ms. Sallen's view is that AUSA Rossi should have gone back to his office

4   to talk to supervisors, but also "take[n] steps to tell the court." (*Id.* at 177.) She added that

5   if AUSA Rossi "didn't get help in his office, he could have called the state bar's ethics

6   hotline which is confidential." (Hr'g Tr. 4/24/24 at 178.) Rossi could also have consulted

7   with lawyers like her who "have deals with government agencies to provide outside

8   counsel. There were sources for him to get advice." (*Id.*)

9       With respect to the August 2021 free talk, Ms. Sallen's opinion is that by asking BR

10  if he was still cellmates with Mike Williams when Smith was not present, AUSA Rossi

11  was "taking advantage of the information that he knows from" BR who is represented by

12  conflicted counsel. (*Id.* at 179.) Stated another way, AUSA Rossi was "exploiting the

13  conflict[.]" (*Id.*) Once again, Ms. Sallen testified that when Smith returned to the free talk

14  and said he does not want to be around when BR talks about Western Hills information,

15  that statement alone should have "set off bells and sirens that there is a problem here[.]"

16  (*Id.*) She added: "How could a lawyer in Mr. Rossi's position not pay attention to it?"

17  (Hr'g Tr. 4/24/24 at 179.)

18      Counsel asked Ms. Sallen to address whether she felt that AUSA Rossi and Smith

19  were colluding. (*Id.* at 181.) She testified that "when people go along in kind of a wink-

20  wink, nod-nod way, that we're just going to go along here . . . and we're going to get this

21  information, . . . they're all agreeing that they're going to kind of ignore the obvious in

22  order to get the benefit of what Mr. B.R. wanted and what Mr. Rossi wanted. (*Id.*) She

23  further testified that "it seemed like Mr. Rossi made a calculated decision to go forward

24  with everything, to not raise the conflict issue in order to get the information that he wanted

25  from Mr. B.R." (*Id.* at 182.) That decision left "Ms. Monteen without adequate

26  representation for months." (*Id.* at 183.) Ms. Sallen is not saying that AUSA Rossi said

27  "let's ignore Ms. Monteen's constitutional rights," but rather a decision was made "that the

28  most important thing was to get the information from Mr. B.R." (Hr'g Tr. 4/24/24 at 183.)

1    Ms. Sallen's opinion is that from June 2021 to March 2022, Ms. Monteen had

2    conflicted counsel, which is the same thing as not having counsel because "Mr. Smith

3    wasn't able to competently and diligently represent her at the same time that he was

4    representing Mr. B.R." (*Id.*)  Finally, in response to counsel's question of whether Ms.

5    Monteen was harmed by conflicted counsel litigating three motions, she testified: "There's

6    got to be harm because he was not able to explain to her that there's a . . . government

7    informant who's going to provide evidence against you." (*Id.* at 185.)

8                                          **DISCUSSION**

9           Before a court may disqualify a prosecutor, a defendant "must demonstrate

10   prejudice from [a] prosecutor's conflict of interest" *or* "present clear and convincing

11   evidence of prosecutorial misconduct." *United States v. Williams*, 68 F. 4th 564, 573 (9th

12   Cir. 2023) (emphasis added).  The Ninth Circuit made clear a defendant seeking to

13   disqualify a prosecutor based on his/her conflict of interest must establish prejudice.  It also

14   seems clear that, based on that court's use of the conjunction "or," prejudice need not be

15   shown in order to disqualify a prosecutor based on prosecutorial misconduct.  However,

16   the government argues that a defendant must show prejudice because claims of

17   prosecutorial misconduct always inherently involve prejudice.  The Court disagrees for the

18   reasons discussed below.

19          To be sure, a court may not impose the drastic remedy of dismissal of an indictment

20   based on prosecutorial misconduct unless the misconduct is flagrant and caused substantial

21   prejudice to the defendant.  *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988).

22   However, "[i]n cases involving prosecutorial misconduct which is neither flagrant nor

23   prejudicial, a district judge can still sanction the misconduct, but the sanction chosen must

24   be proportionate to the misconduct." *Jacobs*, 855 F.2d at 655; *see also United States v.

25   Ross*, 372 F.3d 1097, 1111 (9th Cir. 2004) (prosecutors may be sanctioned even if their

26   misconduct does not prejudice the defendant).[13]

27   _____

28          [13] The government has repeatedly argued that the criminal law does not provide a remedy
     for a violation of the Rules of Professional Conduct.  However, the defense's position is that AUSA

"A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice . . . ."  *United States v. Chu*, 5 F.3d 1244, 1249 (9th Cir. 1993).  The Supreme Court of the United States has observed:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape innocence or innocence suffer.  He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

"Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers."  *Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (citations omitted).  "[L]awyers representing the government in criminal cases serve truth and justice first.  The prosecutor's job isn't just to win, but to win fairly, staying well within the rules."  *Id.* at 1323.  A prosecutor's "function is to vindicate the right of people as expressed in the laws and give those accused of a crime a fair trial."  *Id.*

"Much of what the United States Attorney's Office does isn't open to public scrutiny or judicial review.  It is therefore particularly important that the government discharge its responsibilities fairly, consistent with due process."  *Id.* at 1324.  As a result, "[s]anctions may be necessary to punish prosecutors who fail to fulfill their duty 'to win fairly, staying well within the rules.'"  *Ross*, 372 F.3d at 1111 (*quoting Kojayan*, 8 F.3d at 1323).  "[T]he judiciary – especially the court before which the primary misbehavior took place – may exercise its supervisory power to make it clear that the misconduct was serious, that the

---

Rossi's violations of the professional rules of conduct amount to prosecutorial misconduct which, as noted above, is sanctionable.  Moreover, as discussed in text *infra*, a Court may exercise its supervisory powers to address and sanction a violation of the ethical rules.

1    government's unwillingness to own up to it was more serious still and that steps must be

2    taken to avoid a recurrence of this chain of events." *Kojayan*, 8 F.3d at 1325; *see United*

3    *States v. Williams*, 504 U.S. 36 (1992) (supervisory power "may be used as a means of

4    establishing standards of prosecutorial conduct before the courts themselves.").

5           "Supervisory powers are a means by which the federal courts fulfill their role in the

6    criminal justice system:  Judicial supervision of the administration of criminal justice in

7    the federal courts implies the duty of establishing and maintaining civilized standards of

8    procedure and evidence." *Ross,* 372 F.3d at 1107 (internal quotation and citation omitted.)

9    Exercising this inherent authority is most appropriate in fact situations that do not lend

10   themselves to rules of general application. *United States v. Harrison*, 716 F.2d 1050, 1053

11   n. 1 (4th Cir. 1983).  "[T]he magnitude of the misconduct affects the use of the use of the

12   supervisory power, whether or not actual prejudice is shown.*"  United States v. Omni*

13   *International Corp.*, 634 F. Supp. 1414, 1438  (D. Md. 1986); *see also United States v.*

14   *Serubo,* 604 F.2d 807, 818 (3d Cir. 1979); *United States v. Hogan*, 712 F.2d 757 (2d Cir.

15   1983).  "In determining the proper remedy pursuant to the supervisory power, the relief

16   chosen should be directly related to the seriousness of the misconduct." *Omni*

17   *International Corp*, 634 F. Supp. at 1438.

18          The allegations of misconduct committed by AUSA Rossi all stem from his failure

19   to recognize Smith's actual conflict of interest when it arose and his failure to alert the

20   Court to the conflict when Smith would not do so.  As a result, the Court must first

21   determine when Smith's actual conflict of interest matured.  That is an easy analysis given

22   the testimony of two ethics experts who opined that Smith had a concurrent conflict of

23   interest in representing Monteen and BR at least as early as the first free talk on June 23,

24   2021.  The government concedes that Smith labored under an actual conflict of interest for

25   months and only disputes the timing of when the conflict arose.  However, the government

26   has not presented any evidence to rebut the credible, thorough, and persuasive testimony

27   of the defense ethics experts about when the conflict arose.

28

Smith's Concurrent Conflict of Interest:

The Court concludes that Mr. Smith had a conflict of interest from the perspective of both BR and Ms. Monteen as of June 23, 2021.  The Court agrees with the ethics experts that this is not a complex or nuanced conflict analysis.  The conflict arose as a result of BR's assertions that he knew about Western Hills and Freestones generally, as well as specific members of those gangs, including several of the Western Hills defendants.  BR also asserted that he knew information about the Floyd Davis homicide, which is charged in the indictment in this case, as well as the Chandler Booker homicide, which is alleged as a motive for retaliatory violent in the indictment.

> "When [an] attorney is actively engaged in legal representation which requires him to account for two masters, an actual conflict exists when it can be shown that he took action on behalf of one.  The effect of his action of necessity will adversely affect the appropriate defense of the others.  Moreover, an adverse effect may not always be revealed from a review of the affirmative actions taken.  Rather, the failure to take actions that are clearly suggested from the circumstances of the case can be revealing.

*United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991).

When this Western Hills (and Freestone) information was raised by BR, a competent and non-conflicted attorney needed to stop the free talk and discuss with BR what exactly he knew about Western Hills and these defendants, as well as the Freestones.  And if BR in fact had information relevant to the Western Hills case, counsel would need to advise BR about whether it was worthwhile cooperating based, at least in part, on his sentencing exposure on the pending charges and the danger that could result from cooperating.  But Smith could not do any of those things because of his loyalty obligation to Ms. Monteen.  That is the essence of a concurrent conflict of interest.

From BR's perspective, Smith had "a conflict of interest because of his loyalty obligation to Ms. Monteen," which included to avoid assisting another client in prejudicing Ms. Monteen's defense."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 5.)  As a result, there was a significant risk that would fail to represent BR adequately with regard to his potential cooperation.  For example, Mr. Smith might fail to give BR disinterested

information about the benefit of cooperating, might not prepare BR adequately to testify completely and truthfully about Western Hills, or might not zealously pursue a cooperation agreement.

From Ms. Monteen's perspective, Smith had a conflict of interest because his representation of BR was directly adverse to Ms. Monteen and there was also "a significant risk that Mr. Smith's representation of Ms. Monteen would be limited by his duties to Mr. [BR]." (*Id.* at 5–6.)  Smith betrayed his duty of loyalty to Ms. Monteen by assisting another client in potentially testifying against her.  By assisting BR to become "a cooperating witness in the case against Ms. Monteen, Mr. Smith prejudiced Ms. Monteen's defense," even if the possibility that BR would become a witness was "contingent and remote – e.g., dependent on whether Mr. [BR] entered into a cooperation agreement, Ms. Monteen went to trial, and the prosecution called Mr. [BR] as a witness." (*Id.* at 5.)

Moreover, as Professor Green explained, the Supreme Court has held that "a conflict of interest arising out of concurrent representation of two defendants can adversely affect the representation in multiple ways, even though its effects may be unprovable." (*Id.* at 6.) There were multiple risks to Ms. Monteen "that may or may not have eventuated." (*Id.*) Specifically, there was a risk that Smith would, even if inadvertently, disclose confidential information gained from representing Monteen or learned from JDA counsel when advising and preparing BR for free talks.  There was also a risk that Smith would withhold information from Monteen because of his confidentiality duty to BR.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 6.)

Relatedly, there was a risk that Smith would exploit the representation of Ms. Monteen to obtain information that could benefit BR, such as refreshing BR's memory or ensuring the accuracy of his information.  There was also a risk that Smith would neglect or abandon Ms. Monteen's case to minimize the appearance that he was exploiting his representation of Ms. Monteen.  Indeed, it appears that Smith neglected Ms. Monteen's case given her testimony about the very few meetings that she had with Smith and the cursory nature of their discussions during those meetings.  Ironically, it appears that Smith

only began earnestly working on her case after he was certain that he had a conflict and had to withdraw from representation.

Based on the facts discussed above, the Court concludes that Smith had an actual conflict of interest as of June 23, 2021, as a result of his concurrent representation of Monteen and BR.  As a result, he needed to move to withdraw from representing both clients.  As discussed below, when Smith failed to do so, AUSA Rossi was duty-bound to bring the conflict to the Court's attention.

Rossi's Failure to Recognize the Conflict which arose at the June 23, 2021, BR Free Talk

The Court agrees with Professor Green and Ms. Sallen that AUSA Rossi knew of the facts establishing the conflict by no later than June 23, 2021, when BR told Rossi that he had information about both Western Hills and Freestones that is relevant to the pending charges, and that he knew certain defendants and members of both gangs.  Once again, the government has not presented evidence to rebut the credible, thorough, and persuasive opinions of Professor Green and Ms. Sallen that it should have been clear to AUSA Rossi on June 23, 2021, that Smith had an actual conflict in concurrently representing Monteen and BR.

Mr. Rossi's position that he believed on that BR only had information about the Freestones is belied by June 23, 2021, free talk transcript, especially when read in conjunction with the Western Hills indictment.  The theory behind the violent offenses alleged in the indictment stem from a rivalry between these two gangs which resulted in many acts of retaliatory violence over the course of many years.  Mr. Rossi testified that the Freestones and Western Hills Bloods are "inextricably intertwined."  Thus, an act of violence committed by a Freestone gang member against a Western Hills gang member is both important and relevant to the RICO conspiracy and the violent offenses, including the motive for the offenses committed by Western Hills defendants.  For example, the grand jury was told that the murder of Chandler Booker (who was a purportedly a WHB gang member) by the Freestones was a motive for the retaliatory violence by Western Hills

members alleged in the RICO conspiracy count.  (Hr'g Tr. 4/25/24 at 108-109.)  As a result, Rossi's assertions that the Booker murder was not relevant to the Western Hills case is clearly not accurate.

BR started the free talk by stating that he knows "a lot of people, . . . whether its Freestone, Western Hills.  I know everybody."  To use Ms. Sallen's expression, that statement should have resulted in "bells and sirens" going off for AUSA Rossi given that he is the prosecutor on the Western Hills case.  Similarly, AUSA Rossi should have been alerted to the conflict when BR later said: "I thought y'all was gonna ask me about, uh, Freestone and all that, Western Hills and all that."  That statement is astounding given that the purported subject of the free talk was unrelated alien smuggling activity, and therefore, should have made it crystal clear to Rossi that Smith had a conflict.  Rather than recognize the conflict, Rossi attempted to get BR to discuss what he knew about "them."  Even if Mr. Rossi's used the word "them" to refer only to the Freestones, that was not made clear to BR.  Moreover, a later conversation reflects that AUSA Ross was clearly interested in Western Hills information.  Specifically, when Mr. Smith mentioned that AUSA Rossi was prosecuting this 18-defendant case, AUSA Rossi asked BR what he knew about it.  AUSA Rossi testified that Smith was clearly referring to the Western Hills case; as a result, Rossi's questions pertained to that case as well.

Although BR expressed reluctance to talk in-depth about Freestones or Western Hills, he repeatedly asked Rossi what he wanted to know and continued to volunteer and dangle information (albeit vague) about both gangs and their members.  Again, BR said that he knows about Floyd Davis, Marshall Davis, Mar-K, and also stated that he knows "people from Western Hills, Sly Bone, Sammy Mack, Lil' Mike, I know all of them."  BR also implied that he had information about F.D. homicide, which is charged in the Western Hills indictment.  Thus, it was simply not reasonable for AUSA Rossi to believe that BR only had information on Freestones.  And, as noted above, even if that was the case, that information was still relevant to the Western Hills indictment.

Professor Green and Ms. Sallen believe that, based on AUSA Rossi's memorandum, he recognized the conflict on June 23, 2021, but did nothing to address it then or at any point thereafter.  For the reasons discussed below, the Court does not agree that Rossi recognized that an actual conflict arose on June 23, 2021.  Although, at the end of the day, it doesn't matter because AUSA Rossi did not notify the Court of the conflict regardless of when he believed it matured.

Rossi's memo notes that he "cautioned Mr. Smith that if [BR] decided to share information on WHB members, especially those indicted under the RICO charge, Mr. Smith would have a conflict."  The devil is in the details of what "decided to share information" means.  The Court attempted to clarify whether that phrase meant that Rossi believed that Smith would have a conflict if BR merely agreed to provide information about Western Hills, or if the conflict would only occur if and when BR shared that information.  Rossi made clear many times during his testimony that it was the latter.  And that position is consistent with the many other references in Rossi's memo to the "potential" conflict that he believed existed prior to the December 2021 free talk.

Thus, while AUSA Rossi (unlike Smith) was at least cognizant of the conflict issue in June 2021, the evidence is clear that he only believed that a conflict would arise if BR followed through and shared information on Western Hills.  What was never made clear is whether Rossi came to this erroneous conclusion on his own, after consulting with a supervisor or co-counsel, or if he was convinced by Smith's position that they had to wait to hear what BR said about Western Hills.  But the lack of clarity on that point has no impact on the fact that Rossi, as a minister of justice, had the duty to recognize the clear conflict when it arose on June 23, 2021.

Based on the foregoing, the Court finds that Rossi failed in his duty to recognize that Smith had an actual conflict in representing Monteen and BR as of June 23, 2021.  As discussed below, that failure resulted in Rossi violating his duty to notify the Court of the conflict when Smith did not timely withdraw from representing Monteen and BR.  As a result, Monteen and BR continued to have conflicted counsel for over nine months.  And,

1    as Ms. Sallen aptly noted, everything went downhill after AUSA Rossi failed to recognize

2    the conflict on June 23, 2021.

3              <u>Failure to recognize the conflict at the August 11, 2021, BR Free Talk</u>

4            *Assuming arguendo* that either the conflict was not apparent to AUSA Rossi on June

5    23, 2021, or that a conflict did not arise at that point, the conflict certainly matured on

6    August 11, 2021, and AUSA Rossi should have recognized the conflict for the following

7    reasons.  When Smith returned to the free talk after his court hearing, he told BR that:  "Oh,

8    and if you wanna talk about that other thing where, you know, I represent somebody in that

9    case, . . . I'll leave the room if you – I just don't wanna be present[.]"  (Evid. Hr'g on the

10   Potential Misconduct Motion, Def. Ex. 9 at 104.)  Smith added that "we can deal with that

11   later on . . . '[c]ause I don't wanna mess up that other case and create a conflict."  (*Id.*)

12   Rossi responded:  "Right. . . . No, I gotcha."  (*Id.*)  Smith volunteered that "as far as I know,

13   she had nothin' to do with the homicides in that – with that other indictment, but [I'd] . . .

14   rather not be around when you discuss[.]"  (*Id.*)

15           Rossi agreed that Smith was clearly referencing BR cooperating in the Western Hills

16   case.  Ms. Sallen testified that Smith's comments were like "bells and sirens" going off

17   that should have alerted Rossi to the conflict and that Smith had no idea about the ethical

18   rules regarding conflicts of interest.  Smith's comments reflect that BR had information on

19   Western Hills and that he and BR had talked about BR sharing that information.  Moreover,

20   Smith's comment that he would leave the room if Western Hills was discussed clearly

21   shows that he did not understand the ethical rules pertaining to conflicts of interest.  In fact,

22   Rossi testified that he was confused by Smith's comment because "leaving the room"

23   would not prevent a conflict, and that he had concerns for the months that followed that

24   Smith did not understand the conflict or the ethical rules.

25           Thus, even if it is debatable whether Smith had a conflict on June 23, 2021, or that

26   Rossi should have recognized the conflict at that time, it should have been crystal clear to

27   Rossi on August 11, 2021, that Smith had an actual conflict.  Once again, Rossi failed in

28   his duty to recognize the conflict and, as a result, failed in his duty to notify the Court of

the conflict when Smith did not timely withdraw from representing either client.  Those failures in August 2021 caused Monteen and BR to have conflicted counsel for seven more months.

Failure to recognize the conflict after receiving BR's letter:

Professor Green testified that the BR letter should have made it "more crystal clear" to AUSA Rossi that Smith had a conflict if it already was not crystal clear based on the information provided by BR and comments made by Smith at the free talks in June 2021 and August 2021.  Unlike the free talks in June and August where BR also dangled Freestone information, BR makes clear in his letter that he wants to cooperate on the Western Hills prosecution and provide information to help AUSA Rossi get convictions. BR first stated that "[t]he last time we spoke I told you I knew about Western Hills and Freestones but at that time I wasn't ready[.]"  That statement undercuts AUSA Rossi's assertion that BR was only providing information on the Freestones at the first two free talks.  BR also advised AUSA Rossi that he knows everything about Western Hills; he knows about the F.D. homicide, including who was present; and that David Williams and Sly Bone (defendant Moore) told him everything.

Based on the specific Western Hills information laid out in BR's letter, it is hard to fathom how AUSA Rossi did not recognize Smith's conflict at this point.  There is no legal or factual support for his view (perhaps influenced by Smith) that a conflict would not arise unless BR provided information about Western Hills.  AUSA Rossi's failure to recognize the conflict in early December 2021 and report the conflict to the court caused Monteen and BR to have conflicted counsel for four months.

Failure to Notify the Court of the Conflict:

"[W]hen a conflict situation becomes apparent to the government, the government has a duty to bring the issue to the court's attention and, if necessary, move for disqualification of counsel."  *United States v. Tatum*, 943 F.2d 370, 379–80 (4th Cir. 1991); *see United States v. Agurs*, 427 U.S. 97, 110-111 (1976) (citation omitted) (although the government attorney must prosecute with "earnestness and vigor," he must also "be faithful

to his client's overriding interest that 'justice shall be done.'").  The Fifth Circuit has arguably gone even further in holding that "[w]hen an attorney discovers a *possible* ethical violation concerning a matter before the court, he is not only authorized but is in fact obligated to bring that problem to that court's attention." *In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976) (emphasis added).

In *Gopman*, a defense attorney "argued that the government lacked standing to challenge the alleged conflict of interest, and that the trial judge had no jurisdiction to entertain the government's motion for disqualification." *Id.*  The Fifth Circuit rejected those contentions.  The government's motion was based on the defense attorney's violation of "the ethical canons of the American Bar Association, which prohibit a lawyer from representing parties with adverse interests." *Id.*  The court first noted that the ethical canons had been explicitly adopted by the local rules of the district court. *Id.*  As noted above, the court held that an attorney who discovers a possible ethical violation concerning a matter before the court must bring the problem to the court's attention. *Id.*  The court further held that "[n]or is there any reason why this duty should not operate when, as in the present case, a lawyer is directing the court's attention to the conduct of opposing counsel.  In fact, a lawyer's adversary will often be in the best position to discover the unethical behavior." 532 F.2d at 265–66.  Finally, the court concluded that "the trial judge had jurisdiction to act upon this claim of unethical conduct." *Id.* at 266.  The court held that "it is beyond dispute that lawyers are officers of the court and that the courts have the inherent authority to regulate their professional misconduct" and, if necessary, impose sanctions. *Id.*

*Gopman* resolves any argument by the government that only Monteen's counsel has standing to raise the ethical violations alleged against AUSA Rossi.  To the contrary, all of the defense attorneys were duty-bound to bring the violations to the Court's attention.  Similarly, *Gopman* resolves the government's argument that this Court does not have the authority to impose sanctions based only on a violation of the rules of professional conduct.  As discussed below, the Court not only has the authority act upon a claim of unethical conduct, it has as an obligation to do so when the alleged ethical violation is a conflict of

interest in a criminal case.

Once the risk of a conflict situation "is brought to the attention of the court . . . [it] has the responsibility to investigate further, to advise the defendant personally, and to receive a knowing waiver if that is the expressed wish of the defendant.  In the absence of waiver the court must resolve the question as it would any issue relating to the defendant's right to counsel." *Tatum*, 943 F.2d at 379.  The Supreme Court has held that the trial judge has "the duty of seeing that the trial is conducted with solitude for the essential rights of the accused . . . . The trial court should protect the right of an accused to have the assistance of counsel." *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978).  The Supreme Court has flatly stated that a conflict situation which is not addressed by the trial court requires reversal:  "*Sullivan mandates* a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Wood v. Georgia*, 450 U.S. 261, 272 n.18 (1981) (emphasis in original) (*quoting Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980)).

Once again, AUSA Rossi's position is that Smith's concurrent conflict of interest did not arise until BR provided information about Western Hills at the third free talk on December 28, 2021.  As discussed above, there is no factual or legal support for that position.  That said, even if Rossi was correct that the conflict matured on December 28, 2021, he failed to fulfill his duty to notify the Court of the conflict after it was clear that Smith would not timely withdraw from representing both clients.  As a result, the Court could not fulfill its responsibility to investigate the conflict and protect the right of the accused to have the assistance of counsel.

As discussed below, instead of fulfilling his obligation to notify the Court of Smith's conflict, Rossi acquiesced in Smith's delay of moving to withdraw from representing either client for months; encouraged the view that Mr. Smith had no need to immediately withdraw; and exploited the conflict while he allowed it to linger.  Relatedly, Rossi was not candid with the Court when he inexplicably litigated three pre-motions against Smith in Monteen's case after he knew there was an actual conflict and Smith had to withdraw

1   from representing Monteen and BR.  Because the Court was unaware of the conflict, it

2   proceeded as if Monteen was being represented by constitutionally effective defense

3   counsel.  AUSA Rossi was also not candid with the Court during a hearing where the Court

4   was trying to ascertain whether all cooperator and/or CI information had been disclosed to

5   the defense.

6       Justifications for the delay in reporting the conflict to the Court:

7       The government has repeatedly and strenuously argued that Rossi had legitimate

8   reasons to delay reporting the conflict to the Court: a concern for BR's safety and a concern

9   over a leak of sealed information by court staff.  Professor Green made clear that there is

10  not a "concern for safety" or a "fear of a leak" exception to either the rules of professional

11  conduct or a prosecutor's duty as a minister of justice to report to an actual conflict to the

12  Court if defense counsel will not do so.  Simply put, a prosecutor must find a way to

13  disclosure the conflict to the Court.  Moreover, as discussed below, even if there were a

14  "safety" or "leak" exception to a prosecutor's duty to notify the Court of an actual conflict,

15  neither exception would apply based on the record before this Court.

16      Purported safety concerns:

17      BR did not appear concerned for his safety for the following reasons.  Smith told

18  Rossi that BR was not willing to sit in protective custody for six months waiting to testify.

19  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 34 at 13.)  If BR was truly fearful of

20  imminent physical harm, he presumably would have done so even if that housing situation

21  would have been unpleasant.  Moreover, during the free talks BR never mentioned a

22  concern for his safety because he was housed with Western Hills defendants.  To the

23  contrary, at the June 23, 2021, free talk he told Rossi:  "them dudes all in here, though.

24  They got locked up.  Shit, they can't do nothin'."  (Evid. Hr'g on the Potential Misconduct

25  Motion, Def. Ex. 8 at 129.) [14]  Moreover, during the August 11, 2021, free talk BR told

26

27      [14]  AUSA Rossi testified that he believed that BR got nervous when they started talking
    about the murder of Chandler Booker (a Western Hills gang member) which was allegedly
28  committed by Freestone gang members.  Rossi also wrote in memorandum that he believed that
    BR "was fearful of relating [the Chandler Booker] information for fear of retribution by members

Rossi that his cellmate, either David or Michael Williams, got caught with a knife and that he is now cellmates with Rakestraw.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 9 at 91.)  BR never mentioned that he was concerned for his safety because Williams had a knife, or because he was cellmates with Rakestraw.

Additionally, during the detention hearing before Judge Ferraro on March 4, 2022, where AUSA Rossi and Smith requested that BR be released from custody on an ankle monitor, BR never told Judge Ferraro that he was concerned for his safety because he was housed with Western Hills defendants or mentions any other safety concern. [15]  Instead, he told Judge Ferraro:

> I understand your concern, you know, due to my safety or whatever the case may be.[[16]]  But, you know, like, I've dealt with a lot from my past, you know what I mean?  So, and I'm just focused on trying to change my life.  Like, losing my father and going through so much things, the only thing I'm focused on is changing my life and being with my family.  That's it.  That's all that matters to me.  I wouldn't be doing this agreement to begin with, you know what I mean?  Before, I was worried about the streets, in the streets, all that, but I'm not worried about none of that.  I just want to go home to my family, literally.

(Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 33 at 13.)

BR went on to tell Judge Ferraro that: (1) he's trying to change because he's only 24 and has so much time ahead of him; (2) he's "tired of prison mentally" and doesn't "want to be a part of prison;" (3) he's "not a risk to nobody;" (4) he's not worried about partying or drinking; (5) he's a "smart individual" who got his high school diploma and is supposed to be going to barber school; (6) prison is holding him back because it separated him from his family; and (7) he would do anything for his family "even if it means having a snitch jacket on me." (*Id.* at 13–16.)

---

of the Freestones."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 3, Ex. A, Attach. 12 at 7.)  Rossi never mentions in his memorandum that he believed that BR was fearful of Western Hills gang members.

[15] BR also never expressed a concern for his safety during his sentencing with Judge Marquez.

[16] BR was responding to Judge Ferraro's belief that he would be safer in custody than in the community where his family may also be at risk.

Judge Ferraro asked if AUSA Rossi's position was that "the government can't assure that [BR] will be safe if he remains in the custody of the . . . Attorney General." (*Id.* at 6.) Rossi responded: "That is our concern, Your Honor." (*Id.*) The following conversation ensued:

> THE COURT: Well, then how are you ever going to put him in prison? If he's convicted of the offense he's charged with, . . . are you going to release him because you can't protect him?

> MR. ROSSI: No, Your Honor. We would move him to a different facility, out of state.

> THE COURT: Okay. I don't – that's troubling to me because you can do the same thing now. If the marshal – they're responsible for his safety. If they don't think that they can keep him safe here, they can move him anywhere in the United States. I mean, I've done that before as a prosecutor. I don't – to me, releasing him means he is less protected. Once they find out where he is, which is not going to be difficult over time, then he's going to be in a place where the government isn't going to protect him and he's going to be – put his family members at risk that he's staying with as well.

(*Id.* at 6–7.) Judge Ferraro told Rossi that "I know the government can protect him. I mean, if the Marshals are aware that this is a real risk, they can transport him to another facility. They could put him in Alaska." (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 33 at 8.)

Judge Ferraro told BR: "The only thing that's being urged here for your release is that the government can't protect you, and I don't believe that to be true. I do believe they can protect you[.]" (*Id.* at 19.) BR did not tell Judge Ferraro that he was not being protected or was fearful for his safety. Rather, BR asked Judge Ferraro if he was not being released: (1) "[b]ecause you feel like I can't protect myself or I have to protect myself," and/or (2) "your worry is that I will have a gun or something." (*Id.* at 20, 22.)

The evidence discussed above undercuts the notion that BR was concerned for his safety because he was housed with Western Hills defendants. If that was his concern, he presumably would have made that clear to Judge Ferraro, rather than focusing on his desire to be with his family.

- 123 -

As Professor Green noted, a prosecutor should be concerned about an inmate's safety.  However, there are several facts that cast doubt on the seriousness of AUSA Rossi's concern about BR's safety because he was housed with Western Hills defendants.  Rossi was aware that BR did not have gang affiliations with either the Freestones or Western Hills.[17]  While BR said he used to "hang out" with Freestones, he also said he knew many of the Western Hills defendants as well.  AUSA Rossi never had any information that BR was injured, attacked, or threatened by another inmate, let alone a Western Hills defendant.  (Hr'g Tr. 10/20/23 at 92, Doc. 2736.)  For example, Smith never told AUSA Rossi that BR had a physical altercation at CCA or was worried.  (*Id.* at 93.)

Moreover, BR never told AUSA Rossi during free talks (or in his letter) about any safety concerns that stemmed from being housed with Western Hills defendants.   In fact, Rossi testified that when BR told him at the end of the June 23, 2021, free talk that he was cellmates with Michael Williams, he did not think that BR was reporting that "he had some fear of Mike Williams."  (Hr'g Tr. 10/19/23 at 106, Doc. 2735.)   Rossi thought it "[s]ounded like an anecdote considering that he had discussed that I was the prosecutor in the case."  (*Id.*)  Moreover, as noted earlier, in his memorandum Rossi noted that he believed that BR did not want to talk about the Chandler Booker homicide because he was fearful of Freestone gang members.  Rossi never mentions a similar belief with respect to Western Hills gang members.

At the August 11, 2021, free talk, Rossi asked BR if he was still cellmates with Michael Williams, and BR responded that he is now cellmates with Rakestraw.  Rather than express concern for his safety, there is audible laughter and Rossi merely said, "they're moving them around."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 9 at 90.)  Earlier in that free talk, BR had told AUSA Rossi that it already "looked weird" that he was coming to court a lot and people in his pod are asking why he is going to court.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 9 at 64.)   AUSA Rossi certainly

---

[17] Apparently neither Rossi nor Smith was concerned about for BR's safety because he providing information in June 2021 about Moreno-Aguilar and the SMGK gang.

interpreted that comment to mean that people in BR's pod already think that he's a snitch. Nevertheless, AUSA Rossi did not ask BR if he was fearful because he was still cellmates with a Western Hills defendant or suggest that he may want to go into protective custody because he used to hang out with Freestone gang members (even though Rossi believed BR also feared the Freestones).

Similarly, AUSA Rossi did not express a concern for BR's safety after he said that his former cellmate (Michael Williams) got caught with a knife in their cell.  That would have been the time not only for concern, but for action.  However, Rossi did not take any action at that time or later to make sure BR was safe from the Western Hills gang members who, according to Rossi, had repeatedly called for the murder of Freestones on sight, and therefore, posed a significant threat to BR.

In Rossi's June 25, 2021, email to AUSA Vercauteren he stated: "while he's going to have a target on his back no matter what, we don't think there won't [sic] be any harm in him being released with an ankle monitor if it secures his testimony."  Thus, AUSA Rossi clearly believed that BR was not going to be safe regardless of whether he was in or out of custody.  And, as discussed earlier, Judge Ferraro was certain that BR could be kept safe while in custody and would likely be safer in custody than in the community where his family could also be at risk.

Finally, there is evidence that suggests that the delay in reporting the conflict to the Court stemmed more from trying to meet BR's demands for cooperating, *i.e.*, being released, rather than safety concerns.  BR brought up being released from custody at the June 2021 free talk where he dangled Western Hills information in front of AUSA Rossi. He did the same thing at the August 2021 free talk when he told Rossi that he was willing to help but feels like he should get something in return.  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 9 at 64.)  Additionally, in BR's November 29, 2021, letter to Rossi, he repeatedly stated that he will provide Western Hills information if Rossi gets him to his family, and ends the letter by stating:  "You get me to my family and I get you a conviction."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 13.)  Moreover, Rossi testified

that in his email exchanges with Smith between January 2022 and March 2022, Smith kept "putting conditions on Mr. [BR]'s cooperation." (Hr'g Tr. 10/20/23 at 66–67, Doc. 2736.) For example, at one point Smith says that BR will only cooperate if he is released; at another point Smith says that BR will only cooperate if he is disclosed to the defense as a cooperating witness after he is released; and then he changed his mind and said he will cooperate even if he is not released. (*Id.* at 67.) The January 2022 email exchanges with Smith presumably led to Rossi's January 25, 2022, email to AUSA Vercauteren, wherein Rossi advised that BR is not willing to sit in protective custody for six months waiting to be sentenced, and that Smith asked if the government would agree to release on an ankle monitor because otherwise BR would not likely testify.

Although the evidence discussed above suggests that the delay in reporting the conflict to the Court resulted from trying to meet BR's demands for cooperating, the Court acknowledges that prisons are dangerous places and the danger increases for a cooperator. But, as discussed above, other than try to get BR out of prison on March 4, 2022, (months after the final free talk), Rossi did nothing to address his purported safety concerns. AUSA Rossi never contacted the Marshals to ask if BR could be moved to another pre-trial detention facility or another unit within Core Civic so he was not housed with the Western Hills defendants. Rossi testified that he had been told by the Marshals in other cases that they cannot ensure the safety of a cooperator. However, every situation is different. Indeed, the scale and subject matter of this case is rather unprecedented in the District of Arizona. Thus, Rossi should have at least asked the Marshals Service and/or CCA to move BR to another unit at CCA or another pre-trial detention facility if AUSA Rossi truly had safety concerns about him being housed with Western Hills defendants. Finally, if Rossi's concern for BR's safety was so significant that it was preventing him from fulfilling his duty to notify the Court of Smith's conflict, the surefire way to ensure BR's release so Rossi could fulfill that duty was to dismiss BR's pending charges without prejudice. Although Rossi may have viewed that as the nuclear option, it would have protected both Monteen's right to conflict-free counsel, as well as BR's safety and right to conflict-free

counsel.  Instead, Rossi chose the option of resolving BR's case, even though Ms. Monteen already had conflicted counsel for many months and would continue to have conflicted counsel until BR's case was resolved.

Fear of a leak in the court:

Another explanation offered for why AUSA Rossi did not disclose the conflict to the court in a sealed motion was because he had a concern about a leak of sealed information by court staff.  Rossi's specific testimony was: "I don't think my concern was the filing of the motion, I think my concern would be an under seal hearing regarding that motion."  (Hr'g Tr. 10/20/23 at 98, Doc. 2736.)  Rossi further testified that "[t]here are a number of people in this courthouse who are present even during under sealed hearings and, in my experience, that has occurred before."  (*Id.* at 98–99.)

While it is not entirely clear, it appears that AUSA Rossi is referring to an incident where a former court employee was alleged to have inappropriately accessed and disclosed sealed information on the Western Hills case.  If AUSA Rossi's concern about a "court leak" of information discussed at a sealed hearing stemmed from the incident with the former court employee, that concern is suspect for several reasons.  First, this was an isolated and unprecedented incident (and the sharing of information was never substantiated).  Second, the incident involved an allegation that the former employee improperly accessed sealed documents in this case, not that the former employee disclosed information discussed at a sealed hearing.  Second, the Court has had countless sealed hearings on this case, including *ex parte* hearings requested by government counsel to discuss sensitive cooperator and CI information.  The government has not identified any leak of information discussed at these sealed hearings.  Finally, if Rossi had a concern about a leak of information discussed at a sealed proceeding, he presumably would have included that information in his May 10, 2022, memorandum, and/or provided that information to AUSA Clemens so she, Mr. Grimes (from the DOJ PRAO), and supervisors in the U.S. Attorney's Office were aware of another reason why he did not notify the Court of the conflict.  The failure to do so makes it appear that the concern about a "court leak"

1    is an after-the-fact attempt to justify the failure to notify the Court of the conflict.

2         In summary, AUSA Rossi failed in his duty to notify the Court of Smith's conflict

3    when Smith did not timely do so or move to withdraw.  There are no exceptions to that

4    duty imposed on a prosecutor because of safety concerns or fear of a leak of information

5    from the Court.  And those purported concerns are neither credible nor supported by the

6    record for the reasons discussed above.

7         <u>Allowing conflict to linger, concealing the conflict, and exploiting the Conflict:</u>

8         AUSA Rossi failed in his duty as a minister of justice by allowing the conflict to

9    linger for nine months, assisting Smith in concealing the conflict, and exploiting the

10   conflict.  AUSA Rossi clearly acquiesced in Smith's delay of reporting the conflict to the

11   Court.  There are several email communications where Smith tells Rossi that he needs to

12   withdraw on Monteen's case but won't until BR's cooperation agreement is finalized and

13   he is released from custody.  Rossi never advised Smith that if he did not immediately

14   withdraw from representing Monteen, the government would bring the conflict to the

15   Court's attention.  In fact, Professor Green testified that "AUSA Rossi evidently never

16   disabused Mr. Smith of the idea that he could delay until after Mr. [BR] was sentenced."

17   (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 8.)

18        Professor Green's opinion is that "instead of insisting that Mr. Smith seek with

19   withdraw or calling Mr. Smith's conflict to the court's attention, AUSA Rossi supported

20   Mr. Smith's concealment of the conflict of interest from Ms. Monteen and the court." (*Id.*)

21   In fact, Rossi's December 6, 2021, email to Smith "encouraged the view that Mr. Smith

22   had no need to immediately withdraw from the representation[.]"  (*Id.*; *see also* Evid. Hr'g

23   on the Mot. to Disqualify, Def. Ex. 6.)  By doing so, Professor Green's opinion is that

24   AUSA Rossi violated Rule 8.4(a) of the Arizona Rules by knowingly assisting or inducing

25   Smith to violate the professional conduct rules by arranging an additional free talk and

26   negotiating for BR's cooperation.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 4 at 8–

27   9.)  The Court agrees.

28

The conflict of interest was exploited in several ways. Because an actual conflict arose on June 23, 2021, AUSA Rossi should not have proceeded with the August 11, 2021, free talk with a conflicted attorney, which is tantamount to BR not having counsel. Rossi compounded that problem by asking BR about Western Hills defendants. And he asked those questions when BR's conflicted attorney was not present. When explaining why he was talking with BR about Western Hills, Rossi testified:

> [W]e were talking about Freestone crimes, specifically the murder of Chandler Booker. And then also if Mr. [BR] had information with regard to a murder or any information really that would be a conflict, we would then deal with the conflict. I'm not going to not get information about a murder because of a potential conflict when the – if a conflict happens, and say Mr. [BR] said this, well, I know somebody in this case committed a murder.
>
> . . . .
>
> Okay. We're going to pause here. I'm going to talk to somebody smarter than me on this issue, and right now, Jesse, you need to get off the case.

(Hr'g Tr. 10/19/23 at 132–33, Doc. 2735.)

The evidence is clear that AUSA Rossi was willing to risk creating the conflict that he did not believe yet existed because he was prioritized information about a murder which is clearly relevant to the Western Hills prosecution over Ms. Monteen's right to conflict-free counsel. Additionally, by continuing the free talk without Smith present, Rossi ran the risk of BR disclosing confidential information that his attorney may well have advised him not to share. Moreover, given Smith's concurrent conflict of interest, it was certainly possible that Smith had shared with BR, even if inadvertently, Monteen's confidential information or confidential JDA information. As a result, Rossi ran the risk that BR would share that confidential with the government. Rossi's actions demonstrated a reckless disregard of the rights of BR, Monteen, and the JDA.

AUSA Rossi also exploited the conflict by allowing the December 28, 2021, free talk with BR to occur with conflicted counsel, especially when the subject of this free talk was exclusively Western Hills. As Professor Green opined, there was a risk that Smith would, even if inadvertently, disclose confidential information gained from representing

- 129 -

Monteen or learned from JDA counsel when advising and preparing BR for free talks. Whether confidential information was in fact shared is not relevant because prejudice is presumed when there is an actual conflict.  Because this free talk was solely focused on Western Hills information, Rossi recklessly disregarded the risk that the government could learn privileged or confidential information as a result of Smith's concurrent representation.[18]

Once again, AUSA Rossi was willing to create the conflict that he did not yet believe existed to get the information that he wanted from BR.  Rossi wanted BR's information so badly that he allowed the free talk on December 28, 2021, proceed in his absence because he was sick, even though the agents were in no position to steer clear of information that would create a conflict (assuming one did not already exist).  Specifically, when asked why he just did cancel the free talk, Rossi testified: "A couple reasons.  We'd already reset it once, I was concerned that Mr. [BR] may change his mind if he did have information, and also I'd explained to Mr. Smith at this point several times what my and my office's position would be should Mr. [BR] share information that relates to those RICO charges.  And, frankly, I was a little resigned to the fact that it's going to come up."  (Hr'g Tr. 10/20/23 at

_____

[18] The Court notes that the defense has not pointed to confidential information that Smith shared with BR or the government.  However, BR certainly made statements during the third free talk that suggest that occurred.  The most glaring statement is when BR volunteers that Monteen was not involved in anything, she was just Michael Williams' girlfriend.  BR does not provide exculpatory information about any defendant except for Smith's other client.  Thus, BR's bringing up Monteen's innocence hardly seems coincidental.

A more subtle statement is BR's references to not reviewing anybody's "paperwork."  Specifically, after Agent Parkinson confirms that BR does not have any questions before they begin the free talk, BR stated:  "just so there is a clear understanding of what I'm gonna say is like . . . I didn't read nobody's paperwork or anything like that."  (Evid. Hr'g on the Potential Misconduct Motion, Def. Ex. 10 at 2.)  Later in the interview, BR again stated:  "And like I said, I want to make it very clear that I didn't see no paperwork or nothin'[.]"  (*Id.* at 70.)  It is, once again, odd that BR (twice) wanted to make that point clear.  A prosecutor or agent may certainly want to confirm that fact with a cooperator.  And a cooperator's attorney may want to make it clear to the government what materials, if any, were reviewed by the client.  But, in this Court's view, it is unusual for a cooperator to make such a statement, unless the cooperator in fact reviewed someone else's paperwork and wants to try to "cover his tracks" in the event the government later suspects or learns that the information came from some other source.

- 130 -

61–62, Doc. 2736.)  Thus, in order to obtain the desired information from BR, Rossi's exploited what he believed was a potential conflict by forging ahead with a free talk knowing it would create a conflict.

Both ethics experts also opined the government exploited Smith's conflict to its benefit because the government was able to secure BR's cooperation and testimony. Specifically, the government had an attorney in Smith who was on board with BR's cooperation and testimony at trial.  It was unknown whether a non-conflicted attorney would have advised BR to cooperate given that: (1) he faced a relatively short sentence on the alien smuggling charge; (2) the Western Hills defendants are allegedly a dangerous bunch; and (3) BR had already cooperated on Bryan Moreno-Aguilar and AUSA Rossi told Smith prior to the third free talk that he would let Judge Marquez know at sentencing what BR had done and tried to do for the government.

The prejudice to the defendants that resulted from the government exploiting the conflict to its benefit appears to have been cured when the government eventually decided not to use BR as a witness.  Nevertheless, there is no doubt that the government exploited the conflict to its benefit by prioritizing BR's cooperation and potential testimony over Ms. Monteen's right to conflict-free counsel.

Lack of Candor to the Court:

AUSA Rossi displayed a lack of candor to the Court on several occasions.  The most baffling is litigating three motions against Smith when AUSA Rossi was convinced that Smith had an actual conflict, had to withdraw from representing both clients, and would be withdrawing once BR was sentenced.  The Court was in the dark about a conflict while all three motions were being litigated.  As a result, in addition to failing in his duty to bring the conflict to the Court's attention previously, AUSA Rossi violated his duty of candor to the Court by not raising the conflict while litigating Smith's pre-trial motions.

The most bizarre motion litigated before this clueless Court was the Motion to Sever, because AUSA Rossi strenuously opposed a severance even though he knew that Monteen's severance from trial group four was a given once Smith withdrew from

representation.  The Court cannot fathom what AUSA Rossi and Smith were thinking in litigating any motion involving conflicted defense counsel, but especially the severance motion.  Both Rossi and Smith violated their duty of candor to the Court in essentially pretending that severance of Monteen was a consequential issue that needed to be expeditiously resolved given the May 2022 trial date.  The pretend severance motion is even more frustrating given the massive amount of pre-trial motions filed by other group four defendants which were pending before the Court during this time frame, and actually needed to be expeditiously resolved.

The defense argues that AUSA Rossi also violated his duty of candor to this Court during a March 17, 2022, hearing on a motion to compel compliance with the district court's scheduling order.  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 25.)  The defense claims that AUSA Rossi was not candid with the Court when discussing the disclosure of cooperator and CI information because the government already knew that BR was going to be a cooperating witness at trial.  The defense points out that BR's cooperation agreement was lodged with the Court on February 14, 2022.  Moreover, Smith sent Rossi an email on March 4, 2022, advising that BR would testify regardless of whether he is released from custody prior to his testimony.

The purpose of the March 17, 2022, hearing was to make sure the government had disclosed the identity of and information on all cooperators and CIs that would testify at the trial in May 2022.  The Court asked the government if there are other cooperators "out there" that the defense does not yet know about.  (*Id.* at 16.)  AUSA Sottosanti represented that: "we've disclosed at this point the people that we think we're going to use."  (*Id.*)  AUSA Sottosanti went on to state that "[o]bviously if something else comes up later on, then we will disclose it at that time, but for the people we would have on our witness list, if it we're going to trial tomorrow, right now, that's who we've given information about so far."  The Court stated:  "'If something else comes up.' Can you help me?  What would come up?"  (*Id.*)  AUSA Sottosanti pointed out "the witness list isn't due for another month, and as we go through it, if there are other people that we determine are necessary or that

1   we want to use, then we will disclose that to the defense, but at this time the people we
2   would have on our witness list or have agreements with, we have given the information to
3   defense." (*Id.* at 16–17.)

4          The problem with AUSA Sottosanti's representation that the government provided
5   the defense with information about any witness it has "agreements with" is that, as of
6   March 17, 2022, the government entered into a cooperation agreement with BR which was
7   lodged in BR's case on February 14, 2022. The cooperation agreement is also problematic
8   for AUSA Sottosanti's representation that the witnesses the government "think[s] we're
9   going to use" have been disclosed. Moreover, as defense counsel point out, Smith had told
10  AUSA Rossi in a March 4, 2022, email that BR would testify even if he remained in
11  custody. Thus, even if AUSA Sottosanti's representation that the government had
12  disclosed the witnesses that would testify if the case "we're to go to trial tomorrow" meant
13  that BR was still be in custody and it was unsure if he would testify at trial if he remained
14  in custody, Smith's email makes it clear that BR was going to testify even if remained in
15  custody.

16         That said, because AUSA Sottosanti was not included on that March 4, 2022, email
17  and did not testify at the evidentiary hearing, the record is not clear on whether she knew
18  that BR would cooperate even if he remained in custody, or that she knew that BR had
19  previously conditioned cooperation on being out of custody. The record is also not clear
20  on whether AUSA Sottosanti knew that BR had signed the cooperation agreement or that
21  it had been lodged with the court on February 14, 2022. Given these unknowns, the Court
22  declines to find that AUSA Sottosanti demonstrated a lack of candor to the Court at the
23  hearing on March 17, 2022.[19]

24  _____

25  [19] AUSA Sottosanti's knowledge of BR's conditions on cooperation is unclear in another
    respect. On March 17, 2022, (the same day as the hearing before this Court), AUSA Rossi filed a
26  sealed sentencing memorandum with Judge Marquez wherein he moved for a departure based on
    BR's cooperation and requested a time served sentence. (Doc. 94, U.S. v. BR.) BR's sentencing
27  was set for March 23, 2022. As a result, at the hearing before this Court on March 17, 2022, the
    government certainly expected and planned that BR would be out of custody for the May 2022
28  trial (assuming that was still a condition of his cooperation) and on its witness list. But, again, the

AUSA Sottosanti's knowledge of the BR cooperation saga may well have been limited given that AUSA Rossi chimed in and advised the Court that the government wanted "be clear" and not "mislead the Court," or for there to be any "confusion."  AUSA Rossi chose his words carefully when discussing cooperator and CI disclosure.  AUSA Rossi first tried to make clear that "the only other CI file that will exist in this case will be for the cooperator that's been discussed today[;]  . . . "that is the only other information that we have involving CIs in this case that were used for any of the overt acts."  (Evid. Hr'g on the Mot. to Disqualify, Def. Ex. 25 at 19.)  To the extent that AUSA Rossi is referring to cooperator statements that were used to allege overt acts for the RICO conspiracy count, his representation is not false because BR's statements were not used for that purpose.

Based on AUSA Rossi's comments, the Court wanted to "make clear" what has been and will be disclosed on cooperators and/or CIs: "Two CIs," the cooperator or CI (whatever you call that person) "who's going to testify at trial, and the CI reference in your response that I ordered production of already."  (*Id.* at 19.)  Rossi responded:  "That is correct, with regard to the overt acts[.]"  (*Id.*)  Once again, that statement is not false because BR's testimony does not specifically relate to the overt acts, at least in term of him being a percipient witness to any act.

AUSA Rossi again felt the need to make clear that: "if a witness comes forward between now and trial, and it's for things that are related to the overt acts and the substantive counts, the government considers that something different.  I believe what the Court is referring to, and what defense counsel is referring to, is anyone who has cooperated with the government with the investigation that led to the charges in this case."  (*Id.* at 20.)  Because BR did not cooperate with the investigation that led to the charges in this case, that part of AUSA Rossi's representation is not false.  However, as of March 17, 2022, BR was going to be a witness at trial, and did not fall into the category of a witness who may

record is not clear on whether AUSA Sottosanti was made aware of AUSA Rossi's sentencing memorandum; that AUSA Rossi was seeking a time served sentence; and/or that BR's sentencing was set on March 23, 2022.

"come[] forward between now and trial."  Perhaps AUSA Rossi viewed it that way, but that view is a stretch.

The problem is that AUSA Rossi danced around the issue that the Court was addressing: to ensure that as of March 17, 2022, the defense had been both advised of all cooperating witnesses (whether labelled as a cooperator or CI) who would testify at trial in two months and provided with all cooperator and CI information.  As discussed above, AUSA Rossi had been advised by Smith on March 4, 2022, that BR would testify even if Judge Marquez kept him in custody.  Moreover, BR was likely going to be out of custody in May 2022 anyway because Rossi had requested in his sentencing memorandum that Judge Marquez impose a time served sentence at the sentencing set for March 23, 2022.  Thus, Rossi knew on March 17, 2022, that BR was going to be a witness at the trial in May 2022, even if BR again changed his mind and conditioned cooperation on being out of custody.

AUSA Rossi was not providing the Court with the information that it wanted and that the defense needed to prepare for a trial in two months.  As a result, he demonstrated a lack of candor.  The Court reaches that conclusion because AUSA Rossi did not draw a distinction for the Court between the disclosure of cooperators used for the "overt acts" or in "the investigation that led to the charges in this case," and cooperators who came forward after the charges were filed.  The Court was in no position to do so itself because it had no reason to know that there could be cooperators who Rossi believed were unrelated to the "overt acts" or the "investigation."[20]

---

[20] Frankly, the Court does not understand how BR's testimony would not relate to the overt acts or the substantive charges; if that were the case, his testimony would not be admissible because it would not be relevant.  Moreover, BR seems to be a cooperator used during an ongoing "investigation" given that the government: (1) interviewed him on three occasions; (2) wanted to lock-in his testimony before the grand jury (which is an investigative body); and (3) obtained a Third Superseding Indictment which extended the end date of the RICO conspiracy so the government could argue (as they later did) that the defendants' statements to BR were admissible as co-conspirator statements because they were made during and in furtherance of the RICO conspiracy.

Ultimately, the Court advised that it was "going to accept Mr. Rossi and the government's representation that that's what exists." (*Id.* at 20.)  AUSA Rossi knew on March 17, 2022, that BR would testify as a cooperating witness at all trials (including the trial in two months) and the purpose of the hearing was to ensure that all cooperator information had been disclosed or would shortly be disclosed to the defense.  As a result, Rossi's representation to the Court about disclosure of cooperators and/or CIs was not candid.

What is regrettable is that AUSA Rossi did not have to be cagey about the disclosure of cooperator and CI information.  He could have easily and candidly advised the Court and defense counsel that there was another cooperator who would be disclosed in about a week.  He could have let defense counsel and the Court know that the government only recently learned that cooperator would testify and that is why the cooperator had not yet been disclosed.  He could have told the Court and defense counsel that although he could not provide the name of the cooperator today because of a concern for the cooperator's safety, he would provide that information in eight days (the day BR was being sentenced).  Defense counsel obviously would not have been happy with what they viewed as another belated disclosure two months before trial; but they were going to be unhappy a week later anyway once BR was sentenced and disclosed as a witness.  By making defense counsel unhappy a week earlier, AUSA Rossi would have at least fulfilled his obligation to be candid to the Court.[21]

---

[21] Defense counsel also argue that AUSA Rossi was not candid with the Court when, prior to a hearing related to a motion to dismiss based on selective enforcement, he represented to the Court that the Third Superseding Indictment only fixed string citations for certain offenses. Defense counsel point out that the Third Superseding Indictment also extended the end date of the RICO conspiracy and the government relied on this new end date in arguing that the statements made by certain defendants to BR were admissible as co-conspirator statements.  The Court declines to find that AUSA Rossi was not candid for two reasons.  First, his representation that the Third Superseding Indictment only fixed string citations is unrelated and unconnected to the Smith conflict.  Second, AUSA Rossi's representation was in response to the Court's question of whether the Third Superseding Indictment impacted the ability to proceed with the scheduled evidentiary hearing on the selective enforcement motion.  Neither the technical fixes nor the extension of the end date of the RICO conspiracy had any effect on that motion.

1          <u>The Defendants Have Shown Prejudice and Harm</u>:

2          As discussed earlier, prejudice need not be shown for the Court to exercise its

3   supervisory powers and disqualify an AUSA based on prosecutorial misconduct or even

4   ethical violations that do not rise to the level of prosecutorial misconduct.  However, even

5   if some showing of prejudice or harm was required, the defendants have met their burden.

6          *Prejudice specific to Monteen*:

7          AUSA Rossi's failure to notify the court of the conflict when Smith would not do

8   so, had significant adverse consequences for Monteen, the other defendants, and the

9   administration of justice.  With respect to Monteen, AUSA Rossi's allowing the conflict to

10  linger ensured an even longer delay of Monteen's trial.  If Rossi had fulfilled his

11  responsibly as a minister of justice shortly after the June 23, 2021 free talk, Monteen

12  undoubtedly would have been appointed new counsel nine months earlier than when Smith

13  ultimately withdrew from representation.  During those nine months, Monteen's new

14  attorney could have been reviewing disclosure, assessing whether pre-trial motions should

15  be filed, and preparing for trial.  Instead, Rossi allowed the conflict to linger and allowed

16  Monteen to be represented by a conflicted attorney for nine months, which amounts to

17  Monteen not having a lawyer during that time period.  Relatedly, as discussed earlier,

18  AUSA Rossi litigated pre-trial motions against a conflicted attorney, which deprived

19  Monteen of her Sixth Amendment right to effective assistance of counsel.

20         *Trial delays*:

21         Counsel for Michael Williams and Samuel Rakestraw, who along with Monteen and

22  defendant Moore were part of trial group four, argue that they were prejudiced by delay of

23  their trial which resulted from AUSA Rossi's failure to timely notify the Court of Smith's

24  conflict.  Defense counsel point specifically to a March 28, 2022, Status Conference before

25  Judge Soto.  (Hr'g. Tr. 3/28/2022, Doc. 1397.)  Judge Soto noted that the purpose of the

26  Status Conference was "to try and determine whether or not this case was going to be ready

27  to go to trial on [May 17, 2022.]" (*Id.* at 3.)  That determination was necessary both because

28  of the many pending pre-trial motions as well as Smith's motion to withdraw from

1   representing Monteen, which Judge Soto noted "obviously, has caused me some concerns
2   also." (*Id.*)

3        Judge Soto asked to "hear from the parties as to whether or not this case is going to
4   be ready to proceed to trial in May and also what effect, if any, the motion to withdraw
5   filed by Mr. Smith, what effect that might have on proceeding to trial in May." (*Id.*) AUSA
6   Rossi told Judge Soto that "as far as dates or being prepared for trial, I think I'll leave that
7   to defense counsel at this time." (*Id.*) Mr. Flores told Judge Soto: "Well, it has no effect
8   for, I believe, us three being ready, Your Honor, based on Mr. Smith's contribution to our
9   work. So it won't affect us being ready at all." (Hr'g. Tr. 3/28/2022 at 10, Doc. 1397.)

10       However, Mr. Flores represented even though his client does not want to continue
11  the May 2022 trial, it was not a realistic date given the pending motions and additional
12  motions that the defense would likely be filing. (*Id.* at 8–9, 11.) Counsel for Moore agreed
13  that a continuance of the May trial was necessary. Counsel for Rakestraw also agreed that
14  a continuance was needed, but added that his client does not want a continuance. (*Id.* at
15  10–11.) Defense counsel proposed a no later than a mid-September 2022 trial date. (*Id.* at
16  12–13.)

17       Mr. Flores suggested to Judge Soto that Monteen could easily severed out of group
18  four and "put in another group without any effect on our group." (*Id.*) Judge Soto asked
19  AUSA Rossi if he had any objection to Mr. Flores' suggestion that Monteen "not being
20  part of group four" if her new counsel is not ready. (Hr'g. Tr. 3/28/2022 at 15, Doc. 1397.)
21  AUSA Rossi responded:

22       Normally, we wouldn't . . . [but] . . . as far as Defendant Monteen goes, the
23       only concern the government has is that the only other group that would make
         sense to put her in already has, I believe, five defendants. So our concern is
24       that if she's taken out of this group and put in the other group that's charged
         with the RICO offenses, that may be too many in the court's mind to have
25       one trial for all of them.

26  (*Id.* at 15.) Judge Soto noted that if he continued to the trial for the group four defendants
27  to September 2022, it was possible that Monteen's counsel could be ready. (*Id.*) Rossi
28  responded: "That is possible, Your Honor." (*Id.*)

There is no doubt that the government's refusal on March 28, 2022, to sever Monteen from trial group four was going to cause a lengthy delay of the trial for those defendants.  However, defense counsel wanted the trial continued to mid-September 2022 anyway because of the motions they planned to file and the other trial preparation that still needed to be done.  If counsel for the group four defendants represented that they were ready to go to trial in May 2022 without Monteen, and the government insisted that she should remain in group four and Judge Soto agreed, then AUSA Rossi's delay in reporting the Smith conflict would have been sole cause of the delay of the May 2022 trial date.  But that is not what happened.  Moreover, Monteen was in fact removed from trial group four shortly after being appointed new counsel.

All that said, the Court is of the view that AUSA Rossi's failure to timely convince Smith to withdraw or notify the Court of the conflict, and instead allowing the concurrent representation to continue for nine months, delayed the trials for all of the trial groups.  The Court believes that defense counsel were duty-bound to both bring the Smith conflict to Court's attention and explore whether Smith had disclosed confidential information (from Monteen or the JDA) with BR and the government.  The government has not made the latter an easy or expeditious task.  As a result, there has been a two-year delay in the trial of any defendant.[22]  Each necessary continuance of the trial for the group four defendants (which was the first group set for trial) pending the resolution of the conflict-related motions has had a domino effect on the timing of trials for the remaining trial groups.  And, as defense counsel point out, they have a spent considerable amount of time working on the conflict issue which could have been spent on trial preparation  This lengthy delay has been prejudicial even if only in the general sense that memories undeniably fade over time.  There is also prejudice in terms of the lengthy period of pre-trial detention for many of the

---

[22] For what it's worth, this Court's view is that the lengthy time period that it has taken to resolve the conflict-related motions is excludable delay under the Speedy Trial Act.  In fact, the Court recommended that the district court deny trial group four's motion to dismiss based on a Speedy Trial violation in which counsel argued that delay of the trial stemming from the conflict-related litigation was not excludable time.

1    defendants who have joined in the instant motion.

2            *Prejudice to the administration of justice*:

3            Finally, the Court concludes there has been prejudice to the administration of

4    justice.  Monteen's testimony best demonstrates that point.  When asked how she feels now

5    that she is aware that Smith helped BR provide the government with information to help

6    prosecute the case against her, she testified:  "Not good.  I mean, it makes it hard to trust

7    anybody representing me after that."  (*Id.*)  Monteen explained that:

8            [t]his is my first time ever having a lawyer and, I mean, after that, it did start
             off kind of bad once I knew that so it makes it hard just to kind of trust
9            anybody representing me.  The whole time I did think Jesse had the best
             interests, even without speaking for the [sic] months.  I never had a lawyer
10           before so I didn't know it wasn't normal.

11

12   (Hr'g Tr. 10/18/23 at 23–24, Doc. 2734.)

13           With respect to her current attorney, she testified:  "I don't really know who really

14   has the best interests and if you're fighting for me, how you should be."  (*Id.* at 24.)  She

15   still has worries that she does not really know how the process works because of how she

16   was treated by Smith, especially since her case is complicated and she put all her trust in

17   Smith "and he breached that trust[.]"  (*Id.* at 24–25.)

18           With respect to the government's involvement in Smith's conflict, her attorney

19   asked Monteen: "how does that affect  . . . your feeling about the judicial process, that the

20   government is alleged to have been involved in working with your attorney against you?"

21   (*Id.* at 26.)  Ms. Monteen responded:  " Yeah, I definitely don't trust it, and they're still

22   working on my case after dealing with Mr. Smith."  (*Id.*)

23           Ms. Monteen's difficulty trusting her new attorney, as well as her lack of trust in the

24   government and the judicial process, is understandable given the actions and inaction of

25   both Smith and AUSA Rossi.  In fact, given the government's involvement in the Smith

26   conflict, the other defendants who did not have conflicted counsel likely do not have

27   complete trust in the judicial process and/or that AUSA Rossi will fulfill his role as a

28   minister of justice.  For that reason, even if defense counsel still believe that AUSA Rossi

can fulfill that role, counsel likely felt compelled to file or obliged to join the motion to disqualify.  Defense counsel were faced with the difficult, if not impossible, task of trying to assure their clients that even though the lead prosecutor in their case did not respect Monteen's rights, counsel is confident that AUSA Rossi will respect their rights.  By filing the disqualification motion, the assurance that AUSA Rossi would respect the defendants' rights would come from the Court if the motion were denied.

A cynic may argue that no criminal defendant or defense attorney ever truly trusts the prosecutor(s).  While this Court is as cynical as they come, it is not that cynical.  In this Court's experience in the District of Arizona, defense attorneys do not view prosecutors as the enemy who will do anything to obtain a conviction.  The Court believes that defense attorneys, like the Ninth Circuit, recognize that "[t]he overwhelming majority of prosecutors are decent, ethical, honorable lawyers who understand the awesome power the wield, and the responsibility that goes with it."  *Kojayan*, 8 F.3d at 1324.  In fact, the Court suspects that defense attorneys routinely tell their clients as much.[23]

Defense attorneys in the District of Arizona rarely make allegations of prosecutorial misconduct.  In fact, this Court has never had to address a motion to disqualify a prosecutor on that basis.  The fact that defense counsel sought this drastic remedy reflects one or more of the following significant concerns: (1) defense counsel do not trust AUSA Rossi to be a minister of justice; (2) their clients do not trust Rossi to serve in that role; and/or (3) their clients may think that they are also in cahoots with the government.  None of those concerns may be valid.  But it is the appearance of impropriety that must be eliminated to ensure the integrity and fairness of the justice system.   Litigants and members of the public should not be given reason to doubt the integrity and fairness of the justice system or that the

---

[23] The Court does not have a personal relationship with AUSA Rossi, but he has appeared before the Court on countless occasions on this case and many others.  He has always been a consummate professional: respectful, courteous to all, well prepared, and a thoughtful, reasonable, and effective advocate for the government.  As a result, the Court was shocked to learn of the allegations against AUSA Rossi.  The Court suspects that defense counsel, at least up until this conflict mess surfaced, had a similar opinion of AUSA Rossi (and still may) and were also shocked to learn of how he dealt with the Smith conflict.

1   judicial process will honor fundamental constitutional rights.  Again, disqualification is the

2   proportionate sanction to achieve the required integrity and fairness of the justice system

3   and the judicial process.

4           Finally, although perhaps least importantly, the failure of AUSA Rossi to recognize

5   the conflict when it arose and notify the Court when Smith refused to do so caused a waste

6   of judicial resources.  The Court spent a considerable amount of time dealing with Smith's

7   pre-trial motions on Monteen's case which never should have been filed by conflicted

8   counsel.  As noted above, at that time the Court had a laundry list of pre-trial motions filed

9   by group four counsel that actually needed to be addressed well in advance of the May

10  2002 trial date.  The Court did not need to waste it time addressing any motion filed by

11  Smith, especially a pretend severance motion.

12          As should be apparent from the length of this Report and Recommendation, the

13  biggest time expenditure has been the litigation of the conflict-related motions for the past

14  two years, both of which stemmed from the government's failure to recognize Smith's

15  conflict in June 2021.  If Smith had withdrawn shortly after the June 2021 free talk, or if

16  AUSA Rossi had timely notified the Court of the conflict and the Court removed Smith as

17  Monteen's counsel, the concern over Smith sharing confidential information would have

18  minimal.  Any such concern would likely have been resolved among counsel without Court

19  involvement.  And there would have been no basis for defense counsel to file a motion to

20  disqualify AUSA Rossi; in fact, that thought would likely have never crossed their minds.

21          <u>Lack of Training and Supervision:</u>

22          "One of the most important responsibilities of the United States Attorney and his

23  senior deputies is ensuring that line attorneys are aware of the special ethical

24  responsibilities of prosecutors, and that they resist the temptation to overreach.  [T]raining

25  to impart awareness of constitutional rights is an essential function of an office . . . whose

26  administration of justice the public [relies on.]"  *Kojayan*, 8 F.3d at 1324 (internal

27  quotations and citations omitted).  To the extent AUSA Rossi's ethical lapses stemmed

28  from insufficient training, the *only* positive thing that can result from Smith's conflict

1    fiasco is that the United States Attorney's Office will take its responsibility seriously and

2    provide the needed training.

3         There was clearly a lack of supervision and control exercised by AUSA Rossi's

4    superiors.  AUSA Rossi's supervisors apparently knew little about the Smith conflict.

5    AUSA Vercauteren has no specific recollection of discussing the conflict with AUSA

6    Rossi.  He testified that he vaguely recalls discussing an ethical issue with an AUSA, but

7    that conversation may have been with a different AUSA on a different case.  If AUSA

8    Vercauteren discussed the Smith conflict with AUSA Rossi, that should have been a

9    memorable (or at least documented) discussion because the blatant conflict is so shocking.

10   If AUSA Vercauteren and AUSA Rossi never discussed the Smith conflict, then it is

11   shocking how little supervision was occurring in a case of this scale and magnitude.

12        Ms. Seger does not recall discussing the Smith conflict or potential conflict with

13   AUSA Rossi in June 2021 or in August 2021.  Based solely on the December 6, 2021,

14   email which was provided to her prior to her testimony, she does recall a discussion with

15   AUSA Rossi about that issue in early December 2021.  Although Ms. Seger testified that

16   she told AUSA Rossi about how she handled a conflict situation in another case, she never

17   followed up with AUSA Rossi to see if he addressed the Smith conflict issue.  She simply

18   assumed that AUSA Rossi would handle it.  In fact, she litigated motions against Smith

19   even though she did not know if AUSA Rossi had dealt with the conflict, let alone if he

20   dealt with it appropriately.  Ms. Seger made clear that she was leaving the office shortly

21   and essentially "had one foot out the door."  Thus, it appears that AUSA Rossi's superiors

22   and experienced co-counsel left him flying solo in the latter half of 2021 into early 2022

23   on a massive case; unfortunately for AUSA Rossi and everyone involved, he crashed and

24   burned.[24]

---

25
26   [24] The Court declines to find that AUSA Rossi testified falsely that he discussed the conflict
     issue with Ms. Seger after the first free talk or with AUSA Vercauteren after the third free talk.
27   Seger testified that she cannot recall every conversation with Rossi so it's possible they had
     conversations prior to their conversation in early December 2021.  Vercauteren testified that he
28   cannot specifically recall speaking with Rossi about the conflict, but it is possible that they had
     that discussion.  Frankly, based on the Court's involvement in this case for the past five years, it

"The Department of Justice has an obligation to its lawyers and to the public to prevent prosecutorial misconduct." *United States v. Lopez-Avila*, 678 F.3d 955, 964 (9th Cir. 2012). "When a prosecutor steps over the boundaries of proper conduct and into unethical territory, the government has a duty to own up to it and to give assurances that it will not happen again." *Lopez-Avila*, 678 F.3d at 965. As discussed earlier, there is barely "a hint of appreciation of the seriousness of the misconduct[.]" *Id.* Instead, the government minimizes and tries to justify AUSA Rossi's actions and inactions, shifts the blame to Smith (which he admittedly deserves as well), expresses umbrage at defense counsel for impugning AUSA Rossi's reputation, and says "no harm, no foul" because the government believes the defendants have not been prejudiced. The government routinely argues at sentencings that defendants have not sufficiently accepted responsibility for their misdeeds to assure the court that they will not be repeated. What's good for the goose is good for the gander.

## CONCLUSION

Based on the discussion above, the Court concludes that constitutional and ethical violations are clear and convincing evidence of prosecutorial misconduct. The government's request that the Court rebuke or chastise AUSA Rossi is not a sufficient sanction for the misconduct, the lack of supervision that likely led to the misconduct, and the government's continued failure to appreciate the seriousness of the misconduct. Disqualification of AUSA Rossi from further participation in the prosecution of these defendants is the proportionate sanction, especially given that there are two other AUSAs who have been involved in this case for over two years. These AUSAs have capably litigated many pre-trial motions before this Court and have demonstrated a mastery of the facts of the government's case against the defendants. Moreover, the United States Attorney for the District of Arizona fought hard to ensure that his AUSAs from the District of Arizona served as Firewall Counsel to litigate conflict-related motions. In fact, he

---

is hard to believe that AUSA Rossi was not consulting with supervisors and co-counsel. The nature of the charges in this case requires the government to obtain the papal blessing from Main Justice on many matters. The government has told the Court as much on multiple occasions.

assigned two AUSAs to do so.  The United States Attorney's Office can surely spare another AUSA to assist in the prosecution of this case.  Thus, there is no doubt that the government will be competently, effectively, and adequately represented at trial and will be not prejudiced by the disqualification of AUSA Rossi.

### **RECOMMENDATION**

For the reasons delineated above, the Magistrate Judge recommends that the District Judge enter an order **GRANTING** the Motion to Disqualify Assistant U.S. Attorney Rossi (Doc. 2895).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, a party may normally serve and file written objections within fourteen (14) days after being served with a copy of a Report and Recommendation.  However, in light of the abbreviated time before trial for the group four defendants, **objections shall be due on or before May 15, 2024** and **any responses to objections shall be due on or before May 17, 2024**.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-18-01695-TUC-JAS**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 10th day of May, 2024.

Eric J. Markovich
United States Magistrate Judge